No. 24-1367

# In the United States Court of Appeals for the Seventh Circuit

AMYA SPARGER-WITHERS, on behalf of herself and all others similarly situated,
Plaintiff-Appellant,

*v.*

JOSHUA N. TAYLOR, et al., Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Indiana (Civ. No. 21-2824)
(Hon. James R. Sweeney II)

**BRIEF OF APPELLANT AND SHORT APPENDIX**

Anthony B. Sanders
INSTITUTE FOR JUSTICE
12143 24th St N
Lake Elmo, MN 55042
Telephone: 651.278.0257
E-mail: asanders@ij.org

J. Lee McNeely
Cynthia A. Bedrick
Scott A. Milkey
MCNEELYLAW LLP
2177 Intelliplex Drive, Suite 251
Shelbyville, IN 46176
Telephone: 317.825.5110
E-mail:   LMcNeely@McNeelyLaw.com
          CBedrick@McNeelyLaw.com
          SMilkey@McNeelyLaw.com

Samuel B. Gedge
    *Counsel of Record*
Michael N. Greenberg
Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321
E-mail:   sgedge@ij.org
          mgreenberg@ij.org
          rbelden@ij.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1367</u>

Short Caption: <u>Amya Sparger-Withers v. Joshua Taylor, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Amya Sparger-Withers. (Mr. Gedge also has been appointed counsel for the certified class. Dist. Ct. Doc. 88, at 16.)</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>(a) Institute for Justice (b) McNeelyLaw LLP [The original disclosure statement included a space between "McNeely"</u>

<u>and "Law," which has been corrected in this statement]</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Samuel B. Gedge</u>    Date: <u>4/22/2024</u>

Attorney's Printed Name: <u>Samuel B. Gedge</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: <u>Institute for Justice, 901 N. Glebe Road, Suite 900</u>

    <u>Arlington, VA 22203</u>

Phone Number: <u>703.682.9320</u>    Fax Number: <u>703.682.9321</u>

E-Mail Address: <u>sgedge@ij.org</u>

rev. 12/19 AK

Save As          Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua Taylor, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        Amya Sparger-Withers. (Mr. Greenberg also has been appointed counsel for the certified class. Dist. Ct. Doc. 88,

        at 16.)

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
         (a) Institute for Justice (b) McNeelyLaw LLP [The original disclosure statement included a space between "McNeely"

        and "Law," which has been corrected in this statement]

(3)     If the party, amicus or intervenor is a corporation:

        i)          Identify all its parent corporations, if any; and

                   N/A

        ii)         list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

                   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: /s/ Michael N. Greenberg          Date: 4/22/2024

Attorney's Printed Name:  Michael N. Greenberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  Institute for Justice, 901 N. Glebe Road, Suite 900

          Arlington, VA 22203

Phone Number: 703.682.9320                    Fax Number:  703.682.9321

E-Mail Address: mgreenberg@ij.org

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua Taylor, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Amya Sparger-Withers. (Mr. Belden also has been appointed counsel for the certified class. Dist. Ct. Doc. 88, at 16.)

_____

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 (a) Institute for Justice (b) McNeelyLaw LLP [The original disclosure statement included a space between "McNeely"

and "Law," which has been corrected in this statement]

(3)      If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and
N/A

ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Robert M. Belden          Date: 4/22/2024

Attorney's Printed Name:  Robert M. Belden

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes ☐      No ☑

Address:  Institute for Justice, 901 N. Glebe Road, Suite 900

Arlington, Virginia  22203

Phone Number: 703.682.9320          Fax Number:  703.682.9321

E-Mail Address: rbelden@ij.org

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1367</u>

Short Caption: <u>Amya Sparger-Withers v. Joshua Taylor, et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [✓]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Amya Sparger-Withers. (Mr. Sanders also has been appointed counsel for the certified class. Dist. Ct. Doc. 88, at 16.)</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>(a) Institute for Justice (b) McNeelyLaw LLP [The original disclosure statement included a space between "McNeely"</u>

<u>and "Law," which has been corrected in this statement]</u>

(3)   If the party, amicus or intervenor is a corporation:

    i)   Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

---

Attorney's Signature: <u>/s/ Anthony B. Sanders</u>    Date: <u>4/22/2024</u>

Attorney's Printed Name: <u>Anthony B. Sanders</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: <u>Institute for Justice, 12143 24th St. N.</u>

        <u>Lake Elmo, MN 55042</u>

Phone Number: <u>651.278.0257</u>    Fax Number: <u>N/A</u>

E-Mail Address: <u>asanders@ij.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>24-1367</u>

Short Caption: <u>Amya Sparger-Withers v. Joshua Taylor, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Amya Sparger-Withers.

 

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    (a) Institute for Justice (b) McNeelyLaw LLP

 

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/ J. Lee McNeely</u>    Date: <u>4/22/2024</u>

Attorney's Printed Name: <u>J. Lee McNeely</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: <u>McNeelyLaw LLP, 2177 Intelliplex Drive, Suite 251</u>

    <u>Shelbyville, IN 46176</u>

Phone Number: <u>317.825.5110</u>    Fax Number: <u>317.825.5109</u>

E-Mail Address: <u>LMcNeely@McNeelyLaw.com</u>

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua Taylor, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amya Sparger-Withers.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

(a) Institute for Justice (b) McNeelyLaw LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Cynthia A. Bedrick    Date: 4/22/2024

Attorney's Printed Name:  Cynthia A. Bedrick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✓]

Address:  McNeelyLaw LLP, 2177 Intelliplex Drive, Suite 251

Shelbyville, IN 46176

Phone Number: 317.825.5110    Fax Number:  317.825.5109

E-Mail Address: CBedrick@McNeelyLaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua Taylor, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amya Sparger-Withers.

 

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

(a) Institute for Justice (b) McNeelyLaw LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Scott A. Milkey    Date: 4/22/2024

Attorney's Printed Name: Scott A. Milkey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: McNeelyLaw LLP, 2177 Intelliplex Drive, Suite 251

Shelbyville, IN 46176

Phone Number: 317.825.5110    Fax Number: 317.825.5109

E-Mail Address: SMilkey@McNeelyLaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

Statement of jurisdiction ............................................................................................ 1

Statement of the issue................................................................................................. 2

Statement of the case ................................................................................................. 2

      A.     Indiana's civil-forfeiture statutes........................................................ 2

      B.     Joshua Taylor's civil-forfeiture practice ......................................... 4

      C.     Procedural history ............................................................................. 7

Summary of argument ................................................................................................ 9

Standard of review.................................................................................................... 11

Argument.................................................................................................................... 11

I.     Defendants' system of contingency-fee forfeiture prosecutors violates the Due
Process Clause .................................................................................................... 11

      A.     The Supreme Court's decision in *Marshall* v. *Jerrico* confirms a due-
process standard constraining prosecutors' financial self-interest.............. 11

      B.     Defendants' system of contingency-fee forfeitures contravenes the Due
Process Clause's limit on financially self-interested prosecutors ................ 17

      C.     The contrary arguments offered by the district court and Defendants
lack merit ................................................................................................ 21

            1.     The district court's interpretation of *Marshall* was
unprecedented and wrong .................................................................. 22

            2.     The district court erred in "proceed[ing] on a hypothetical" and
viewing itself as "free to choose its own standard." ........................... 26

            3.     The district court's False Claims Act analogy was unsound ............ 36

            4.     Defendants' remaining arguments were flawed ................................. 39

II.     The federal courts have the power to hear this case ....................................44

        A.      Amya Sparger-Withers had standing when the case was filed ..................... 44

        B.      The case continued to present a live controversy when the district court
                certified the class and does so still ................................................................... 44

                1.      Joshua Taylor's act of voluntary cessation did not moot Sparger-
                        Withers's individual claim ........................................................................ 45

                2.      Even had Sparger-Withers's individual claim been mooted, the
                        case falls within two class-action-specific exceptions to the
                        mootness doctrine ...................................................................................... 47

Conclusion ................................................................................................................................. 49

# TABLE OF AUTHORITIES

**Page**(s)

C<span>ASES</span>

*Abbott* v. *State,*
    183 N.E.3d 1074 (Ind. 2022)............................................................................. 2

*Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ...................................................................................... 40

*Alpha Epsilon Phi Tau Chapter Hous. Ass'n* v. *City of Berkeley,*
    114 F.3d 840 (9th Cir. 1997).......................................................................... 27

*Am. Bankers Mgmt. Co.* v. *Heryford,*
    885 F.3d 629 (9th Cir. 2018).......................................................................... 39

*Baca* v. *Padilla,*
    190 P. 730 (N.M. 1920)................................................................................. 30

*Baran* v. *Port of Beaumont Nav. Dist. of Jefferson Cnty.,*
    57 F.3d 436 (5th Cir. 1995)............................................................................ 16

*Berger* v. *United States,*
    295 U.S. 78 (1935)........................................................................................ 18

*Biemel* v. *State,*
    37 N.W. 244 (Wis. 1888) .............................................................................. 30

*Brucker* v. *City of Doraville,*
    38 F.4th 876 (11th Cir. 2022)............................................................14, 15, 16, 17

*C.R.M.* v. *State,*
    799 N.E.2d 555 (Ind. Ct. App. 2003) ............................................................. 46

*Caperton* v. *A.T. Massey Coal Co.,*
    556 U.S. 868 (2009)................................................................................. 16, 41

*Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah,*
    508 U.S. 520 (1993)...................................................................................... 25

*Ciarpaglini* v. *Norwood,*
    817 F.3d 541 (7th Cir. 2016) ..................................................................... 45, 46

*City & Cnty. of San Francisco* v. *Philip Morris, Inc.*,
  957 F. Supp. 1130 (N.D. Cal. 1997) ................................................................. 40-41

*Cochise Consultancy, Inc.* v. *United States ex rel. Hunt*,
  139 S. Ct. 1507 (2019) ........................................................................................ 38

*Coleman* v. *Town of Brookside*,
  No. 22-cv-423, 2023 WL 5767749 (N.D. Ala. Mar. 23, 2023) ............................ 16

*Cox* v. *Voyles*,
  No. 15-cv-1386, 2017 WL 11205981 (D. Ariz. Aug. 18, 2017) ........................... 16

*Doe ex rel. Doe* v. *Elmbrook Sch. Dist.*,
  658 F.3d 710 (2011), *adopted in relevant part*, 687 F.3d 840 (7th Cir. 2012) ................ 45

*Epps* v. *Creditnet, Inc.*,
  320 F.3d 756 (7th Cir. 2003) ............................................................................... 11

*Espenscheid* v. *DirectSat USA, LLC*,
  688 F.3d 872 (7th Cir. 2012) ............................................................................... 48

*FBI* v. *Fikre*,
  144 S. Ct. 771 (2024) ..................................................................................... 45, 46

*Flora* v. *Sw. Iowa Narcotics Enf't Task Force*,
  292 F. Supp. 3d 875 (S.D. Iowa 2018) ................................................................ 16

*Freeport-McMoRan Oil & Gas Co.* v. *FERC*,
  962 F.2d 45 (D.C. Cir. 1992) .......................................................................... 18, 39

*Gacho* v. *Wills*,
  986 F.3d 1067 (7th Cir. 2021) ........................................................................ 11, 41

*Georgia* v. *McCollum*,
  505 U.S. 42 (1992) ............................................................................................... 40

*Greater Ga. Amusements, LLC* v. *State*,
  728 S.E.2d 744 (Ga. Ct. App. 2012) ...................................................................... 4

*Harjo* v. *City of Albuquerque*,
  326 F. Supp. 3d 1145 (D.N.M. 2018) .............................................................. 15, 17

*Herr* v. *U.S. Forest Serv.*,
 803 F.3d 809 (6th Cir. 2015) ............................................................. 25

*Hill* v. *City of Seven Points*,
 31 F. App'x 835 (5th Cir. 2002) ......................................................... 16

*Horner* v. *Curry*,
 125 N.E.3d 584 (Ind. 2019) ................................................................. 3

*Hughley* v. *State*,
 15 N.E.3d 1000 (Ind. 2014) ........................................................ 2, 3, 38

*Hurd* v. *People*,
 25 Mich. 405 (1872) ........................................................................... 30

*Imbler* v. *Pachtman*,
 424 U.S. 409 (1976) ........................................................................... 35

*In re McKinney*,
 948 N.E.2d 1154 (Ind. 2011) .............................................. 3, 19, 21, 42

*Kincaid* v. *District of Columbia*,
 854 F.3d 721 (D.C. Cir. 2017) ...................................................... 28, 35

*Marshall* v. *Jerrico, Inc.*,
 446 U.S. 238 (1980) .................................................................. *passim*

*Mathews* v. *Eldridge*,
 424 U.S. 319 (1976) ........................................................................... 26

*McNeil* v. *Cmty. Prob. Servs., LLC*,
 No. 18-cv-33, 2021 WL 365844 (M.D. Tenn. Feb. 3, 2021) ............... 16

*Medina* v. *California*,
 505 U.S. 437 (1992) ..................................................................... 26, 29

*Mendenhall* v. *Goldsmith*,
 59 F.3d 685 (7th Cir. 1995) ............................................................... 35

*Milwaukee Police Ass'n* v. *Bd. of Fire & Police Comm'rs*,
 708 F.3d 921 (7th Cir. 2013) ............................................................. 44

*Nelson* v. *Colorado*,
 581 U.S. 128 (2017) ........................................................................... 27

*Nielsen* v. *Preap*,
   139 S. Ct. 954 (2019)..................................................................47

*Olson* v. *Brown*,
   594 F.3d 577 (7th Cir. 2010).....................................................47

*Regina* v. *Thursfield*,
   8 Eng. Rep. 490 (1838).............................................................30

*Sargent* v. *State*,
   27 N.E.3d 729 (Ind. 2015)...........................................................3

*Seminole Tribe of Fla.* v. *Florida*,
   517 U.S. 44 (1996).....................................................................24

*Serrano* v. *Customs & Border Patrol*,
   975 F.3d 488 (5th Cir. 2020).....................................................48

*State* v. *Henning*,
   33 Ind. 189 (1870)......................................................................30

*State* v. *Timbs*,
   134 N.E.3d 12 (Ind. 2019)......................................................3, 38

*State* v. *Town of Dover*,
   9 N.H. 468 (1838).......................................................................30

*Susman* v. *Lincoln Am. Corp.*,
   587 F.2d 866 (7th Cir. 1978).....................................................48

*Torres* v. *Goddard*,
   793 F.3d 1046 (9th Cir. 2015)...................................................38

*Trinity Lutheran Church of Columbia, Inc.* v. *Comer*,
   582 U.S. 449 (2017)...................................................................45

*Tumey* v. *Ohio*,
   273 U.S. 510 (1927)........................................................11, 12, 23

*United States* v. *Honeywell Int'l Inc.*,
   47 F.4th 805 (D.C. Cir. 2022)................................................36-37

*United States* v. *James Daniel Good Real Prop.*,
    510 U.S. 43 (1993)..................................................................... 28

*United States* v. *Quiros*,
    No. 19-cr-76, 2020 WL 519807 (D. Vt. Jan. 28, 2020) .............. 16

*United States ex rel. Kelly* v. *Boeing Co.*,
    9 F.3d 743 (9th Cir. 1993)...............................22, 37, 38, 39, 40

*United States ex rel. Polansky* v. *Exec. Health Res., Inc.*,
    599 U.S. 419 (2023)................................................................. 37

*Vt. Agency of Nat. Res.* v. *United States ex rel. Stevens*,
    529 U.S. 765 (2000)........................................................36, 37, 38

*Ward* v. *Vill. of Monroeville*,
    409 U.S. 57 (1972)................................................................... 12

*Williams* v. *Pennsylvania*,
    579 U.S. 1 (2016)..................................................................... 27

*Withrow* v. *Larkin*,
    421 U.S. 35 (1975)................................................................... 16

*Wolkenstein* v. *Reville*,
    694 F.2d 35 (2d Cir. 1982) ...................................................... 16

*Young* v. *United States ex rel. Vuitton et Fils S.A.*,
    481 U.S. 787 (1987)......................................................21, 23, 29, 41

**STATUTES, REGULATIONS AND CODES**

Indiana Civil Forfeiture Statute, Ind. Code tit. 34, art. 24, ch. 1:

    §§ 34-24-1-1 *et seq.* ................................................................... 2
    § 34-24-1-1(a) ........................................................................... 2
    § 34-24-1-2(a)(3)....................................................................... 39
    § 34-24-1-2(k)........................................................................... 43
    § 34-24-1-4(a) ............................................................................ 3
    § 34-24-1-4(d)(1)-(2) ................................................................ 7
    § 34-24-1-5(a) ............................................................................ 3
    § 34-24-1-8(a) ............................................................................ 4
    § 34-24-1-8(e) ........................................................................ 4, 6

Indiana Racketeering Forfeiture Statute, Ind. Code tit. 34, art. 24, ch. 2:

§§ 34-24-2-1 *et seq.* ....................................................................... 2
§ 34-24-2-2(a) ................................................................................. 2
§ 34-24-2-2(d) ................................................................................. 7
§ 34-24-2-2(e)(1) ............................................................................. 3
§ 34-24-2-8 ..................................................................................... 6

Ind. Pub. L. No. 47-2018 ................................................................... 4

Ind. Trial Rule 41(A)(2) .................................................................... 45

## OTHER AUTHORITIES

1 Joel Prentiss Bishop, *Commentaries on the Law of Criminal Procedure* (1866).....30, 36

1 Wm. & Mary, 2d Sess., ch. 2 (1689), in 6 Statutes of the Realm 143 (reprint 1963)..........31

2 Cong. Rec. (1874) .........................................................................32

28 Cong. Rec. (1896) .....................................................................33, 34

*Annual Report of the Attorney-General of the United States* (1873)..................33

*Annual Report of the Attorney-General of the United States* (1879)..................33

*Annual Report of the Secretary of the Treasury* (1874).........................................32

Br. of Appellants, *Marshall* v. *Jerrico, Inc.*,
No. 79-253, 1980 WL 339540 (U.S. Jan. 1980) .............................................12, 24

Br. of Garrison Law Firm L.L.C. Supp. Mot. Summ. J.,
*Economan* v. *Cockrell*, No. 20-cv-32 (N.D. Ind. Feb. 28, 2023) (Doc. 161) ...................40

David B. Smith, *Prosecution and Defense of Forfeiture Cases* (2018)...................................3

Dep't of Justice, *DOJ Seal – History and Motto*,
https://tinyurl.com/ynccr5zm...................................................................30

Dep't of Justice, Letter to Courts (Apr. 20, 2023)
https://tinyurl.com/8d5wxf6z ...................................................................16

Edward Coke, *The Third Part of the Institutes of the Laws of England* ..................... 29-30

*Findings and Report on Civil Drug Forfeitures in Division 2,*
*Including a Limited Number of Cases in the Other Four Divisions*
*of the Delaware Circuit Court* (Ind. Cir. Ct., Delaware Cnty. Aug. 18, 2008)..............19

Lois G. Schwoerer, *The Declaration of Rights, 1689* (1981) ..................................................31

Louis S. Rulli, *Prosecuting Civil Asset Forfeiture on Contingency Fees: Looking for*
*Profit in All the Wrong Places*, 72 Ala. L. Rev. 531 (2021) ..........................................3-4

Merriam-Webster.com..............................................................................................................25

Nicholas R. Parillo, *Against the Profit Motive: The Salary Revolution in*
*American Government, 1780-1940* (2013).........................................................31, 32, 33, 34

Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted*
*Inaction*, 65 Yale L.J. 209 (1955) ...................................................................................35

Statement of Interest of the United States, *Coleman* v. *Town of Brookside*,
No. 22-cv-423 (N.D. Ala. July 26, 2022) (Doc. 56)........................................................17

Tr. of Oral Arg., *Marshall* v. *Jerrico, Inc.*, No. 79-253 (Mar. 19, 1980),
https://tinyurl.com/5yt7fxvm ...........................................................................................24

## STATEMENT OF JURISDICTION

The U.S. District Court for the Southern District of Indiana had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 because it arises under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

This Court's jurisdiction is based on 28 U.S.C. § 1291. The district court entered final judgment on February 7, 2024. App. 22-25. No motion was filed that tolled the time within which to appeal. On behalf of herself and the certified class, Plaintiff Amya Sparger-Withers filed her notice of appeal on March 7, 2024. Doc. 139.[1]

---

[1] "Doc." signifies documents on the district-court docket, and page citations are to the PDF page number in the automatically generated header at the top of the filed document.

## STATEMENT OF THE ISSUE

This case is a certified class action challenging a systemic defect in Indiana's system of civil forfeiture: Unlike every other state in the nation, some (though not all) prosecuting attorneys in Indiana outsource civil-forfeiture prosecutions to private lawyers on a contingency-fee basis. By design, this arrangement gives the prosecutor a personal monetary stake in his or her cases. Forfeit more, earn more. Forfeit less, earn less. Forfeit nothing, earn nothing.

In upholding this system, the district court broke with the views of several federal courts—and the Department of Justice—and held that the Due Process Clause places no limit on the degree to which prosecutors may be financially self-interested in the cases they prosecute. The issue presented on appeal is whether Defendants' system of contingency-fee forfeiture prosecutions violates the Due Process Clause.

## STATEMENT OF THE CASE

### A.    Indiana's civil-forfeiture statutes

1.    Like many states, Indiana has a civil-forfeiture regime allowing it to sue to confiscate property linked to certain crimes. Ind. Code §§ 34-24-1-1 *et seq.* (Civil Forfeiture Statute); *id.* §§ 34-24-2-1 *et seq.* (Racketeering Forfeiture Statute). These actions "typically proceed under either the general forfeiture statute in Indiana Code chapter 34-24-1, or the Racketeering Forfeiture Statute in Indiana Code chapter 34-24-2." *Abbott* v. *State*, 183 N.E.3d 1074, 1079 (Ind. 2022). And although they proceed in civil court, the cases "have significant criminal and punitive characteristics." *Hughley* v. *State*, 15 N.E.3d 1000, 1005 (Ind. 2014). To forfeit property, the state must show that the property is connected to one of a list of predicate crimes. Ind. Code §§ 34-24-1-1(a), 34-24-2-2(a). In turn, an owner can

recover the property only if she "did not know of the illegal use." *Id.* § 34-24-1-5(a); *see also id.* §§ 34-24-1-4(a), 34-24-2-2(e)(1). In these ways, the civil-forfeiture laws "focus[] on the owner's involvement in a crime," *State* v. *Timbs*, 134 N.E.3d 12, 24 (Ind. 2019), and amount to "criminal-like penalties," *Hughley*, 15 N.E.3d at 1005.

The system is "punitive and profitable." *Timbs*, 134 N.E.3d at 21. And vulnerable to abuse. The Indiana Supreme Court has characterized "the way Indiana carries out civil forfeitures" as "concerning." *Id.* at 31. Individual members of that court have noted "over-reach," *Sargent* v. *State*, 27 N.E.3d 729, 735 (Ind. 2015) (Massa, J., dissenting); have likened civil forfeiture to a "law enforcement Weapon[] of Mass Destruction," *id.*; and have voiced "serious concerns with the way Indiana carries out civil forfeitures," *Horner* v. *Curry*, 125 N.E.3d 584, 612 (Ind. 2019) (Slaughter, J., concurring in the judgment).

2.    In one respect, Indiana is unique: Some (though not all) prosecutors in Indiana outsource civil-forfeiture cases to private lawyers on a contingency-fee basis. These arrangements inject direct financial self-interest into the justice system, and they have become notorious. A leading civil-forfeiture treatise describes them as "an institutionalized bounty hunter system" and a "scandal." David B. Smith, *Prosecution and Defense of Forfeiture Cases* ¶ 1.01, at 1-13 (2018). They have even led to attorney discipline: In 2011, the Delaware County Prosecuting Attorney had his license suspended for having abdicated "his duties as a public official" in service of "the private gain he realized in . . . forfeiture proceedings." *In re McKinney*, 948 N.E.2d 1154, 1155 (Ind. 2011) (per curiam).

Even so, Indiana remains a "defiant outlier." Louis S. Rulli, *Prosecuting Civil Asset Forfeiture on Contingency Fees: Looking for Profit in All the Wrong Places*, 72 Ala. L.

Rev. 531, 561 (2021).[2] In 2018, in fact, the legislature doubled down, codifying contingency-fee forfeitures into statute. Ind. Pub. L. No. 47-2018, § 5. The Civil Forfeiture Statute provides explicitly that county prosecutors "may retain an attorney to bring an action under this chapter." Ind. Code § 34-24-1-8(a). And those attorneys "must" be paid on contingency fee. *Id.* § 34-24-1-8(e) (setting percentages); *id.* (providing that a court may authorize higher compensation if a case is unusually complex or time-consuming).

**B.     Joshua Taylor's civil-forfeiture practice**

1.     Defendant Joshua Taylor is one of the most prolific contingency-fee forfeiture prosecutors in Indiana; today, he prosecutes civil-forfeiture actions across twenty counties. App. 60-61 (seventeen counties); Doc. 120-3, at 98-115 (three new counties).

Taylor's practice descends directly from one of the pioneers of contingency-fee forfeitures, his mentor J. Gregory Garrison. In the 1980s, Garrison contracted with Marion County to take over its forfeiture docket. Doc. 120-5, at 16. From the start, Garrison was paid based on the amount of property he forfeited. Doc. 120-5, at 16. Within a few years, though, Marion County took its forfeitures back in-house; during his candidacy, the county's new prosecutor had declared, "I don't think any one individual should get rich off of the prosecution of criminals." Doc. 120-7, at 3.

---

[2] For a time, some jurisdictions in Georgia used private, contingency-fee lawyers to prosecute civil-forfeiture actions. In 2012, the Georgia Court of Appeals held those arrangements "repugnant" and "void as against Georgia public policy." *Greater Georgia Amusements, LLC* v. *State*, 728 S.E.2d 744, 747. Today, we understand that one county on Long Island uses contingency-fee counsel to prosecute certain forfeiture cases.

But Garrison had already expanded; by 1990, he was prosecuting forfeitures in twenty jurisdictions. Doc. 120-5, at 35-36. Over the next three decades, his book of business often tracked the political winds; he would get forfeiture contracts when his political allies won elections and lose them when his political adversaries did. Doc. 120-5, at 17-18, 30, 33.

Garrison's forfeiture work earned him substantial sums. In Lake County alone, he would make $100,000 annually in the early 1990s. Doc. 120-8, at 3. A single forfeiture case in 2009 earned him a contingency fee of around $650,000. Doc. 120-5, at 59. That same year, he took in another $125,000 from forfeitures in Marion County alone. Doc. 120-5, at 58. (He lost that contract soon after, when the politics changed once more. Doc. 120-5, at 32.) And at deposition in this case, Garrison freely admitted the obvious: Pursuing forfeiture cases on contingency fee fundamentally alters the prosecuting lawyer's incentives. *E.g.*, Doc. 120-5, at 46 ("[T]he incentive which is consistent with your performance is a very different operation."); Doc. 120-5, at 57 ("Q. . . . So am I understanding you correctly that when we talk about the incentive, the idea is that for these outside lawyers, they have an incentive to do a job and to forfeit as much money as possible because their -- their finances are on the line. Is that -- am I getting that correctly? A. That's correct.").

Around 2010, Garrison hired Joshua Taylor, who soon became his right-hand man in forfeiture actions. Doc. 120-5, at 70; Doc. 120-5, at 7 ("I taught him all he knows, pretty much, . . . ."). In 2019, Taylor assumed Garrison's book of forfeiture clients—seventeen counties—and executed contingency-fee contracts of his own. Doc. 120-4, at 7-8.

2.     Across the counties, Taylor's forfeiture contracts are materially identical to one another. Doc. 120-3, at 2-115 (the contracts). For each, the signatories are Joshua

Taylor and the respective prosecuting attorney. *E.g.*, App. 32 (Hancock County). For each, Taylor "agrees to represent the State of Indiana and provide Legal Services" in prosecuting actions under Indiana's Civil Forfeiture Statute and Racketeering Forfeiture Statute. App. 27. For each, Taylor's prosecutorial duties "include[], but [are] not limited to, the drafting and filing of a post-seizure probable cause affidavit, drafting and filing of the complaint and all required subsequent pleadings, the taking of depositions and other discovery, attendance at pretrial conferences, hearings, and trial, and the drafting of any settlement Contracts." App. 27. For each, Taylor has unilateral authority to make "[d]ecisions to enter into a settlement agreement" or "to proceed to trial." App. 28.

The agreements also provide for compensation by contingency fee. Consistent with Indiana Code § 34-24-1-8(e), Taylor's compensation for prosecuting cases under the Civil Forfeiture Statute is calculated as follows:

> ➤ Thirty percent of the first $10,000 of the proceeds or money obtained under a settlement or judgment;

> ➤ Twenty percent of the part of the proceeds or money obtained under a settlement or judgment that is more than $10,000 and less than $100,000; and

> ➤ Fifteen percent of the part of the proceeds or money obtained under a settlement or judgment that equals or exceeds $100,000.

App. 29. Unlike actions under the Civil Forfeiture Statute, actions under Indiana's Racketeering Forfeiture Statute have no statutory cap on contingency-fee percentages. *Compare* Ind. Code § 34-24-1-8(e), *with id.* § 34-24-2-8. For those cases, Taylor's agreements set an across-the-board fee of thirty percent. App. 29.

3.     Forfeiture prosecutions now comprise most of Taylor's law practice. Doc. 120-4, at 10. Since 2019 (while he was still working under Garrison), he has forfeited over $2.4 million in currency, all on contingency fee. Doc. 120-13, at 14; Doc. 120-14, at 4; Doc. 120-15, at 3. He also earns contingency fees from the "proceeds" of forfeited non-currency property. Ind. Code §§ 34-24-1-4(d)(1)-(2), 34-24-2-2(d). Along with his contingency fees from forfeited currency, his prosecutions since 2019 have earned him (or the Garrison Law Firm) a percentage of the resale value of, among many other items: 63 vehicles, a parcel of real estate, one John Deere lawnmower, an array of jewelry (watches (6), rings (5), bracelets (2), and pairs of earrings (2)), several fishing reels, a clay-target thrower, two guitars, four televisions, three speakers, a Ring doorbell, a PlayStation console, $110 in Xbox gift cards, $3,000 in redeemed lottery tickets, and a YETI® cooler. Docs. 120-13, -14, -15.

**C.     Procedural history**

1.     In February 2021, the State of Indiana—represented by Taylor—filed an action under the Civil Forfeiture Statute captioned *State of Indiana* v. *Amya A. Sparger and $6,096.00 in US Currency*. Doc. 121, at 18. Of the currency sought, around $2,000 had been earned by Amya Sparger-Withers from customizing and selling clothing items. Doc. 121, at 18. (She invoked the Fifth Amendment in response to questions at deposition about the other approximately $4,000.) Under his contingency-fee contract with the Hancock County Prosecutor, Taylor stood to profit personally from prosecuting the case; if any of the currency were to be forfeited, he would take thirty percent. Doc. 121, at 18.

2.a.     Amya Sparger-Withers filed this putative class action on November 10, 2021, challenging Taylor's contingency-fee arrangements and the underlying statute and naming

as defendants Taylor and the county prosecutors with whom he had contingency-fee contracts. Doc. 1. Also on November 10, Sparger-Withers moved for class certification. Doc. 6. Taylor was served with process the following Monday, November 15. Doc. 33, at 1.

At 8:41 the next morning, Taylor filed a two-sentence motion to voluntarily dismiss the state-court forfeiture case against Sparger-Withers; the state "no longer wishes to prosecute this cause," he advised. Doc. 46-6, at 2. The state court dismissed the case a day later. Doc. 46-7. Taylor and his co-defendants then moved to dismiss this action under Rule 12(b)(1), contending that Taylor's dismissal of the state-court forfeiture case against Sparger-Withers extinguished any justiciable controversy. Doc. 46.

b.     In September 2022, the district court denied the motion to dismiss and held that the case presented a live controversy under the "inherently transitory" doctrine. App. 37-40. The court also certified a class under Rule 23(b)(2) covering all current and future defendants in Taylor-prosecuted civil-forfeiture actions. App. 48.

c.     At summary judgment, the district court ruled for Defendants. The Supreme Court, a range of lower courts, and the Department of Justice all have confirmed that due process imposes a constraint on prosecutors' monetary stake in their cases. In the decision below, however, the district court took a contrary view: The Due Process Clause imposes no such constraint at all. In evaluating Defendants' system of contingency-fee prosecutors, the court thus declined to apply the standard developed by the Supreme Court. It considered itself "free to choose its own standard." App. 13. And it held that due process sets no limit on prosecutors' financial stake in their cases—civil or criminal. App. 14-19.

For the district court, that resolved the case. The court acknowledged that "[i]t is hard to imagine a financial interest more direct" than contingency-fee-prosecution schemes of the sort at issue here. App. 10. But it held that the Due Process Clause serves as no check. The court then lauded the concept of contingency-fee prosecutions more generally. "[T]o argue that a prosecutor becomes too zealous when motivated by a contingent fee," it asserted, "is to deny the basic premise of the adversary system." App. 19.

## SUMMARY OF ARGUMENT

I.     Defendants' system of contingency-fee forfeiture prosecutions is unconstitutional.

A.     The Due Process Clause imposes a disinterestedness standard on prosecutors. Though the standard is not as stringent as that applicable to judges, the Supreme Court has applied an objective due-process standard to review funding schemes that are alleged to distort prosecutorial judgment. *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 243-44 (1980) (concluding that the risk of financial considerations' influencing the civil prosecutor's judgment was "too remote and insubstantial to violate the constitutional constraints applicable to the decisions of an administrator performing prosecutorial functions"). Circuit courts, district courts, and the Department of Justice all have read *Marshall* as holding that due process imposes a disinterestedness requirement on prosecutors. And courts at every level of the federal judiciary have treated prosecutorial contingency fees as the bellwether of unconstitutionality.

B.     Judged against the Supreme Court's analysis in *Marshall*, Defendants' system of contingency-fee forfeiture prosecutions is unconstitutional. Joshua Taylor exercises

-9-

wide prosecutorial discretion. And by design, his compensation depends—wholly—on the profitability of his prosecutions; in *Marshall*'s terms, he is "financially dependent on the maintenance of a high level of penalties." Precedent, real-world experience, deposition testimony, and decades of prosecutorial guidance confirm that this eat-what-you-kill compensation scheme carries with it an obvious risk of distorting sovereign enforcement power in service of private gain. Even the district court acknowledged that "[i]t is hard to imagine a financial interest more direct" than the sort presented here.

C.    The district court accepted that Indiana's civil-forfeiture regime falls on the sovereign, criminal-enforcement end of the litigation spectrum. App. 13. But it upheld Indiana's system even so, based on various permutations of a single error: its view that due process imposes no constraint at all on prosecutors' having a financial stake in their cases, civil or criminal. On the district court's view, an entire section of the Supreme Court's opinion in *Marshall* could be written off as merely "various observations." The district court also posited that the Court in *Marshall* somehow resolved the due-process question before it while "refusing to give any rule" that might act as precedent in future cases. Based on that error, the district court considered itself "free to choose its own standard." And it selected one under which it could exercise its "historical imagination" to conclude that, in the past, "there was no belief that the prosecutor . . . in a criminal case had any special duty to justice in the abstract." On that premise, the court again departed from *Marshall* and concluded that due process sets no constraint on prosecutors' financial self-interest. That analysis was deeply flawed on multiple levels, and Defendants' main arguments below—which the district court ignored—were misplaced also.

-10-

II.     Below, Defendants claimed that this case did not present a justiciable controversy. That was wrong; this Court can be confident of its and the district court's jurisdiction.

## STANDARD OF REVIEW

Summary-judgment decisions are reviewed de novo, as are questions of subject-matter jurisdiction. *Epps* v. *Creditnet, Inc.*, 320 F.3d 756, 758 (7th Cir. 2003).

## ARGUMENT

### I.     Defendants' system of contingency-fee forfeiture prosecutors violates the Due Process Clause.

The Fourteenth Amendment's Due Process Clause imposes a disinterestedness standard on prosecutors. Defendants' system of contingency-fee forfeiture prosecutions contravenes that standard, and neither the district court's nor Defendants' contrary arguments counsel differently.

### A.     The Supreme Court's decision in *Marshall* v. *Jerrico* confirms a due-process standard constraining prosecutors' financial self-interest.

1.     The Due Process Clause provides that no state may "deprive any person of life, liberty, or property, without due process of law." In various contexts, the Supreme Court has applied the Clause to "set[] a constitutional baseline" categorically barring arrangements that could taint the disinterestedness of state actors in the justice system. *Gacho* v. *Wills*, 986 F.3d 1067, 1071 (7th Cir. 2021). Judges, for example, cannot preside over cases in which they have a "direct, personal, substantial, pecuniary interest." *Tumey* v. *Ohio*, 273 U.S. 510, 523 (1927). On that premise, the Supreme Court has long forbidden arrangements under which judges are paid based on how they decide cases before them. Whether or not the judge is biased in actuality, due process guards against incentives that would offer "a possible temptation to the average man." *Id.* at 532.

The Supreme Court also has long acknowledged that the due-process constraints applicable to judges may not necessarily extend identically to every state actor in the justice system. *Tumey* v. *Ohio* is an example—a case presenting a due-process challenge to an ordinance granting a judge an additional $12 per conviction. *Id.* at 523, 531-32. In defending that system, the State of Ohio asserted that "the legislature of a State may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the State and the people." *Id.* at 535. The Court, for its part, did not contest that proposition. *See id.* (accepting it as "truth"). Yet whatever might be said of officials charged with enforcement, the Court reasoned, those charged with judicial powers are subject to the strictest limits on having an interest in the outcome of the cases before them. *See id.*; *Ward* v. *Vill. of Monroeville*, 409 U.S. 57, 60-61 (1972) (holding that a judge's institutional financial incentive likewise contravened due process).

In 1980, the Court confirmed that due process limits the financial incentives not just of judges, but of prosecutors. In *Marshall* v. *Jerrico, Inc.*, the Solicitor General quoted *Tumey* to contend that due process places no constraint on the government's power to "stimulate prosecutions" through monetary "rewards" for prosecuting officials. Br. of Appellants, No. 79-253, 1980 WL 339540, at *21, 23 (U.S. Jan. 1980). A unanimous Court rejected that far-reaching proposition. The Court acknowledged that "[t]he rigid requirements of *Tumey* and *Ward*" are "designed for officials performing judicial or quasi-judicial functions," not "those acting in a prosecutorial or plaintiff-like capacity." 446 U.S. 238, 248 (1980). Thus, the "strict requirements of neutrality" applicable to judges are not "the same"

as those applicable to prosecutors. *Id.* at 250. At the same time, though, the Court rebuffed any suggestion "that the Due Process Clause imposes no limits on the partisanship of . . . prosecutors." *Id.* at 249. Prosecutors of course may be "zealous in their enforcement of the law," the Court observed. *Id.* at 248. But that zeal must be in service of "the public interest." *See id.* at 249. In turn, "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249-50.

Having articulated those principles, the Court evaluated whether the program before it violated due process. In doing so, it did not mark out "with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function." *Id.* at 250. Wherever the due-process line lay, the Court reasoned, the enforcement regime at issue (involving civil penalties for child-labor violations) was constitutional. Under federal law, civil penalties for child-labor violations were payable to the Employment Standards Administration (the Department of Labor's largest agency) whose regional offices prosecuted the child-labor law. *Id.* at 240, 245-46. According to the plaintiff in *Marshall*, that arrangement violated due process; in the plaintiff's view, the civil penalties might trickle down from the parent agency to a particular regional office, in turn "distort[ing] the assistant regional administrator's objectivity" in pursuing penalties. *Id.* at 241-42. The Court, however, found that prospect "exceptionally remote." *Id.* at 250. "It is plain," the Court remarked, "that no official's salary is affected by the levels of the penalties." *Id.* at 245. So at a personal level, "[n]o governmental official stands to profit economically from vigorous enforcement of the child labor provisions." *Id.* at 250.

Nor, the Court continued, did the prospect of "institutional" gain—for the agency as a whole—pose a "realistic possibility" of distorting prosecutorial judgment either. *Id.* The regional offices responsible for pursuing penalties "ha[d] no assurance that the penalties they assess will be returned to [them] at all." *Id.* at 251. From both an institutional perspective and a personal one, the risk of monetary considerations' influencing prosecutorial judgment was "too remote and insubstantial to violate the constitutional constraints applicable to the decisions of an administrator performing prosecutorial functions." *Id.* at 243-44.

2.    Consistent with *Marshall*, lower courts have analyzed prosecutorial and law-enforcement financial incentives under the Due Process Clause. In 2022, for example, the Eleventh Circuit applied *Marshall* in concluding that the Clause imposes a disinterestedness requirement on prosecutors. *Brucker* v. *City of Doraville*, 38 F.4th 876. Like the Court in *Marshall*, the Eleventh Circuit in *Brucker* recognized that enforcement-related funding can create risk of either "institutional" financial incentives or "personal" financial incentives. *Id.* at 886-87. The enforcement scheme before it, the court held, raised concerns on neither front. As for "institutional" financial incentives, the court acknowledged that, in certain circumstances, a prosecutor "can be impermissibly biased 'by the prospect of institutional gain as a result of zealous enforcement efforts.'" *Id.* at 887 (quoting *Marshall*, 446 U.S. at 250). In the court's view, however, an institutional incentive arises only if a prosecutor "has executive responsibility over the institution's finances," which, the court concluded, the city prosecutor before it did not. *Id. But cf. Marshall*, 446 U.S. at 250-52 (articulating no such rule). On the record before it, the court also concluded that the prosecutor's compensation raised no "personal" financial incentive either. 38 F.4th at 886-87.

"[I]mportantly," the court observed, the prosecutor's "compensation is not directly contingent on the number of cases he prosecutes." *Id.* at 886. Because his "pay does not depend on the number of cases he handles," his "compensation structure" was held not to violate the Due Process Clause. *Id.*

Other courts have applied *Marshall* similarly. To give one example, New Mexico's federal district court entertained a *Marshall*-style challenge to the City of Albuquerque's forfeiture program—and invalidated it. At an institutional level, the court reasoned, the program created "an unconstitutional institutional incentive to prosecute forfeiture actions" because forfeited property "pay[s] all of the program's major expenses" and was available for "discretionary purchases." *Harjo* v. *City of Albuquerque*, 326 F. Supp. 3d 1145, 1193, 1194 (D.N.M. 2018). Because "the forfeiture program can spend as much as it raises," the court reasoned, "there is a realistic possibility that the forfeiture program prosecutors' judgment will be distorted." *Id.* at 1195. On that basis, the court held that the program embodied "an unconstitutional institutional incentive" in violation of the Due Process Clause. *Id.* at 1196. At the same time, the court added, Albuquerque's program did not suffer the additional due-process defect of giving its attorneys "an unconstitutional *personal* incentive." *Id.* at 1193 (emphasis added). Because their "continued employment or salary is not contingent on the forfeiture program revenues," the court held, the attorneys "ha[d] no direct, personal incentive to prosecute." *Id.* at 1193, 1205; *id.* at 1200 ("[*Marshall*] suggested that a program violates due process if a prosecutor 'stands to profit economically.'").

Those decisions are not outliers, and they illustrate a foundational point. If less "rigid" than for judges, the Due Process Clause imposes a disinterestedness requirement

on prosecutors as well. *Marshall*, 446 U.S. at 248. Circuit courts have read *Marshall* this

way.[3] District courts have read *Marshall* this way.[4] So, too, has the Department of Justice.[5]

      3.        Though the due-process standard used in *Marshall* is "more relaxed" than

that applicable to judges, *Wolkenstein* v. *Reville*, 694 F.2d 35, 41 (2d Cir. 1982) (Friendly,

J.), the analytic methods bear some similarities. Like the standard applicable to judges, the

standard applicable to prosecutors is objective. Thus, the Court in *Marshall* did not probe

the integrity of individual prosecuting officials. Rather, it evaluated the system in objective

terms—considering the "potential," "risk," and "realistic possibility" of financial bias as

against "'a realistic appraisal of psychological tendencies and human weakness.'" 446 U.S.

at 239, 250, 251-52 (quoting *Withrow* v. *Larkin*, 421 U.S. 35, 47 (1975)); *see generally Caper-*

*ton* v. *A.T. Massey Coal Co.*, 556 U.S. 868, 883-84 (2009) (describing *Withrow*'s framework

as an "objective" one that "do[es] not require proof of actual bias").

---

[3] *Hill* v. *City of Seven Points*, 31 F. App'x 835, *19 (5th Cir. 2002); *Baran* v. *Port of Beau-*
*mont Nav. Dist. of Jefferson Cnty.*, 57 F.3d 436, 445 (5th Cir. 1995); *Wolkenstein* v. *Reville*,
694 F.2d 35, 41 (2d Cir. 1982).

[4] *McNeil* v. *Cmty. Prob. Servs., LLC*, No. 18-cv-33, 2021 WL 365844, at *13 (M.D. Tenn.
Feb. 3, 2021) ("The due process neutrality requirement has also been applied to officials
who perform prosecutorial/enforcement functions, based on language from the Supreme
Court's opinion in *Marshall v. Jerrico, Inc.*"); *see also Coleman* v. *Town of Brookside*, No.
22-cv-423, 2023 WL 5767749, at *5-6 (N.D. Ala. Mar. 23, 2023) (applying *Brucker*, 38 F.4th
at 887); *United States* v. *Quiros*, No. 19-cr-76, 2020 WL 519807, at *11 (D. Vt. Jan. 28, 2020);
*Cox* v. *Voyles*, No. 15-cv-1386, 2017 WL 11205981, at *10 (D. Ariz. Aug. 18, 2017); *Flora* v.
*Sw. Iowa Narcotics Enf't Task Force*, 292 F. Supp. 3d 875, 903-04 (S.D. Iowa 2018).

[5] *E.g.*, Dep't of Justice, Letter to Courts at 11 (Apr. 20, 2023) ("The Department has taken
the position that due process protections also apply when the disposition of fines creates a
personal interest in the outcome of an enforcement proceeding for other officials who
enforce the law, including police, prosecutors, and probation officers."),
https://tinyurl.com/8d5wxf6z.

When it comes to a prosecutor's "personal" financial incentives, another principle is clear: A compensation structure under which the prosecutor is "financially dependent on the maintenance of a high level of penalties" raises core due-process concerns. *Marshall*, 446 U.S. at 251. Courts at every level of the federal judiciary, in fact, have treated prosecutorial contingency fees as the bellwether of unconstitutionality. *Id.* at 250; *Brucker*, 38 F.4th at 886; *Harjo*, 326 F. Supp. 3d at 1166; *accord* Statement of Interest of the United States at 13, *Coleman* v. *Town of Brookside*, No. 22-cv-423 (N.D. Ala. July 26, 2022) (Doc. 56) (advising that a prosecutor's compensation structure plausibly violates due process when "the more cases he opts to prosecute, the more money he makes").

**B.  Defendants' system of contingency-fee forfeitures contravenes the Due Process Clause's limit on financially self-interested prosecutors.**

1.    Judged against the Court's analysis in *Marshall*, Defendants' system of contingency-fee forfeiture prosecutions is unconstitutional. Joshua Taylor files and prosecutes hundreds of civil-forfeiture cases for the State of Indiana. At every stage, he exercises wide prosecutorial discretion. App. 62-63; Doc. 120-4, at 36-41, 42, 45. And by design, his compensation depends—entirely—on the outcome of his prosecutions. He "is compensated for prosecuting a Civil Forfeiture Action only if property is forfeited to the State in that Civil Forfeiture Action." App. 53; App. 55-56. The "amount of compensation [he] receives" is "a percentage of the money or proceeds forfeited to the State in that Civil Forfeiture Action." App. 54. He is "not compensated" at all "if property is not forfeited." App. 53. If no property is forfeited, he may even stand to *lose* money. Doc. 120-4, at 75.

This arrangement raises bedrock due-process concerns. In applying the Due Process Clause to prosecutors, courts at every level of the federal judicial system have taken

as given that prosecutorial contingency fees raise a quintessential risk of personal financial incentives. *See* p. 17, *supra*. For good reason: Such a system pits the government's duty to do justice against the prosecutor's interest in earning money. Unlike with private litigants, the state's obligation in enforcing public laws "is not that it shall win a case, but that justice shall be done." *Freeport-McMoRan Oil & Gas Co.* v. *FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)); *see also Marshall*, 446 U.S. at 249 ("Prosecutors are also public officials; they too must serve the public interest." (citing *Berger*, 295 U.S. at 88)). Below, Taylor acknowledged as much. Doc. 120-4, at 74-75. At a structural level, however, his personal interests conflict with the state's. He has a direct financial stake in winning—as much, as often, and as quickly as he can. In *Marshall*'s parlance, he is "financially dependent on the maintenance of a high level of penalties." 446 U.S. at 251. Viewed through *Marshall*'s objective lens, this arrangement exemplifies the type of compensation structure that carries a "realistic possibility" of "distort[ing]" prosecutorial judgment. *Id.* at 250. Even the district court found it "hard to imagine a financial interest more direct" than the sort presented here. App. 10.

2.    Below, Defendants nowhere denied the obvious: that their system of contingency-fee forfeitures created a realistic possibility of distorting prosecutorial discretion. *E.g.*, Doc. 128, at 21-22 (noting Sparger-Withers's "arguments about incentive structures" but nowhere rebutting them). The record reinforces that proposition.

**The Delaware County scandal.** Delaware County, Indiana, offers a real-world case study in the distorting effects of prosecutors' "stand[ing] to profit economically from vigorous enforcement" of their forfeiture cases. *Marshall*, 446 U.S. at 250. In the late 1990s, a

deputy prosecuting attorney contracted to prosecute the county's forfeiture actions in return for a 25% contingency fee. *In re McKinney*, 948 N.E.2d 1154, 1156-57 (Ind. 2011) (per curiam). That personal stake rapidly "created a conflict of interest between his duties as a public official and the private gain he realized in the forfeiture proceedings." *Id.* at 1155. His ability to exercise disinterested judgment in parallel criminal cases (which he continued to prosecute) was irreparably compromised. *Id.* at 1161. His conduct on the civil side escalated into "a carefully crafted assault on the judicial system and court adjudication in civil forfeitures." *Findings and Report on Civil Drug Forfeitures in Division 2, Including a Limited Number of Cases in the Other Four Divisions of the Delaware Circuit Court*, at 6 (Ind. Cir. Ct., Delaware Cnty. Aug. 18, 2008). And "[o]n numerous occasions when the ethics of the asset forfeiture procedures were called into question," he "turned a blind eye and acted to protect his private interest in his continued pursuit of forfeiture property." *McKinney*, 948 N.E.2d at 1155-56.

**The Garrison deposition.** At deposition, J. Gregory Garrison—Taylor's mentor and the pioneer of for-profit forfeitures—full-throatedly embraced the system's incentive-skewing design. In his telling, the system directly affects the prosecutor's incentive: toward forfeiting as much property as possible. Salaried government attorneys—acting only for the "common w[eal]"—have less of an "incentive" to maximize forfeitures, Garrison testified, because they "are not getting paid according to how good a job they do." Doc. 120-5, at 44, 46-47. Outsourcing the prosecutions to contingency-fee lawyers, by contrast, alters the incentive. As Garrison explained it, "the incentive which is consistent with your performance is a very different operation." Doc. 120-5, at 46. Because "their finances are on the line,"

contingency-fee prosecutors "have an incentive to do a job and to forfeit as much money as possible." Doc. 120-5, at 57 ("[A.] That's correct."); Doc. 120-5, at 11, 44, 56-57.

**_Guidance from the DOJ and the National District Attorneys Association._** What Garrison touted as a virtue, many prosecutors view as a grave threat to the integrity of the justice system. The National District Attorneys Association's _Guidelines for Civil Asset Forfeiture_—publicized by the Indiana Prosecuting Attorneys Council—warns that "[s]alaries and personal benefits of any person influencing or controlling the selection, investigation, or prosecution of forfeiture cases must be managed in such a way that employment or salary does not depend upon the level of seizures or forfeitures in which they participate." Doc 120-24, at 5; Doc. 121, at 37. The same admonishment appears in the "ten commandments" of civil forfeiture compiled by the U.S. Treasury Department (again courtesy of IPAC): "No prosecutor's or sworn law enforcement officer's employment or salary shall be made to depend upon the level of seizures or forfeitures he or she achieves." Doc. 120-25, at 41, 52. The _National Prosecution Standards_ declares much the same thing: "[F]actors that may not be considered in setting compensation include . . . [r]evenues generated by the prosecution function—such as asset forfeitures or collection of fees." Doc. 120-26, at 19.

3.      At base, the record fortifies what _Marshall_'s reasoning makes clear: When a prosecutor's personal financial interest is in maximizing enforcement, there is a "realistic possibility" that he or she will act on that incentive rather than faithfully steward the public trust. _Marshall_, 446 U.S. at 250. In this regard, civil-forfeiture actions are not (as Garrison posited) "like any other contingent fee case." Doc. 120-5, at 56. Nor do forfeiture prosecutors stand on the same footing as "personal injury lawyers." Doc. 120-5, at 64. Quite the

opposite. "The responsibility of a public prosecutor differs from that of the usual advocate," as "his duty is to seek justice, not merely to convict." *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987) (citation omitted). Although prosecutors may of course "be zealous in their enforcement of the law," that zeal must be trained unswervingly in service of "the public interest"—not private gain. *Marshall*, 446 U.S. at 248, 249. For they "are not simply advocates," but "ministers of justice." *McKinney*, 948 N.E.2d at 1160 (citation omitted).

In its basic design, Indiana's system of contingency-fee forfeitures turns that principle on its head—and does so in a particularly abuse-prone context. The state's forfeiture laws vest their enforcers with vast discretion; as one prosecutor declared in the 1980s, "the statute is limited only by your own creativity." Doc. 120-27, at 2. And where prosecutors personally "stand[] to profit economically from vigorous enforcement" (*Marshall*, 446 U.S. at 250), the distorting incentive is unavoidable: Whatever a prosecutor's reserves of integrity, such a system incentivizes them to exercise public power in service of private gain. If *Marshall*'s standard applies anywhere, it applies here.

**C.    The contrary arguments offered by the district court and Defendants lack merit.**

The district court accepted that Indiana's civil-forfeiture regime falls on the sovereign, criminal-enforcement end of the litigation spectrum. App. 13. The court further accepted that "[i]t is hard to imagine a financial interest more direct" than the sort presented here. App. 10. But it upheld Indiana's system even so, on a single theory: The Due Process Clause imposes no constraint at all on prosecutors' having a financial stake in their cases,

civil or criminal. That was error, and Defendants' chief arguments below (which the court ignored) supply no alternative ground for affirmance.

> ### 1.  The district court's interpretation of Marshall was unprecedented and wrong.

a.     As its top-line position, the district court construed *Marshall* to hold that due process imposes no check—none—on prosecutors' having a financial stake in their cases. App. 9-10. That view openly conflicts with recent Eleventh Circuit precedent. App. 7 (rejecting Eleventh Circuit's decision with a "*contra*"). It conflicts with decisions from other circuits. *See* p. 16, *supra*. And with decisions from other district courts. And with the stated views of the Department of Justice. And, seemingly, with the views of Defendants themselves. Doc. 134, at 5 (calling the position ultimately embraced by the district court a "straw man"). Even the Ninth Circuit—portrayed by the district court as being aligned with it—stopped far short of the district court's outlier position. In the district court's recounting, the Ninth Circuit "describ[ed] as 'exaggerated' the argument that *Marshall* 'strongly suggested' a financial disinterestedness requirement for prosecutors." App. 6-7 (quoting *United States ex rel. Kelly* v. *Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993)). In truth, however, those excerpted phrases were trained on *Marshall*'s application to False Claims Act relators—not prosecutors writ large. (More on that below.) On the same page, in fact, the Ninth Circuit warned that a "criminal prosecution" would "arguably require[] a higher level of prosecutorial disinterest than would be necessary in a civil enforcement action under the FCA." *Kelly*, 9 F.3d at 759 (emphasis omitted).

b.     The district court's reasoning finds no support in *Marshall* either. It is true, as the district court noted, that the Court in *Marshall* acknowledged its earlier comment

in *Tumey*: that governments "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the State and the people." *Marshall*, 446 U.S. at 249 (quoting *Tumey*, 273 U.S. at 535). Contrary to the district court's view, however, the Court did not then hold that due process imposes *no* disinterestedness standard on prosecutors; rather, the Court concluded (unanimously) that due process simply does not impose "the same" standard as the one applicable to judges under *Tumey. Id.* at 250; *Young*, 481 U.S. at 807 (reading *Marshall* to say, not that prosecutors are subject to no "standard of disinterest" at all, but that the standard for prosecutors is "not necessarily . . . as stringent" as that for judges). Across two and a half pages of the U.S. Reports—all of Section II.B—the Court then conducted the analysis detailed above. Then, it announced its bottom-line conclusion: that "on this record and as presently administered" the "reimbursement provision" did not "violate[] standards of procedural fairness embodied in the Due Process Clause." *Marshall*, 446 U.S. at 252. Only by misreading an entire section of the Court's decision could the district court conclude that a prosecutor's financial self-interest is subject to no due-process constraint.

The district court's efforts to square its views with *Marshall* highlight how far afield it strayed. The court posited, for example, that *Tumey* v. *Ohio* "stands as controlling law" on the question whether "contingency-fee private prosecution is allowed." App. 9. For the Court in *Marshall* to have applied any due-process check on prosecutorial self-interest, the district court reasoned, would thus have "overturn[ed] old law *sub silentio*"—a reading the district court judged "unwise." App. 6. To state the obvious, however, *Tumey* involved due-process constraints on judges, not prosecutors. *See* pp. 11-12, *supra*. And, for that matter,

the district court's overreading of *Tumey* was pressed by the federal government in *Marshall* itself. Like the district court, the government in *Marshall* insisted that there is no "due process problem" with even a criminal prosecutor's "depend[ing] entirely upon the fines assessed against people he was able to get a court to convict." Tr. of Oral Arg. 7-8, *Marshall* v. *Jerrico, Inc.*, No. 79-253 (Mar. 19, 1980) (pages worth reading in full), https://tinyurl.com/5yt7fxvm. Like the district court, the government invoked *Tumey*'s "stimulate" line for support. *Id.* at 7-8, 11 ("We think this proposition should govern the case here."); Br. of Appellants, *Marshall*, 1980 WL 339540, at *21, 23.  Yet the Court took a different path and applied the due-process standard detailed above.

The district court compounded its error by writing off all of Section II.B of the *Marshall* opinion as merely "various observations." App. 6. The court acknowledged that the Supreme Court's analysis "consider[ed]" such "factors" as "the 'financial dependen[ce]' *vel non* of an official on penalties" and "the 'realistic possibility' of distortion in prosecutorial judgment." App. 8. The district court further acknowledged that the Supreme Court "use[d] th[ose] factors to show that there [wa]s not a due process violation" in the controversy before it. App. 8. Yet the court maintained that the Supreme Court's analysis there somehow should not control the analysis here. That was error. Far from merely "observations" that a lower court can take or leave (App. 6), Section II.B of *Marshall* reflected the "exclusive basis" for the Supreme Court's judgment. *Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 66-67 (1996) (explaining holdings versus dicta).

That *Marshall* did not fully "sharpen" the "outer bounds" of its standard does not make its reasoning any less precedential. App. 5. It is not uncommon for the Supreme Court

to refrain from defining a standard with precision when the controversy before it falls comfortably on one side of the line. *E.g.*, *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 543 (1993). The Court took just that approach in *Marshall*. 446 U.S. at 250. Under the due-process standard applicable to "officials charged with prosecutorial or plaintiff-like functions," it was "clear" that the challenged labor-law provisions were valid. *Id.* at 251-52. Applying that same standard here, it is equally clear that Indiana's system of contingency-fee prosecutors is not. *See* pp. 17-21, *supra*.

c.      At bottom, a through-line error in the decision below was the district court's failure to treat *Marshall* in the way that lower courts are supposed to treat legal precedent. If judges "don't read precedents like statutes," *Herr* v. *U.S. Forest Serv.*, 803 F.3d 809, 819 (6th Cir. 2015), nor should they read precedents with the eye of a literary critic. Here, though, the district court's analysis was shot through with assumptions about how the Supreme Court may have "want[ed] its decision to be read." App. 7. What the Court "[p]erhaps . . . thought." App. 10. What footnotes "suggest[ed]." App. 8; *see also* App. 8 ("But that must be speculation . . . ."). Whether parts of the opinion were intended to be "defensive moves" or tactical "play[s]." App. 8-9. Whether the opinion had "pretensions" to be "a landmark case." App. 6. The court even offered that a footnote singling out an issue the Supreme Court said it was "not" (again, "not") addressing might have been intended as an "apophatic" smoke signal—in layman's terms, that the words on the page somehow meant the opposite of what they said. App. 5, 8; *see also* Merriam-Webster.com (*apophasis*: "the raising of an issue by claiming not to mention it . . . ."). The simpler reading is the right one:

*Marshall* should be taken at its word, and it confirms that due process limits prosecutors' financial stake in their cases.

### 2. *The district court erred in "proceed[ing] on a hypothetical" and viewing itself as "free to choose its own standard."*

Having staked out a top-line position that *Marshall* set no limit at all on prosecutors' financial self-interest, the district court elected to "reinforce its judgment" by "proceed[ing] on a hypothetical": that (on hypothesis) *Marshall* did in fact "establish an unspecified 'financial disinterestedness' requirement for prosecutors." App. 10. Immediately, however, the district court broke again with the standard used in *Marshall*. Venturing far beyond the parties' arguments, the court teed up a false choice between the due-process standard of *Mathews* v. *Eldridge*, 424 U.S. 319 (1976), and that of *Medina* v. *California*, 505 U.S. 437 (1992). App. 11-13. Considering itself "free to choose its own standard," it picked *Medina*. App. 13. It then misapplied *Medina* and ended up back where it began: defying *Marshall* and holding categorically that the Due Process Clause imposes no constraint on contingency-fee prosecutors. App. 16, 19. At every level, the court's exercise was flawed.

a. To start, the district court was wrong to think it could harness either *Mathews* or *Medina* to quality-check the Supreme Court's reasoning in *Marshall*. In resolving the merits of the due-process claim before it, the Court in *Marshall* did not (contra the district court) "refus[e] to give any rule" to evaluate that claim. App. 9. Nor did the Court simply "throw[] future courts back onto general due process principles." App. 9. Rather, the Supreme Court followed the usual practice of an Article III tribunal: It applied a legal standard to the parties' controversy. *See* pp. 12-14, 22-25, *supra* (discussing *Marshall*'s analysis). Whatever its views on the relative virtues of "historicist and interest-

-26-

balancing approaches," App. 11, the district court was duty-bound to follow that precedent, not treat the legal standard as a blank slate and go on the hunt for a new one.

The court also erred in settling on a binary false choice between the standard of *Mathews* and that of *Medina*. App. 11. Neither of those precedents governs the Due Process Clause's disinterestedness standards. As the Ninth Circuit—speaking through retired Justice White—has explained, "[t]he *Mathews* investigation for the *amount* of process that is due in a particular situation is a distinct inquiry from whether that process is *impartial*." *Alpha Epsilon Phi Tau Chapter Hous. Ass'n* v. *City of Berkeley*, 114 F.3d 840, 844 n.4 (9th Cir. 1997); *id.* ("A biased proceeding is not a procedurally adequate one." (citation omitted)). The *Medina* analysis has a similar compass, focused specifically on criminal-procedure rules. *Nelson* v. *Colorado*, 581 U.S. 128, 134-35 (2017) (explaining that "*Medina* 'provide[s] the appropriate framework for assessing the validity of state procedural rules' that 'are part of the criminal process,'" such as rules on "the allocation of burdens of proof and the type of evidence qualifying as admissible"). Neither standard controls in due-process cases about the impartiality required of state actors in the justice system. *Alpha Epsilon Phi Tau Chapter Hous. Ass'n*, 114 F.3d at 844 n.4 (collecting authority, as to *Mathews*); *cf. Williams* v. *Pennsylvania*, 579 U.S. 1 (2016) (not once citing *Medina* in due-process challenge about judicial bias). Rather, courts in cases about impartiality rely on the impartiality standards set by existing due-process precedent—here, the standard applied in *Marshall*.

On its own terms, moreover, the district court's choice of *Medina* as its north star was unsound. Not only does *Medina* apply to questions of procedural rules, rather than disinterestedness, but even for procedural rules, it is limited to rules in criminal court

specifically. Thus, despite the close link between civil forfeiture and the criminal-justice system, the Supreme Court applied *Mathews*—not *Medina*—to a question about the hearing procedures required in civil-forfeiture litigation. *United States* v. *James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993). Across multiple axes, the district court was wrong to depart from *Marshall* and settle on *Medina*.

b. Having erred in selecting *Medina*, the district court then erred in applying it. *Medina* carved out a due-process standard for "rule[s] of criminal procedure." *Kincaid* v. *District of Columbia*, 854 F.3d 721, 726 (D.C. Cir. 2017) (Kavanaugh, J.). Under it, such a rule "usually does not violate the Due Process Clause unless it (i) 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or (ii) 'transgresses any recognized principle of "fundamental fairness" in operation.'" *Id.* The decision below ignored the second part of that inquiry and badly misapplied the first. The district court placed near-dispositive weight on its belief that at some point in the past ("[o]nce"; "the old system") prosecution by "public official[s]" was not the norm. App. 15-16. So exercising its "historical imagination" (App. 18), the court completed its "hypothetical" by once again saying that the Due Process Clause sets no constraint on prosecutors' financial self-interest. App. 10, 18.

Respectfully, everything about that analysis was unfounded.

i. Start—again—with *Marshall*. As the cornerstone of its analysis, the district court opined that even criminal prosecutors have no "special duty to justice in the abstract." App. 16. Yet the Court in *Marshall* said the opposite: In rejecting any suggestion "that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors,"

the Court maintained that "[p]rosecutors are also public officials" and "must serve the public interest." 446 U.S. at 249; *cf. Young*, 481 U.S. at 814 (emphasizing that criminal prosecutors must be "guided solely by their sense of public responsibility for the attainment of justice"). This—to borrow from the part of *Medina* the district court overlooked—is a "recognized principle of 'fundamental fairness.'" 505 U.S. at 448. And it is transgressed by giving prosecutors a personal monetary stake in maximizing punishment. *See* pp. 17-21, *supra*. In holding otherwise, the decision below reflected, not "humility" (App. 18), but a further departure from our hierarchical judicial system. *Compare also* App. 19 (seeing no need for a due-process check on financially self-interested prosecutors so long as a "neutral tribunal" sits at the end of the prosecution), *with Marshall*, 446 U.S. at 249 ("[T]he decision to enforce . . . may itself result in significant burdens on a defendant . . . even if he is ultimately vindicated in an adjudication.").

ii.     Also unsound were the district court's historical insights, which it (wrongly) treated as near-dispositive under *Medina*. Historically, the court maintained, "there was no belief that the prosecutor (or informant) in a criminal case had any special duty to justice in the abstract, apart from his role as one side's advocate in an adversary system." App. 16. From there, the court reasoned that contingency-fee prosecutors are necessarily constitutional. App. 19. Contrary to the district court's view, however, the principle that prosecutors owe a "special duty to justice" is entrenched in the Anglo-American judicial system. Elizabeth I, for instance, deliberately amended her attorney-general's charge from "[he] who prosecutes on behalf of our Lady, the Queen" to "[he] who prosecutes on behalf of our Lady, the Truth." Edward Coke, *The Third Part of the Institutes of the Laws of England* \*79

-29-

(latin); Dep't of Justice, *DOJ Seal - History and Motto*, https://tinyurl.com/ynccr5zm. The principle gained even more importance as governments in America claimed what the decision below termed "a monopoly over criminal enforcement." App. 17. In words that directly rebut the district court's, for instance, Joel Prentiss Bishop recorded in 1866 that, "When the public is the client, however it may be when the client is a private individual, the establishment of real justice should be the object sought." 1 *Commentaries on the Law of Criminal Procedure* § 996, at 688. Far from "modern orthodoxy" (App. 18), the principle that prosecutors are "officer[s] entrusted with the administration of justice" is embedded in our legal tradition. *State* v. *Henning*, 33 Ind. 189, 191 (1870).[6]

Equally well-recognized was the proposition that giving prosecutors a monetary stake in their cases would distort their public trust. As early as the seventeenth century,

---

[6] *See also, e.g., Baca* v. *Padilla*, 190 P. 730, 732 (N.M. 1920) ("To permit and sanction the appearance on behalf of the state of a private prosecutor, vitally interested personally in securing the conviction of the accused, not for the purpose of upholding the laws of the state, but in order that the private purse of the prosecutor may be fattened, is abhorrent to the sense of justice and would not, we believe, be tolerated by any court."); *Biemel* v. *State*, 37 N.W. 244, 247 (Wis. 1888) ("[The prosecutor] is an officer of the state, provided at the expense of the state for the purpose of seeing that the criminal laws of the state are honestly and impartially administered, unprejudiced by any motives of private gain, and holding a position analogous to that of the judge who presides at the trial. Such is the view taken of the office of prosecuting attorney by the courts of this country as well as of England, and we think it is the true view of his position."); *Hurd* v. *People*, 25 Mich. 405, 416 (1872) ("The prosecuting officer represents the public interest, which can never be promoted by the conviction of the innocent. His object like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success."); *State* v. *Town of Dover*, 9 N.H. 468, 472 (1838) (observing that the attorney general's issuance of a criminal information "is an official act, devolving solely on this officer, in which no motive can exist, on his part, other than to protect and promote the public interest"); *accord Regina* v. *Thursfield*, 8 Eng. Rep. 490, 490-41 (1838) ("The learned counsel for the prosecution has most accurately conceived his duty, which is to be assistant to the Court in the furtherance of justice, and not to act as counsel for any particular person or party.").

-30-

Lord Coke deplored the Tudor and Stuart practice of leasing out a personal stake in the Crown's fines and forfeitures. That incentive—he wrote—perverted the enforcement process; it drove the prosecutors to "undue means" and "more violent prosecution" in their pursuit of "private lucre." Lois G. Schwoerer, *The Declaration of Rights, 1689* at 96 & n.223 (1981) (citation omitted). A generation later—on the brink of the Glorious Revolution—a member of parliament echoed Lord Coke, "blam[ing] exorbitant fines on the begging of fines by courtiers, who then put pressure on the bench to set the fine at a large figure." *Id.* at 96. In response, the 1689 Bill of Rights singled out "all Grants and Promises of Fines and Forfeitures of particular persons before Conviction," declaring them "illegal and void." 1 Wm. & Mary, 2d Sess., ch. 2 (1689), in 6 Statutes of the Realm 143 (reprint 1963).

The American experience was in accord; the Fourteenth Amendment's ratifying generation shared the *Marshall* Court's understanding that prosecutorial self-interest posed a real threat to the administration of justice. In the late 1860s and early '70s, for instance, federal lawmakers launched a sustained campaign to abolish "moieties" (bounties) for customs and internal-revenue enforcers. Under existing law, certain enforcement officers—among them, prosecutors—could claim "percentage shares, set by statute, of the forfeitures that federal law imposed for intentional evasion" of customs and revenue laws. Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940* at 221 (2013) (Parrillo). As the ratifying generation recognized, however, those bounties distorted the entire regime. And they responded with urgency. In 1869 and again in 1871, President Grant pressed Congress to focus "especially" on the "repeal of laws allowing shares of fines, penalties, forfeitures, &c., to officers of the Government or to

informers." 2 Cong. Rec. 4030 (1874) (citation omitted). His Treasury Secretary wrote more forcefully still—decrying the conflict between enforcers' "pecuniary interest" and "the real interest of the Government." *Id.* "I am . . . clearly of the opinion," Secretary Boutwell declared, "that the Government ought to rely upon public officers for the proper performance of their duties without stimulating them by any contingent advantages." *Id.*

Congressmen agreed. A representative from New York deplored that while customs officers "are neither judge nor jury," their "opinions have as much force as either; yet the laws give them moieties of the proceeds of every case." *Id.* (Rep. Roberts). Another "'condemn[ed], as heartily as any man on this floor, laws which allow extraordinary powers, in the name of the Government, to interested men, tempted by the acquisition in a single day of an enormous fortune.'" Parillo 247 (citation omitted). Testifying about revenue moieties, the Commissioner of Internal Revenue recounted that they "gave to the officers the appearance of hunters for prey rather than of officers doing their duty." 2 Cong. Rec. 4031 (1874) (citation omitted). Even the system's (few) defenders viewed it as corrosive: "[T]o compete with dishonor," said one, "dishonor must be used." Parrillo 251 (citation omitted).

Congress and President Grant eliminated internal-revenue moieties in 1872 and customs moieties in 1874. *Id.* at 222. "In the abolition of moieties"—the Treasury Department reported later that year—"the law takes from the customs-officer his pecuniary incentive to distort or magnify innocence or heedlessness into crime, and remove from him the reproach under which all spies and informers, for contingent rewards, labor in popular estimation." *Annual Report of the Secretary of the Treasury* 222-23 (1874).

At the federal level (and in the states), prosecutorial financial incentives soon were curtailed more broadly. In 1853, Congress had introduced a nationwide system of "conviction fees" for U.S. Attorneys. Parrillo 43, 268. But as with customs moieties, the "disappointing and perverse results" soon became plain, with "[t]he profit motive push[ing] [enforcers], consciously or not, to resolve doubt in favor of punishment." *See id.* at 4, 40. In 1873, for example, the U.S. Attorney General urged that federal prosecutors "be wholly paid by salaries" and that conviction fees be eliminated. *Annual Report of the Attorney-General of the United States* 17. "The officer should be entirely independent," Attorney General Devens reiterated in 1879, "and held to the performance of his duty by his own sense of justice and propriety and his official oath alone." *Annual Report of the Attorney-General of the United States* 12.

In the years that followed, members of every branch of government recognized for-profit prosecutors as an existential threat to the justice system. A small sample:

➤ President Cleveland, in 1885, complained of "the 'multiplication of small and technical offenses' in criminal dockets." Parrillo 275.

➤ Representative Brown, of Tennessee, insisted that when "the temptation is removed from the district attorney and marshal to multiply cases for fees, and their only motive is to faithfully execute the laws, we shall see the laws better enforced." 28 Cong. Rec. 2396 (1896).

➤ With conviction fees eliminated, argued Representative Swanson (Virginia), "[t]he people would no longer feel that they were made by law subjects to be

-33-

preyed upon by officials who received fees and riches in proportion to the people's ills and misfortunes." Parrillo 287 (citation omitted).

➤ Charles Dickens Clark, on the federal bench in Tennessee, urged that eliminating the fee system "not only will not weaken, but will greatly add to a clean, reputable, and proper administration of the law." 28 Cong. Rec. 2397 (1896).

➤ Another federal judge (unnamed) excoriated "[t]he dependence of these officers for compensation on fees" as "wholly vicious," an "unspeakable evil," and a "disgrace to the Republic." *Id.* at 2398. Only by "[s]trik[ing] down the fee system" could the nation "do away with the harpies who prowl over the country as insatiate wolves, with their strikers and spies as detectives, trying to make crime, and preying on the poor for a living that must come from persecution in the name of public justice." *Id.*

As in the moiety debates of the early 1870s, even the occasional defenders of conviction fees damned them with faint praise. As one argued, "'You need to have the officials stimulated by a similar self-interest to that which excites and supports and sustains the criminal.'" Parrillo 275-76 (citation omitted). Congress abolished the fee system for federal prosecutors in 1896 "with virtually no dissent." *Id.* at 276. Likewise at the state level, "[e]very conviction-fee jurisdiction eventually switched to salaries." *Id.* at 272; *see also id.* at 289 (detailing "apparent similarities with the federal story").

iii.    Under either strand of the *Medina* analysis, history and precedent belie the district court's starting-gate position that prosecutors have no "special duty to justice in the abstract." App. 16. At root, that premise deeply misperceived the prosecutor's role in our

nation's system of ordered liberty. It conflicted with *Marshall*. It conflicted with the history above. It conflicted with decades-old guidance from the DOJ and the National District Attorneys Association. *See* p. 20, *supra*; *cf. Kincaid*, 854 F.3d at 726 (noting that "contemporary practice [is] relevant" under *Medina*, if "to a lesser extent"). It conflicted even with a student note the court cited for support. Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L.J. 209, 221 n.62 (1955) (singling out contingency-fee prosecutions as a "possible motivation for unfairness" and noting an 1864 case casting doubt on such contracts).

For that matter, the court's premise fits poorly with other doctrines too. Unlike almost every other state actor, for example, prosecutors enjoy heightened immunity from damages liability. Why? Because, the Supreme Court has reasoned, even the (largely theoretical) "possibility" of financial exposure might inject monetary considerations into prosecutors' decision-making and distort "the independence of judgment required by [their] public trust." *Imbler* v. *Pachtman*, 424 U.S. 409, 423 (1976); *Mendenhall* v. *Goldsmith*, 59 F.3d 685, 691 (7th Cir. 1995) (applying prosecutorial immunity to enforcement of Indiana's civil-forfeiture laws). There's a reason Indiana's contingency-fee-forfeiture scheme leaves the state an island unto itself. App. 2.

Nothing sums up the district court's errors more starkly than the court's own rationale for Indiana's scheme. Distilled, the court saw no difference between a prosecutor representing the government (whether in a forfeiture case or a felony case or, presumably, a capital case) and a private-sector lawyer in a mine-run civil dispute. App. 16. Both, the court believed, represent principals whose interest is in maximally defeating the people on

the other side of the *v.* So "to argue that a prosecutor becomes too zealous when motivated by a contingent fee," the court concluded, "is to deny the basic premise of the adversary system." App. 19. But that "rational basis" (App. 18) is in fact the core defect in the district court's reasoning. The point is not, of course, that prosecutors must be "blasé" (App. 19), but that the government's sovereign interest in enforcing its public laws is in "the establishment of real justice," not maximizing punishments and profits. Bishop, *supra*, § 996, at 688. *Marshall*'s reasoning rested on that principle; the district court's defied it.

### 3.    *The district court's False Claims Act analogy was unsound.*

In passing, the district court stated that Indiana's system of contingency-fee prosecutions was "indistinguishable" from qui tam actions under the False Claim Act, such that applying a due-process constraint to the former calls into question the latter. App. 2. This theory suffers much the same flaws as those above. The most obvious, again, is *Marshall*, which (at risk of belaboring the point) arose in the context of a civil-enforcement action and recognized that due process imposes a constraint on prosecutorial self-interest.

There are also material differences between the False Claims Act and civil-enforcement schemes like *Marshall*'s and like Indiana's civil-forfeiture law. Unlike civil- or criminal-enforcement actions, False Claims Act qui tam cases have distinctive features of a private tort suit—albeit one where the government is the party harmed. They are based not on a bare "injury to [the government's] sovereignty arising from violation of its laws," but on a "proprietary injury" to the government's property interests. *Vt. Agency of Nat. Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). In this way, "[t]he FCA effectively created a tort cause of action for the government." *United States* v. *Honeywell Int'l Inc.*,

-36-

47 F.4th 805, 813 (D.C. Cir. 2022). In fact, relators have standing to sue *only* because the Act is understood as having "effect[ed] a partial assignment" to them "of the Government's damages claim." *Stevens*, 529 U.S. at 773; *United States ex rel. Polansky* v. *Exec. Health Res., Inc.*, 599 U.S. 419, 430 (2023) ("[A] *qui tam* action is an unusual creature.").

Largely for that reason, the Ninth Circuit (in a case on which the district court relied) has held that *Marshall*'s analysis does not translate to the False Claims Act context. *Kelly*, 9 F.3d 743. The Ninth Circuit appears to have accepted that "government prosecutors" in traditional enforcement actions (*e.g.*, criminal cases) owe a "duty to serve the public interest" that is incompatible with their having a financial stake in their cases. *See id.* at 760. But the court viewed the government's interest in FCA qui tam cases as qualitatively different. Unlike in a traditional enforcement case, the court reasoned, the government's interest in False Claims Act cases is more like that of a private plaintiff—in being made financially whole and "remedying harm to the federal treasury." *Id.* Given that proprietary (rather than sovereign) interest, the court perceived no conflict between the relator's financial self-interest and the interest of the government, also financial. In this context, the court concluded, the "private and public goals are congruent." *Id.*

The Ninth Circuit's analysis may or may not be persuasive within the "anomalous" context of the False Claims Act. *See id.* at 749.[7] But it spotlights a significant difference between FCA cases and the types of enforcement schemes in *Marshall* and here. Under

---

[7] For example, although it is true, as *Kelly* suggests, that the core of a False Claims Act action may be analogous to a traditional tort suit, the Act also provides for penalties. *Stevens*, 529 U.S. at 785-86. The Supreme Court has held, however, that it is the government's assignment of its proprietary interest, in recovering tort-style damages, that undergirds the qui tam device. *Id.* at 771-74.

both the Fair Labor Standards Act (in *Marshall*) and Indiana's civil-forfeiture regime, the government acts purely in its sovereign capacity as the enforcer of a public law. Indiana's civil forfeitures, for example, are rooted in the state's criminal-justice power. They "focus[] on the owner's involvement in a crime." *State* v. *Timbs*, 134 N.E.3d 12, 24 (Ind. 2019). They amount to a "criminal-like penalt[y]." *Hughley* v. *State*, 15 N.E.3d 1000, 1005 (Ind. 2014). There is no "proprietary" state interest in play. *Stevens*, 529 U.S. at 771. No analogy to private tort. Rather—and as courts have held in other contexts—"[i]n rem proceedings seeking the forfeiture of property connected to criminal activity are functionally analogous to criminal proceedings." *Torres* v. *Goddard*, 793 F.3d 1046, 1052 (9th Cir. 2015).

In this way, Indiana's law (like *Marshall*'s) differs fundamentally from the False Claims Act regime. Given the FCA's idiosyncrasies, the court in *Kelly* thought it "not at all clear that qui tam relators are bound to fulfill the same type of public duty as government prosecutors." 9 F.3d at 760. Yet there is no such ambiguity here. Joshua Taylor—statewide forfeiture prosecutor—sues on behalf of the State of Indiana to enforce public laws that are intimately linked to the criminal-justice system. Doc. 128, at 32 (asserting that civil-forfeiture cases are often "directly related to . . . criminal cases"). By his own admission, Taylor is a "state actor[] and acting under color of state law when [he] prosecute[s] civil-forfeiture actions." Doc. 94, at 11. *Contra Cochise Consultancy, Inc.* v. *United States ex rel. Hunt*, 139 S. Ct. 1507, 1514 (2019) ("[The False Claims Act] does not make the relator anything other than a private person . . . ."); *Kelly*, 9 F.3d at 760 ("Qui tam relators pursue their claims essentially as private plaintiffs . . . ."). Taylor decides whether to file the actions. App. 61-62. He decides whether to settle them. App. 63. He harnesses intrusive investigative

tools. Doc. 132-2, at 2-3 (receiving a defendant's text messages via a detective). He can have property seized through *ex parte* orders. Ind. Code § 34-24-1-2(a)(3). In short, he "wield[s] governmental powers" and does so as a prosecutorial actor in Indiana's criminal-justice system. *See Kelly*, 9 F.3d at 760. *But cf. Am. Bankers Mgmt. Co.* v. *Heryford*, 885 F.3d 629, 634, 637 (9th Cir. 2018) (holding that *Kelly* "compels us" to reject a challenge to contingency-fee enforcement of unfair-competition law, citing the questionable ground that the challenger failed to show that the system was "meaningfully different from qui tam litigation").

Whatever might be said of False Claims Act suits—or others where the government seeks to vindicate proprietary interests rather than sovereign ones—*Marshall*'s teaching applies straightforwardly in civil-forfeiture prosecutions like Indiana's. When the state acts purely in its sovereign enforcement capacity, its prosecutors' duty is not to maximize financial returns, but to see "that justice shall be done." *Freeport-McMoRan Oil & Gas Co.*, 962 F.2d at 47 (citation omitted). In this sphere, *Marshall* is clear: If less "rigid" than in its application to judges, due process imposes a constraint on prosecutors' financial stake in their cases. 446 U.S. at 248, 250-51. And to borrow the district court's words, it is "hard to imagine a financial interest more direct" than a contingency-fee scheme of the sort at issue here. App. 10.

### 4. Defendants' remaining arguments were flawed.

For their part, Defendants offered a range of defenses of contingency-fee prosecutors—most of which the district court ignored and all of which lack merit.

a.    Defendants asserted that there are "significant differences" between public prosecutors and private ones—chief among them that "private attorneys bringing civil-forfeiture actions are not 'bound to fulfill the same type of public duty as government prosecutors.'" Doc. 128, at 22, 23 (quoting *Kelly*, 9 F.3d at 760). That is wrong. "The State cannot avoid its constitutional responsibilities by delegating a public function to private parties." *Georgia* v. *McCollum*, 505 U.S. 42, 53 (1992). And here, Taylor admits that he is a "state actor[] and acting under color of state law." Doc. 94, at 11. He exercises the same powers as the public-sector prosecutors who bring forfeiture actions elsewhere in Indiana and across the nation. *See* Doc. 120-31, at 2-95 (forfeiture complaints filed by deputy prosecutors in seventeen Indiana counties). When his firm (or former firm) faces exposure to damages liability, it claims the mantle of absolute prosecutorial immunity "as an advocate for the State." Br. of Garrison Law Firm L.L.C. Supp. Mot. Summ. J. at 20, *Economan* v. *Cockrell*, No. 20-cv-32 (N.D. Ind. Feb. 28, 2023) (Doc. 161). In short, he exercises the state's prosecutorial power, and he is subject to the constitutional constraints that accompany that power—including that articulated in *Marshall*.

Defendants likewise erred in asserting that *Marshall*'s standard applies only when the government pursues criminal remedies, not civil. Doc. 128, at 22. *Marshall* itself, after all, involved a civil-enforcement action, not a criminal one. That is not to say, of course, that there are *no* forms of civil litigation in which governments may retain contingency-fee counsel; "like other associations and private parties," for instance, governments have "a variety of proprietary interests" and can "pursue those interests in court." *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982); *accord City & Cnty. of San*

*Francisco* v. *Philip Morris, Inc.*, 957 F. Supp. 1130, 1135 (N.D. Cal. 1997) (declining to disqualify contingency-fee counsel where the government's "role in this suit is that of a tort victim, rather than a sovereign seeking to vindicate the rights of its residents or exercising governmental powers"). But this case is far from those. As the decision below acknowledged, Indiana's civil-forfeiture system falls squarely on the sovereign, public-law end of the spectrum. App. 13. Defendants acknowledged as much also. Doc. 128, at 32. And as Taylor himself admitted, Indiana's duty in enforcing its civil-forfeiture statutes is not to maximize forfeiture judgments, but to ensure "big J justice." Doc. 120-4, at 74-75. *Accord Marshall*, 446 U.S. at 249. Under a straightforward application of *Marshall*, Defendants' eat-what-you-kill compensation scheme subverts that duty in a way the Due Process Clause forbids.

       b.      Defendants also contended that "there is no evidence" Taylor holds any "inappropriate subjective bias" in enforcing Indiana's civil-forfeiture laws. Doc. 128, at 29. That is immaterial. For disinterestedness standards, "'[t]he imperatives of due process' require application of an objective standard in all cases, 'whether or not actual bias exists or can be proved.'" *Gacho*, 986 F.3d at 1071. That principle applies with equal force to the standard governing prosecutors. In *Marshall* itself, the Court did not inquire into subjective motives; its method of analysis was objective. *See* p. 16, *supra*. Indeed, it is precisely because of "[t]he difficulties of inquiring into actual bias" and "the fact that the inquiry is often a private one" that "the need for objective rules" is acute. *Caperton*, 556 U.S. at 883; *accord Young*, 481 U.S. at 805-06. Under Taylor's arrangements, every person who finds their property targeted in a forfeiture action knows that the prosecutor's vast discretion is

"held by one who st[ands] to reap personal financial gain" from enforcing the law against them. *McKinney*, 948 N.E.2d at 1161. Whatever his motives, such a compensation structure violates the due-process standard set forth in *Marshall*.

c.    Lastly, Defendants attempted to downplay Taylor's prosecutorial discretion. Because Taylor's county-prosecutor clients "retain[] authority" over civil-forfeiture cases at some level—Defendants contended—that purges the risk that Taylor's financial stake may distort his judgment. Doc. 128, at 26. As a factual matter, that theory is inaccurate. Under his contracts, for example, Taylor has plenary authority over some of the most important aspects of his case: He has the power to make "[d]ecisions to enter into a settlement agreement" and "decisions to proceed to trial"—and to do so "without consulting the Prosecuting Attorney." *E.g.*, App. 28. More important, Defendants' theory of "ultimate authority" cannot be squared with *Marshall*'s premise. Doc. 128, at 3. Most prosecutors, after all, report upward to someone—the prosecuting official in *Marshall*, for instance, answered to the national office of the Employment Standards Administration. 446 U.S. at 240, 252. That a given prosecutor is not an apex officer does not eliminate the "realistic possibility" that his or her judgment will be distorted by "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process." *Id.* at 249, 250.

The record here illustrates the point. Defendants asserted that county prosecutors "maintain full authority to review all case files, reverse course, or take over" Taylor's prosecutions. Doc. 128, at 26. In reality, however, Taylor typically files his civil-forfeiture cases without the local prosecutor's knowledge or involvement. App. 62. He typically litigates them without the prosecutor's knowledge or involvement. App. 62-63. He typically settles

them without the prosecutor's knowledge or involvement. App. 63. On their end, the county prosecutors typically "take great pains" not to monitor Taylor's cases. Doc. 120-10, at 10 (Hancock Prosecutor Dep.); Doc. 120-10, at 27 ("I do not look at the forfeiture cases. I do not review the litigation in the forfeiture cases. I do not review the disposition of the forfeiture cases."). No prosecutor, evidently, notices when Taylor fails to return property in compliance with court orders.[8] No one noticed when a *pro se* defendant "wr[ote] Mr. Joshua Taylor almost 2 months ago asking where my money is and still to this day no response."[9] No one noticed when Taylor served a subpoena on a defendant's bank, but (seemingly by mistake) drafted it so that it appeared to be coming from the defendant himself.[10] No one noticed that—for fully a half decade—Taylor failed to give property owners a statutorily mandated notice about how to seek provisional release of their property.[11] In sum, Taylor is the actor exercising the state's prosecutorial power, and with that power come the constitutional constraints articulated in *Marshall*. Amya Sparger-Withers and the class were entitled to judgment as a matter of law.[12]

---

[8] Doc. 120-18, at 2 (documenting incident in which Taylor entered into a settlement to return $1,394 but did not return it for a year and a half).

[9] Doc. 120-21, at 2; Doc. 120-20, at 4 (documenting Taylor's non-compliance with court's deadline to take a position on whether seized $3,980 "are still eligible for forfeiture").

[10] Doc. 120-4, at 78.

[11] Doc. 120-4, at 27-29; Ind. Code § 34-24-1-2(k).

[12] Below, Defendants indicated in passing that any relief entered against them should be against their current contracts only rather than against their implementation of the statute on which the contracts are based. *See, e.g.*, Doc. 134, at 19-20; *see generally* Doc. 1, at 19-21 (complaint, seeking relief as to both statute and contracts). That suggestion lacked merit.

II.    **The federal courts have the power to hear this case.**

The morning after being served with process in this case, Taylor moved to voluntarily dismiss the state-court forfeiture action against Amya Sparger-Withers. The state court granted that motion a day later. Defendants then parlayed that development into a motion to dismiss this (then-putative) class action—arguing, at first, that Sparger-Withers lacked standing and then switching to mootness. The district court rejected both formulations, and this Court can be confident of its and the lower court's subject-matter jurisdiction.

A.    **Amya Sparger-Withers had standing when the case was filed.**

Standing "is evaluated at the time suit is filed," *Milwaukee Police Ass'n* v. *Bd. of Fire & Police Comm'rs*, 708 F.3d 921, 928 (7th Cir. 2013), and on the date this suit was filed, Amya Sparger-Withers had standing. On that date, the state-court civil-forfeiture action against her was live. Doc. 121, at 18 (Pls.' Statement of Undisputed Facts). Joshua Taylor was prosecuting it, on a contingency-fee basis. Doc. 121, at 18. That arrangement visited a present and ongoing harm on Sparger-Withers, which was traceable to Taylor and his contingency-fee arrangement and redressable by a judgment enjoining that arrangement. Doc. 1, at 12-14. Against this backdrop, Sparger-Withers had standing on the date that matters—the day the case began. App. 35-36 (district court, agreeing).

B.    **The case continued to present a live controversy when the district court certified the class and does so still.**

The case continued to present a justiciable controversy after Taylor jettisoned Sparger-Withers's state-court forfeiture case. That act of voluntary cessation did not moot

---

Given how it resolved the case, however, the district court had no occasion to address the issue, and, whatever the proper scope of relief, the decision below should be reversed.

her individual claim. Even had her individual claim been mooted, moreover, two doctrines specific to class actions would secure jurisdiction over the class.

### 1. Joshua Taylor's act of voluntary cessation did not moot Sparger-Withers's individual claim.

Below, Defendants contended that by dismissing his forfeiture action against Sparger-Withers, Taylor extinguished her individual claim. But that is just the sort of "voluntary cessation" that cannot divest the federal courts of jurisdiction. "[A] defendant seeking dismissal based on its voluntary change of practice or policy must clear a high bar." *Ciarpaglini* v. *Norwood*, 817 F.3d 541, 545 (7th Cir. 2016). It is the defendant's "'heavy burden' of making 'absolutely clear' that it could not revert" to its allegedly wrongful behavior. *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U.S. 449, 457 n.1 (2017). And for obvious reasons: "Were the rule more forgiving, a defendant might suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off." *FBI* v. *Fikre*, 144 S. Ct. 771, 777 (2024).

Defendants came nowhere close to carrying their burden. To start, Taylor dismissed his case without prejudice, leaving him free to re-file the precise suit again. *Compare* Ind. Trial Rule 41(A)(2) (without-prejudice dismissal orders), *with* Doc. 46-7, at 2 (dismissal order). Even had Taylor dismissed the case more artfully, moreover, nothing would prevent him from violating Sparger-Withers's due-process rights again in the future. *See Doe ex rel. Doe* v. *Elmbrook Sch. Dist.*, 658 F.3d 710, 719 (2011) ("[A] likelihood that would be 'too speculative to support' a finding of initial standing can be sufficient to defeat an attempt to show mootness caused by voluntary cessation."), *adopted in relevant part*, 687 F.3d 840, 842-43 (7th Cir. 2012) (en banc). Taylor's contracts remain in place; his for-profit

prosecutions continue apace. All told, the case's posture is indistinguishable from one decided by the Supreme Court last month. *Fikre*, 144 S. Ct. at 778 (holding that challenge to No Fly List was not mooted by government's having removed the plaintiff from the list eight years earlier because nothing stopped government from "do[ing] again in the future what it is alleged to have done in the past").

Between this case and *Fikre*, in fact, the one difference cuts in Sparger-Withers's favor: The record strongly suggests "an individually targeted effort to neutralize [this] lawsuit." *Ciarpaglini*, 817 F.3d at 545. There's the timing—with the dismissal motion filed the morning after service of process. There's a string of credulity-straining rationalizations.[13] Even Taylor's internal explanations were inaccurate.[14] Simply, this case spotlights why the voluntary-cessation bar is as high as it is. On this record, Defendants failed to carry their burden, and Sparger-Withers's individual claim remains live.

---

[13] *Compare, e.g.*, Doc. 65, at 7 (Defendants' asserting that the dismissal was based on the belief that "misdemeanor marijuana possession is not a predicate crime for forfeiture"), *with C.R.M.* v. *State*, 799 N.E.2d 555, 557 & nn.1-2 (Ind. Ct. App. 2003) (noting misdemeanor marijuana possession as predicate crime for forfeiture), *and* Doc. 71, at 9 (noting that Taylor has elsewhere argued that the state "'is not constrained by [a] Defendant's conviction for possession of marijuana in proving its forfeiture case'"), *and* Doc. 71, at 7-8 (identifying cases where Taylor sought forfeiture against defendants who faced charges of misdemeanor marijuana possession alone).

[14] *Compare* Doc. 132-3, at 4 (advising police chief that "Mr. Eaton [the Hancock County Prosecutor] and I decided to dismiss the civil forfeiture"), *with* Doc. 120-10, at 26-27 (Eaton Dep.) ("I did not at any time discuss this case with Mr. Taylor or have any knowledge of the disposition or actions in this case. . . . [Q] . . . What is your understanding of why it was dismissed? A I don't have one.").

### 2. Even had Sparger-Withers's individual claim been mooted, the case falls within two class-action-specific exceptions to the mootness doctrine.

Even had Sparger-Withers's individual claim been mooted, Article III jurisdiction still would not have been extinguished for the class under two doctrines: the "inherently transitory" doctrine and the "picking off" doctrine.

a. Under the inherently-transitory doctrine, "the fact that a class 'was not certified until after the named plaintiffs' claims had become moot does not deprive [the courts] of jurisdiction' when . . . the harms alleged are transitory enough to elude review." *Nielsen* v. *Preap*, 139 S. Ct. 954, 963 (2019) (plurality opinion). The exception applies when two conditions are met, and both were satisfied here. App. 36-40 (district court, so holding).

*First*, "it is uncertain that any potential named plaintiff . . . would have a live claim long enough for a district court to certify a class." *Olson* v. *Brown*, 594 F.3d 577, 582 (7th Cir. 2010). As prosecutor, Taylor has discretion over whether and when to drop forfeiture actions. And as Sparger-Withers's experience shows, he can swiftly abandon any case if the defendant challenges his contingency-fee arrangements. That discretion aligns Sparger-Withers's claim directly with the inherently-transitory doctrine, since "uncertainty" about how long any named plaintiff's claim will remain live is "the essence of the exception." *Id.*

*Second*, "there will be a constant class of persons suffering the deprivation complained of in the complaint." *Id.* Taylor lost no time booting Sparger-Withers's case. But for everyone else, it's business as usual, with Taylor continuing to prosecute dozens of forfeiture cases on contingency fee. Docs. 120-13, 120-14, 120-15. This case thus readily meets the second requirement of the inherently-transitory doctrine.

b.      The case also satisfies the "picking off" doctrine. For decades, this Court has held that "a case does not become moot" merely by a defendant's mooting the named plaintiff's claim, so long as "a motion for class certification has been pursued with reasonable diligence and is then pending before the district court." *Susman* v. *Lincoln Am. Corp.*, 587 F.2d 866, 870 (7th Cir. 1978). This doctrine, too, prevents defendants from "manufactur[ing] mootness in order to prevent a class action from going forward." *Espenscheid* v. *DirectSat USA, LLC*, 688 F.3d 872, 874 (7th Cir. 2012) (describing the doctrine). Here, Sparger-Withers moved for class certification the same day her complaint was filed; Taylor immediately dismissed the forfeiture action against her, then claimed mootness. That sequence easily satisfies the picking-off doctrine. *Serrano* v. *Customs & Border Patrol*, 975 F.3d 488, 492 n.1 (5th Cir. 2020) (per curiam).

## CONCLUSION

The judgment of the district court should be reversed.

Dated: April 22, 2024.　　　　　　　　　Respectfully submitted,

/s/ Samuel B. Gedge

Anthony B. Sanders　　　　　　　　　Samuel B. Gedge
INSTITUTE FOR JUSTICE　　　　　　　　　*Counsel of Record*
12143 24th St N　　　　　　　　　Michael N. Greenberg
Lake Elmo, MN 55042　　　　　　　　　Robert M. Belden
Telephone: 651.278.0257　　　　　　　　INSTITUTE FOR JUSTICE
E-mail: asanders@ij.org　　　　　　　　901 N. Glebe Road, Suite 900
　　　　　　　　　　　　　　　　　Arlington, VA 22203
　　　　　　　　　　　　　　　　　Telephone: 703.682.9320
　　　　　　　　　　　　　　　　　Facsimile: 703.682.9321
　　　　　　　　　　　　　　　　　E-mail:　sgedge@ij.org
　　　　　　　　　　　　　　　　　　　　　mgreenberg@ij.org
　　　　　　　　　　　　　　　　　　　　　rbelden@ij.org

J. Lee McNeely
Cynthia A. Bedrick
Scott A. Milkey
MCNEELYLAW LLP
2177 Intelliplex Drive, Suite 251
Shelbyville, IN 46176
Telephone: 317.825.5110
E-mail:　LMcNeely@McNeelyLaw.com
　　　　　CBedrick@McNeelyLaw.com
　　　　　SMilkey@McNeelyLaw.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Cir. R. 32(c) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 13,992 words.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Expanded font.

Dated: April 22, 2024.                    /s/ Samuel B. Gedge
                                          Samuel B. Gedge

                                          *Counsel for Appellant*

**SHORT APPENDIX**

**SHORT APPENDIX**

**TABLE OF CONTENTS**

**Page**

Order on Motions for Summary Judgment (Feb. 7, 2024) (Doc. 137)............................ App. 1

Final Judgment (Feb. 7, 2024) (Doc. 138) ...................................................................... App. 22

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) is in the appendix bound with this brief. I further certify that all material required by Circuit Rule 30(b) is in the separate appendix.

Dated: April 22, 2024.

/s/ Samuel B. Gedge
Samuel B. Gedge

*Counsel for Appellant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMYA SPARGER-WITHERS on behalf of  )
herself and all others similarly situated,  )
  )
                 Plaintiff,  )
  )
                 v.  )     No. 1:21-cv-02824-JRS-CSW
  )
JOSHUA N. TAYLOR, et al.,  )
  )
            Defendants.  )

**Order on Motions for Summary Judgment**

This is a class action civil rights case that presents a single legal question: does

Indiana's system of contingency-fee civil forfeiture prosecution violate due process?

The Court denied a mootness challenge and certified a class of plaintiffs who are

subject to such prosecutions.  (ECF No. 88.)  Now before the Court are the Parties'

cross motions for summary judgment on the legal question.  (ECF Nos. 120 (Plaintiff),

126 (Defendants).)

## I.    Legal Standard

The legal standard on summary judgment is well established:

> Summary judgment is appropriate "if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to
> judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute
> of material fact exists 'if the evidence is such that a reasonable jury could
> return a verdict for the nonmoving party.'" *Skiba* [*v. Illinois Cent. R.R.
> Co.*, 884 F.3d 708, 717 (7th Cir. 2018)] (quoting *Anderson v. Liberty
> Lobby, Inc.*, 477 U.S. 242, 248 [] (1986)). A theory "too divorced from the
> factual record" does not create a genuine issue of material fact. *Id.* at
> 721. "Although we construe all facts and make all reasonable inferences
> in the nonmoving party's favor, the moving party may succeed by
> showing an absence of evidence to support the non-moving party's
> claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020).

App. 2

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir.

2021).  The Court applies that standard here.

## II.   Discussion

### A. Overview

The Court assumes familiarity with the operative facts, which are set forth in

greater detail in its Order on Motion to Dismiss, (ECF No. 88), and the Parties' briefs

on summary judgment, (ECF Nos. 121, 128).  In short, Indiana, alone among the fifty

states, allows private attorneys to prosecute civil forfeitures on a contingency fee

basis.  The Institute for Justice ("IFJ"), the civil-libertarian public interest group

serving as class counsel here, argues that arrangement violates due process.

This case should be easy: Indiana's law, while out of step with modern policy

consensus, is in line with early American practice and indistinguishable from that

other atavism, the *qui tam* action, which has been held constitutional.  Note: *The

History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 97–100 (1972)

(describing early ubiquity and slow decline of the *qui tam* action); Note: *Private

Prosecution: a Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L.J. 209,

222 (1955) (surveying jurisdictions and noting, as of 1955, twenty-one states and the

federal government with private contingency enforcement of criminal laws); *see also,

e.g.*, *Rotella v. Wood*, 528 U.S. 549, 557 (2000) (explaining RICO "private attorney

general" scheme with treble damages to motivate private enforcement).  Long before

there was a public prosecutor, or even a clear divide between civil and criminal

actions, states provided for law enforcement by informers working for reward.  *United*

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 3 of 21 PageID #: 3137
Case: 24-1367      Document: 25        Filed: 04/22/2024      Pages: 96

App. 3

*States v. UCB, Inc.*, 970 F.3d 835, 839 (7th Cir. 2020) (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805)) ("Suits of this type were once so common that '[a]lmost every' penal statute could be enforced by them."). The historic irony here is that civil libertarians in previous centuries preferred that old model to the new one, which IFJ would have the Court force Indiana to adopt. The Court, not being a legislature and having no proper role in policy debates, should be able to leave Indiana to its own devices where long historic practice gives its imprimatur. *Accord Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 39 (1991) (Scalia, J., concurring) (tracing the development of due process jurisprudence) ("In my view, it is not for the Members of this Court to decide from time to time whether a process approved by the legal traditions of our people is 'due' process, nor do I believe such a rootless analysis to be dictated by our precedents."). But some confusion in the caselaw makes this case more difficult than it ought to be in principle.

### B.  Supreme Court Precedent

IFJ thinks there is controlling Supreme Court precedent. It rests its case on *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), which, it contends, establishes a "financial disinterestedness requirement on prosecutors." (Pl.'s Br. Supp. 8, ECF No. 121.) It is worth risking tedium by walking through that decision in detail.

In *Marshall*, the Supreme Court was asked to decide whether a provision of the Fair Labor Standards Act violated the due process clause by allowing civil penalties assessed by the Department of Labor to be paid to the Department of Labor. *Id.* at 239. The Court held it did not. *Id.* at 242.

3

App. 4

The Court began its discussion by declaring, "[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Id.* The Court noted that it "jealously guarded" the requirement for a neutral tribunal, and cited *Tumey v. Ohio*, 273 U.S. 510 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), as examples of cases in which the Court demanded perfect financial disinterestedness from judges. *Marshall*, 446 U.S. at 242. But where the District Court had applied those cases to invalidate the civil penalty scheme at issue, the Supreme Court reversed, explaining that "[t]he rigid requirements of *Tumey* and *Ward*, designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." *Id.* at 248. The Court reasoned that "[p]rosecutors need not be entirely 'neutral and detached,'" because, "[i]n an adversary system, they are necessarily permitted to be zealous in their enforcement of the law." *Id.* (quoting *Ward*, 409 U.S. at 62). The Court quoted *Tumey* for the proposition that states "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." *Id.* at 249 (quoting *Tumey*, 273 U.S. at 535).

In the next paragraph, though, the Court cautioned there were still some limits on acceptable prosecutorial behavior. *Id.* ("We do not suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors."). The Court noted that "prosecutors are public officials" with a duty to "the public interest," *id.* (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)); that "enforcement decisions

4

of an administrator" were not "immunize[d] from judicial scrutiny," *id.*; and that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions," *id.* at 249–50 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) and 28 U.S.C. § 528).  After noting those outer bounds, the Court concluded, "[b]ut the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime."  *Id.* at 250.

The Court did not sharpen its definition of the outer bounds in its application of the law to the facts.  It simply observed, "[i]n this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote."  *Id.*  An apophatic footnote adds, "[i]n particular, we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process."  *Id.* at 250 n.12.  Another adds, "[w]e need not, of course, say whether the alleged biasing influence is to[o] remote to raise constitutional objections even under the standards of *Ward* and *Tumey*."  *Id.* at 252 n.14.  In the body of its discussion, the Court reasoned that on the facts before it (1) "[n]o governmental official stands to profit economically from vigorous enforcement," *id.* at 250; (2) the penalties were such a small portion of the agency budget that "the

5

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 6 of 21 PageID #: 3140
Case: 24-1367      Document: 25      Filed: 04/22/2024      Pages: 96

App. 6

prospect of institutional gain" was low, *id.*; and (3) the penalties were not guaranteed to return to the specific office that won them, *id.*  The Court also thought that "under a realistic appraisal of psychological tendencies and human weakness," *id.* at 252 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)), no agency prosecutor's "enforcement decisions would be distorted" by the possibility of financial gain, *id.*

This Court reads *Marshall* to be a straightforward application of then-existing law to an easy set of facts.  It is a not a landmark case—it seems to have no pretensions to be—and the Court thinks it unwise to read its various observations as overturning old law *sub silentio* or establishing new principles.

On the Court's reading, *Marshall* is faithful to precedent.  The District Court there applied a strict disinterestedness requirement to an administrative prosecutor; the Supreme Court corrected it: strict disinterestedness is not required of prosecutors. *Id.* at 248–49.  That is the heart of the legal discussion in Section II.A, and that was enough to resolve the case.  If the opinion stopped there, of course, IFJ would have no help from it: the *Marshall* Court explicitly distinguished judges, who must be financially neutral, from prosecutors, who need not.  And in case that were not clear enough, the Court cited with apparent approval its earlier precedent wholeheartedly endorsing private prosecution on contingency.  *Id.* at 249 (quoting *Tumey*, 273 U.S. at 535).  The Court, as it happens, did not leave off there, and IFJ understands the remainder of its discussion to undercut the dispositive portion.  That is a misreading. *Cf. U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993) (describing as "exaggerated" the argument that *Marshall* "strongly suggested" a financial

disinterestedness requirement for prosecutors).  The *Marshall* Court did not stop at its quote approving the state's power to "stimulate prosecutions" with financial incentives, *id.*, because to have done so would have invited later problems—problems, ironically, that would spring from overreading a shorter decision.

So, for instance, the Court did not want its decision to be read to repudiate existing law on judicial review of administrative enforcement decisions.  Thus it reserved its power to review enforcement decisions, and cited administrative law cases where it had done so.  *Id.* (citing *Dunlop v. Bachowski*, 421 U.S. 560, 567, n.7 (1975) and *Rochester Telephone Corp. v. United States*, 307 U.S. 125 (1939)).  Nor did the Court want to disclaim existing law setting constitutional limits on prosecutors' discrimination along "unjustifiable standard[s] such as race, religion, or other arbitrary classification." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).  Thus it reserved the possibility that some arrangements "may" be unconstitutional. *Marshall*, 446 U.S. at 250; *contra Brucker v. City of Doraville*, 38 F.4th 876, 886 (11th Cir. 2022) (quoting *Marshall*, 446 U.S. at 249–50) (amending "may . . . raise serious constitutional questions" to "raise[s] serious constitutional questions" and analyzing facts accordingly).  And it cited the rule against federal prosecutors' financial conflicts to reinforce its earlier observation that public officials are limited (at least by statute) in their partisanship.  *Id.* (citing 28 U.S.C. § 528); *cf. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 633 n.10 (1989) (noting in a Sixth Amendment hypothetical, "[t]he fact that a federal statutory scheme authorizing [criminal] contingency fees . . . is at odds with model disciplinary rules or state disciplinary

7

codes hardly renders the federal statute [constitutionally] invalid."). But those are defensive moves; the Court was not announcing new rules. The Court makes that clear when it returns, in summation, to its original proposition: "the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges" because impartial judges, not impartial prosecutors, are the guarantors of a fair adversarial proceeding. *Id*.

The Court in Section II.B continues in its modest, defensive posture. The Court refuses to announce a general rule on prosecutorial self-interest. *Id*. Its footnote suggests any rule it might have made would concern "prosecutions against particular persons"—perhaps the protected classes alluded to in *Bordenkircher*—rather than "a general zealousness in the enforcement process"—perhaps like the structural incentives of contingency-fee prosecution at issue here. *Id*. n.12. But that must be speculation: the Court did not announce a rule. The Court then shows how harmless the financial incentives are on the facts presented. IFJ wants to read the factors it considers—like the "financial dependen[ce]" *vel non* of an official on penalties or the "realistic possibility" of distortion in prosecutorial judgment, *id*. at 250–51—as establishing rules for this Court's analysis, (Pl.'s Br. Supp. 23, ECF No. 121). But the *Marshall* Court does not refer to those factors in order to establish new rules (which would, after all, contradict its exposition of the law earlier in the opinion); it uses the factors to show that there is not a due process violation and to suggest that there might not even be a violation under the more stringent "judicial" requirements of *Ward* and *Tumey*. *Marshall*, 446 U.S. at 252 n.14. The Court's quotation from

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 9 of 21 PageID #: 3143
Case: 24-1367      Document: 25         Filed: 04/22/2024      Pages: 96

App. 9

*Withrow v. Larkin*, 421 U.S. 35 (1975), reinforces that play: *Withrow* held that agency officials may simultaneously serve as prosecutors and judges, so long as a "realistic appraisal" of psychology suggests no motive for bias. *Withrow*, 421 U.S. at 47. When the *Marshall* Court imports the *Withrow* standard, it is, as with its references to *Ward* and *Tumey*, showing that the challenged scheme, so far from being impermissible under its Section II.A standard, might be permissible even under a much more stringent standard.

What, then, does *Marshall* do for this case? The Supreme Court there affirmed that prosecutors need not be neutral like judges; it quoted, without overturning, precedent allowing, even commending, contingency-fee private prosecution; and it suggested that some prosecutorial misbehavior could be unconstitutional without saying what. At one interpretive extreme, *Marshall* resolves the case: *Tumey* says contingency-fee private prosecution is allowed, *Marshall* did not touch that line of precedent, it stands as controlling law, and so IFJ cannot carry its burden of showing Indiana's scheme unconstitutional. *Tumey*, 273 U.S. at 535 (citing *United States v. Murphy & Morgan*, 41 U.S. 203 (1842)) ("The Legislature may offer rewards or a percentage of the recovery to informers."). That would be quite the backfire for IFJ. At the other end of the interpretive spectrum, *Marshall* does nothing at all: it says financially interested prosecutors might violate due process, implicitly limiting *Tumey* and its forebears, but, refusing to give any rule, throws future courts back onto general due process principles. *See, e.g., United States v. Lovasco*, 431 U.S. 783, 796–97 (1977) (admitting, in case of prosecutorial delay, some outer bound to due

9

process, but leaving "lower court[s]" to apply "the settled principles of due process" to determine where exactly the boundary lies). This, too, would not favor IFJ with a bright line rule, but instead would require an ad hoc review of each case.

This Court, if forced to choose, favors the first option: *Marshall* probably intended to leave *Tumey* untouched, because, had it wished to disavow *Tumey*, it would have done so explicitly, and it did not. That choice would minimally resolve this case. The Court will not rest there because the contrary argument has some merit: why would the *Marshall* Court say that some financial interests could "raise serious constitutional questions" if it believed that continency-fee private prosecutions were acceptable? *Marshall*, 446 U.S. at 250. It is hard to imagine a financial interest more direct than that. There are ways to rebut that argument—namely, as this Court has endeavored above, to point out that the *Marshall* Court's general catch-all statement that there *might* be an outer limit should not be taken as an affirmative statement that such a limit *does* exist and overrules precedent. (Alternately, one could read the *Marshall* Court to have implicitly distinguished between the private prosecutors mentioned in *Tumey* and the "public officials," "administrator[s]," and "administrative prosecutors" it deals with in its limiting statements. *Id.* at 249–50. Perhaps the Court thought that public prosecutors were subject to different standards.) To reinforce its judgment, though, this Court thinks it worthwhile to proceed on a hypothetical: as if it is wrong about *Marshall*, such that *Marshall* does abrogate earlier cases and does establish an unspecified "financial disinterestedness" requirement for prosecutors. That means turning to general due process analysis.

10

C. Due Process Standard

A threshold issue in the general analysis, not fully addressed by either party in its briefing, is which standard the Court should apply to decide whether Indiana's law comports with "due process," which words, standing alone, have been called "cryptic and abstract." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). It is an unsettled question. *See generally* Wayne R. LaFave, Jerod H. Israel, Nancy J. King, & Orin S. Kerr, 1 Crim. Proc. § 2.7(c) (4th ed.) (2023) (explaining ongoing debate between historicist and interest-balancing approaches). Sometimes the Supreme Court has endorsed a historical approach to determining the content of "due process," which looks to "settled tradition," "historical practice," and "our common-law heritage" to determine constitutionality. *Medina v. California*, 505 U.S. 437, 444–46 (1992) (citing *Patterson v. New York*, 432 U.S. 197, 202 (1977) and *Martin v. Ohio*, 480 U.S. 228, 232 (1987)). Elsewhere the Supreme Court applies an interest balancing test that calls on the courts' intuitions of fairness. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The Supreme Court recently said that *Medina*'s historical approach should be used for "state procedural rules that are part of the criminal process," while *Mathews*' interest-balancing approach applies, apparently, everywhere else. *Nelson v. Colorado*, 581 U.S. 128, 134 (2017) (citing *Kaley v. United States*, 571 U.S. 320, 351 n.4 (2014) (Roberts, C.J., dissenting)). This Court is not certain how broadly to read that statement, which, if taken as absolute, would bifurcate due process

jurisprudence according to whether the challenged rule was categorized as "criminal" or "not criminal."  That result, without regard to its underlying merits or defects, seems extreme and might be unintentional given the lack of discussion with which it is accompanied.  The Supreme Court had previously "decline[d] . . . to define the respective reach of *Mathews* and *Medina*," *Kaley*, 571 U.S. at 334, and had explicitly rejected *Mathews*' general applicability, *Dusenbery*, 534 U.S. at 168 ("[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims.").  This Court finds it hard to believe that the Supreme Court considers itself in *Nelson* to have resolved a long-running jurisprudential debate on the strength of a few sentences and a citation to a dissenting footnote.  In at least one later case the Supreme Court seems not to have regarded *Nelson* as establishing a general rule.  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 131 n.4 (2023) (Gorsuch, J., opinion) (calling for application of *Medina* to question of civil procedure without reference to *Nelson* or *Kaley*); *id.* at 175 n.3 (Barrett, J., dissenting) (also appealing to historic practice).

The problem, perhaps otherwise academic, matters here because the parties do not agree whether Indiana's civil forfeiture scheme is basically criminal or not.  (*Compare* Pl.'s R. 28, ECF No. 133 ("Civil forfeitures in Indiana . . . are rooted in the state's criminal-justice apparatus.") *with* Defs.' Br. Supp. 4, ECF No. 128 (quoting *Katner v. State*, 655 N.E.2d 345, 347 (Ind. 1995)) ("Forfeiture actions . . . [are] properly classified as civil in nature.").)  Ironically, IFJ urges the Court to make a more or less disguised policy choice, while its "criminal" categorization would, under *Nelson*, call

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 13 of 21 PageID #: 3147
Case: 24-1367     Document: 25          Filed: 04/22/2024     Pages: 96

App. 13

for *Medina's* deference to history, and the State urges a historical approach, while its "civil" categorization would call for *Mathews'* policy balancing.   To add to the confusion, IFJ rejects the application of *Mathews* here, because, in its view, *Mathews* balancing applies when deciding "how much" process is due and not when deciding whether a given process is fair.  (Pl.'s R. 46, ECF No. 133.)

This Court, which must after all use some principle of decision, thinks it best to apply *Medina*.  The *Mallory* notes seem to indicate that the historical approach is in favor.  And if *Nelson* gives the rule, *Medina* is appropriate because Indiana's civil-forfeiture system is seen as "part of the criminal process," *Nelson*, 581 U.S. at 134—it resembles criminal procedure more than the novel administrative processes for which *Mathews'* test was developed, *cf. Medina*, 505 U.S. at 444 (noting *Mathews'* origin in administrative context and urging caution in expanding its scope); *Dusenbery*, 534 U.S. at 167 (declining to apply *Mathews* outside of administrative procedure context); *Kaley*, 571 U.S. at 334 (noting the argument for limiting *Mathews*).  Or if, as *Dusenbery* suggests, the Court is free to choose its own standard, *Medina* seems better suited to this Court's limited constitutional role: Indiana's law is the product of "considered legislative judgment," *Medina*, 505 U.S. at 443; the Court has no roving commission to interfere with that judgment, *id.*; and may not impose its "personal and private notions" on the people of Indiana, *Dowling v. United States*, 493 U.S. 342, 352–53 (1990) (quoting *Lovasco*, 431 U.S. at 790); *Spencer v. State of Tex.*, 385 U.S. 554, 564 (1967) (quoting *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105 (1934) (Cardozo, J.), *overruled by Malloy v. Hogan*, 378 U.S. 1 (1964))

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 14 of 21 PageID #: 3148
Case: 24-1367     Document: 25       Filed: 04/22/2024     Pages: 96

App. 14

("[A] state rule of law 'does not run foul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser . . . .'").

Under *Medina*, a state law is not to be struck down unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina*, 505 U.S. at 446 (quoting *Patterson*, 432 U.S. at 202). "Historical practice is probative of whether a procedural rule can be characterized as fundamental." *Id.*; *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) ("Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice."); *accord Haslip*, 499 U.S. at 36 (Scalia, J., concurring) (advocating for historic practice to be not merely probative but dispositive, yet observing that even under the weaker thesis "very few cases have used the Due Process Clause, without the benefit of an accompanying Bill of Rights guarantee, to strike down a procedure concededly approved by traditional and continuing American practice."). "Contemporary practice" may be considered but is "of limited relevance to the due process inquiry." *Medina*, 505 U.S. at 447 (citing *Martin*, 480 U.S. at 236 and *Patterson*, 432 U.S. at 211); *accord Mallory*, 600 U.S. at 140 n.7 (Gorsuch, J., opinion) (citing *Ownbey v. Morgan*, 256 U.S. 94, 110–11 (1921)) ("[T]he meaning of the Due Process Clause is not measured by the latest popularity poll").

### D. *Medina* Analysis

Any historical evaluation begins with what should be obvious: our modern legal system is neither the only possible nor necessarily the best. By corollary, to note that a present feature of the system was introduced as a "reform" is not to prove it better—

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 15 of 21 PageID #: 3149
Case: 24-1367      Document: 25         Filed: 04/22/2024      Pages: 96

App. 15

only that its supporters wanted it thought so.  And no amount of support, whether now or in the past, suffices to show that a given position is really better, and not merely believed better.

At present, there is a divide, widely believed fundamental, between "criminal" and "civil" actions.  The state has a monopoly on criminal prosecution, through the public prosecutor, who is expected or constrained selectively to enforce the law.  This selective enforcement is called "prosecutorial discretion," and it is protected by absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) ("[T]his immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty.").  The prosecutor is paid a fixed salary independent of his or her success convicting criminals, and is exhorted to seek, not convictions, but justice.  *See* John D. Bessler, *Private Prosecution in America: Its Origins, History, and Unconstitutionality in the Twenty-first Century*, xxii (2022) (describing, and proffering as constitutionally ordained, the modern system).

Once, everything was different.  *See generally* Jonathan Barth, *Criminal Prosecution in American History: Private or Public,* 67 S.D. L. Rev. 119 (2022) (describing old system).  There was no definite line between criminal and civil actions. *E.g.*, *Taylor v. United States*, 44 U.S. 197, 210 (1845) (Story, J.) (discussing ambivalence between "penal" and "remedial" classifications in a forfeiture case).  There was no public official responsible for charging crimes, and the office of "prosecutor," if it existed at all, was a legal advisor to the government or lead counsel

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 16 of 21 PageID #: 3150
Case: 24-1367     Document: 25     Filed: 04/22/2024     Pages: 96

App. 16

on especially important cases. There was no general belief that some guilty individuals best not be charged. There was no absolute immunity for prosecutors. *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring) (identifying the distortions of 1871 common law created by the Supreme Court's post-*Imbler* "functional" immunity jurisprudence). Rewards were a common incentive for successful prosecutions. And there was no belief that the prosecutor (or informant) in a criminal case had any special duty to justice in the abstract, apart from his role as one side's advocate in an adversary system.

The Court has no role in the policy debate between the old system and the new. But it *is* a policy debate, which belongs to the people and their legislatures. Reasonable people can and have taken both sides: the old system prevailed for the first hundred years or so of this country's experience under the Constitution.[1] As the Court intimated in its overview, civil libertarians—people who shared IFJ's philosophic priors—once preferred it. *See* Barth at 151–52 (describing early

---

[1] Of course, what the Court refers to for convenience as the old "system" is in fact a collection of individual policies that were adopted or abandoned separately. And while the general landscape has changed—rather completely, as the secondary sources show—some individual policies survive. *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 279 (2010) (Roberts, C.J., dissenting from dismissal of cert.) (noting continued viability of private prosecution in some states). Often it is precisely those survivals that are troublesome to modern theorists who neglect history. Thus, for instance, IFJ points the Court to recent disapprobation of *qui tam* actions as interfering with a supposed 'unitary executive' power, under Article II, to control all prosecutions. (Pl.'s R. 16, ECF No. 133 (citing *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 450 (2023) (Thomas, J., dissenting)).) But history shows that *qui tam* actions were routine at ratification and were never believed to overstep executive power. One could double down and say that the Founders misunderstood their own law, and that the historic practice is no guarantee of constitutionality, *Polansky,* 599 U.S. at 450, but the honest move, when presented with historic fact that does not fit one's theory, is to abandon the theory, not the fact. Perhaps, then, the Constitution does not require that the executive control all prosecutions, but that all prosecutions *entrusted to the government* must be executive and not legislative or judicial.

American resistance to exclusive public prosecutions and standing public police force); *see also* I. Bennett Capers, *Against Prosecutors*, 105 Cornell L. Rev. 1561 (2020) (contemporary argument from a self-identified "progressive criminal justice scholar" against exclusively public prosecution).   To them, giving the state a monopoly over criminal enforcement was a dangerous innovation: it might allow, for instance, the politically well-connected to escape responsibility for their actions.   It took from ordinary citizens their ability to seek redress at law.   *Rehberg v. Paulk*, 566 U.S. 356, 364 (2012) (quoting *Stewart v. Sonneborn*, 98 U.S. 187, 198 (1879) (Bradley, J., dissenting)) ("[E]very man in the community, if he has probable cause for prosecuting another, has a perfect right, by law, to institute such prosecution . . . .").   And the idea of selective enforcement, which is habitual to modern observers, would have been asking for trouble: why allow the state to criminalize more behavior than it intended to suppress and then pick its targets at its sole discretion?   *Compare* Robert H. Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual Conference of United States Attorneys, April 1, 1940 (acknowledging federal prosecutors' "dangerous power" but relying on "[a] sensitiveness to fair play and sportsmanship" as "perhaps the best protection" against its abuse) *with* Lauren M. Ouziel, *Prosecution in Public, Prosecution in Private*, 97 Notre Dame L. Rev. 1071, 1079–83 (2022) (analyzing shift from private to public prosecution as an escape from traditional procedural limits on enforcement power).   That is hardly compatible with a government of laws not men.   And so forth.

It might now be difficult to see how people once thought that way—apparently more difficult than the Court would like to think, if the rampant presentism it finds in certain academic sources is anything to go by—but that does not excuse the Court, or, it hopes, the Parties, from the effort of historical imagination. The Court's role demands humility. The past two hundred years have seen two diametrically different systems of criminal (and here, quasi-criminal) justice exist beneath the same constitutional regime, which accommodated both. Clearly the Constitution is roomy enough to allow for policies that do not fit with modern orthodoxy. The Court has taken some pains to indicate the historic irony here not to endorse one view or the other, and still less to provoke discomfiture, but simply to illustrate, as vividly as possible, that a policy dispute is not forever settled because one side has the ascendancy. The Court may not—and ought not—stop a fight that is not won. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("By extending constitutional protection to an asserted right or liberty interest, [the courts], to a great extent, place the matter outside the arena of public debate and legislative action.").

Finally, because *Medina* does not by its terms admit that historic practice is dispositive, the Court will observe that a contingency-fee prosecutor has some rational basis. That basis is just what the Supreme Court identified in *Marshall*: that the adversary system expects each party to be zealous in its own cause. It is "judges . . . whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *Marshall*, 446 U.S. at 250. Even the Supreme Court in *Berger*—whose observation that a public prosecutor's

18

Case 1:21-cv-02824-JRS-CSW    Document 137    Filed 02/07/24    Page 19 of 21 PageID #: 3153
Case: 24-1367    Document: 25    Filed: 04/22/2024    Pages: 96

App. 19

interest "is not that it shall win a case, but that justice shall be done" gives the text

for many a sermon on prosecutors' noble disinterestedness—concluded that "[i]t is as

much [the prosecutor's] duty to refrain from improper methods calculated to produce

a wrongful conviction as it is to use every legitimate means to bring about a just one."

295 U.S. at 88.  So, to argue that a prosecutor becomes too zealous when motivated

by a contingent fee is to deny the basic premise of the adversary system.  There is no

correct level of motivation (are prosecutors supposed to be all equally blasé?) just as

there is no correct level of skill—the idea is that each side will put its best foot forward

and the neutral tribunal will find the truth.

Because IFJ cannot show that Indiana's use of contingency-fee private

prosecutions "offends some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental," its case fails and the law

stands.  *Medina*, 505 U.S. at 446 (quoting *Patterson*, 432 U.S. at 202).

### III.   Conclusion

Indiana's use of contingency-fee private prosecutors in civil forfeiture does not

violate the Due Process clause.  Thus, Plaintiff's Motion for Summary Judgment,

(ECF No. 120), is **denied**, and Defendants' Cross-Motion for Summary Judgment,

(ECF No. 126), is **granted**.  The case is resolved and final judgment shall issue

accordingly.

The Court wishes to be clear about the scope of its decision.  It has not declared

Indiana's civil forfeiture scheme constitutional *in toto*, only that the single aspect of

it challenged here, the fee arrangement for prosecutors, is constitutional.  And it has

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 20 of 21 PageID #: 3154
Case: 24-1367        Document: 25          Filed: 04/22/2024       Pages: 96

App. 20

not endorsed Indiana's policy, only observed that the policy choice is Indiana's to

make.

**SO ORDERED.**

Date: 02/07/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

J. Derek Atwood
INDIANA ATTORNEY GENERAL
derek.atwood@atg.in.gov

James A. Barta
Office of the Indiana Attorney General
james.barta@atg.in.gov

Cynthia A. Bedrick
MCNEELY LAW LLP
CBedrick@McNeelyLaw.com

Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste 900
Arlington, VA 22203

Katelyn E. Doering
Office of IN Attorney General
katelyn.doering@atg.in.gov

Samuel B. Gedge
Institute for Justice
sgedge@ij.org

Michael N. Greensburg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd, Ste 900
Arlington, VA 22203

Case 1:21-cv-02824-JRS-CSW   Document 137   Filed 02/07/24   Page 21 of 21 PageID #: 3155
Case: 24-1367      Document: 25      Filed: 04/22/2024      Pages: 96

App. 21

Jill Gagnon Haddad
INDIANA ATTORNEY GENERAL
jill.haddad@atg.in.gov

Melinda Rebecca Holmes
INDIANA ATTORNEY GENERAL
melinda.holmes@atg.in.gov

J. Lee McNeely
McNeely Law LLP
LMcNeely@McNeelyLaw.com

Scott Aaron Milkey
MCNEELYLAW LLP
SMilkey@McNeelyLaw.com

William N. Riley
RileyCate, LLC
wriley@rileycate.com

Anthony B. Sanders
Institute for Justice
asanders@ij.org

Sundeep Singh
RileyCate LLC
ssingh@rileycate.com

App. 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMYA SPARGER-WITHERS on behalf of      )
herself and all others similarly situated,      )
                                                )
                    Plaintiff,                  )
                                                )
          v.                                    )      No. 1:21-cv-02824-JRS-CSW
                                                )
JOSHUA N. TAYLOR in his personal          )
capacity and in his official capacity as civil-  )
forfeiture prosecutor,                         )
BLACKFORD COUNTY PROSECUTING       )
ATTORNEY in his official capacity,           )
DEARBORN AND OHIO COUNTY            )
PROSECUTING ATTORNEY in her official   )
capacity,                                      )
DECATUR COUNTY PROSECUTING        )
ATTORNEY in his official capacity,           )
FAYETTE COUNTY PROSECUTING        )
ATTORNEY in her official capacity,           )
FULTON COUNTY PROSECUTING         )
ATTORNEY in his official capacity,           )
GRANT COUNTY PROSECUTING          )
ATTORNEY in his official capacity,           )
HANCOCK COUNTY PROSECUTING       )
ATTORNEY in his official capacity,           )
HARRISON COUNTY PROSECUTING      )
ATTORNEY in his official capacity,           )
HENRY COUNTY PROSECUTING         )
ATTORNEY in his official capacity,           )
MARSHALL COUNTY PROSECUTING     )
ATTORNEY in his official capacity,           )
MIAMI COUNTY PROSECUTING         )
ATTORNEY in his official capacity,           )
MORGAN COUNTY PROSECUTING       )
ATTORNEY in his official capacity,           )
RUSH COUNTY PROSECUTING          )
ATTORNEY in his official capacity,           )
SHELBY COUNTY PROSECUTING        )
ATTORNEY in his official capacity,           )

App. 23

STARKE COUNTY PROSECUTING        )
ATTORNEY in her official capacity,    )
WABASH COUNTY PROSECUTING       )
ATTORNEY in his official capacity,    )
                                                      )
                        Defendants.          )

### Final Judgment

Pursuant to the Order also issued this day, judgment is entered in favor of Defendants on all claims.  Plaintiff, and the class she represents, shall take nothing by her Complaint.  This is a **final judgment** under Federal Rule of Civil Procedure 58.

**SO ORDERED.**

Date: 02/07/2024

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Roger A.G. Sharpe, Clerk

BY: *Samantha Burmester*

Deputy Clerk, U.S. District Court

J. Derek Atwood
INDIANA ATTORNEY GENERAL
derek.atwood@atg.in.gov

James A. Barta
Office of the Indiana Attorney General
james.barta@atg.in.gov

Cynthia A. Bedrick
MCNEELY LAW LLP
CBedrick@McNeelyLaw.com

2

App. 24

Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste 900
Arlington, VA 22203

Katelyn E. Doering
Office of IN Attorney General
katelyn.doering@atg.in.gov

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Samuel B. Gedge
Institute for Justice
sgedge@ij.org

Michael N. Greensburg
INSTITUTE FOR JUSTICE
901 N. Glebe Rd, Ste 900
Arlington, VA 22203

Jill Gagnon Haddad
INDIANA ATTORNEY GENERAL
jill.haddad@atg.in.gov

Melinda Rebecca Holmes
INDIANA ATTORNEY GENERAL
melinda.holmes@atg.in.gov

J. Lee McNeely
McNeely Law LLP
LMcNeely@McNeelyLaw.com

Scott Aaron Milkey
MCNEELYLAW LLP
SMilkey@McNeelyLaw.com

Julia Catherine Payne
Alliance Defending Freedom
jpayne@adflegal.org

William N. Riley

App. 25

RileyCate, LLC
wriley@rileycate.com

Anthony B. Sanders
Institute for Justice
asanders@ij.org

Sundeep Singh
RileyCate LLC
ssingh@rileycate.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Samuel B. Gedge
Samuel B. Gedge

*Counsel for Appellant*