No. 24-1367

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

AMYA SPARGER-WITHERS
*Plaintiff-Appellant*,

v.

JOSHUA N. TAYLOR, ET AL.
*Defendants-Appellees.*

On Appeal from the United States District Court for the
Southern District of Indiana, No. 1:21-CV-02824-JRS-CSW,
The Honorable James R. Sweeney, II, Judge

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES**

WILLIAM N. RILEY
RUSSELL B. CATE
SUNDEEP SINGH

RILEYCATE, LLC
11 Municipal Drive, Suite 320
Fishers, IN 46038
Telephone: 317.588.2866
Facsimile: 317.458.1785
Email: wriley@rileycate.com

*Counsel for Defendant-Appellee*
*Joshua N. Taylor*

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

KATELYN E. DOERING
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for State Defendants-*
*Appellees*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua N. Taylor, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joshua N. Taylor

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

RileyCate, LLC

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ William N. Riley     Date: July 19, 2024

Attorney's Printed Name: William N. Riley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: 11 Municipal Drive, Suite 320

Fishers, IN 46038

Phone Number: (317) 588-2866     Fax Number: (317) 458-1785

E-Mail Address: wriley@rileycate.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua N. Taylor, et al.

 To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

 The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

  [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

  Joshua N. Taylor

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  RileyCate, LLC

(3) If the party, amicus or intervenor is a corporation:

  i) Identify all its parent corporations, if any; and

   N/A

  ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ Russell B. Cate Date: July 19, 2024

Attorney's Printed Name: Russell B. Cate

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: 11 Municipal Drive, Suite 320

  Fishers, IN 46038

Phone Number: (317) 588-2866 Fax Number: (317) 458-1785

E-Mail Address: rcate@rileycate.com

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 24-1367

Short Caption: Amya Sparger-Withers v. Joshua N. Taylor, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**☐ PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Joshua N. Taylor

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

RileyCate, LLC

(3)  If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Sundeep Singh          Date: July 19, 2024

Attorney's Printed Name: Sundeep Singh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 11 Municipal Drive, Suite 320

Fishers, IN 46038

Phone Number: (317) 588-2866          Fax Number: (317) 458-1785

E-Mail Address: ssingh@rileycate.com

rev. 12/19 AK

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 2

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ........................................................... 3

I.    Civil-Asset Forfeiture in Indiana ............................................... 3

    A.    Indiana law governing civil-forfeiture actions ....................... 3

    B.    Multiple Indiana prosecutors contract with Joshua Taylor under
            Indiana Code § 34-24-1-8 ................................................... 5

II.    Procedural Background ............................................................. 7

    A.    The State brings and later dismisses a civil-forfeiture action
            involving Sparger-Withers's property ..................................... 7

    B.    Sparger-Withers challenges Indiana's contingency-fee statute ............ 9

SUMMARY OF THE ARGUMENT ................................................... 11

STANDARD OF REVIEW ............................................................... 13

ARGUMENT ................................................................................ 14

I.    Supreme Court Precedent Authorizes Incentives for Private Persons
    Pursuing Civil Actions on the Government's Behalf ..................... 14

    A.    The Supreme Court has limited financial incentives for judges,
            but approved of incentives for advocates ............................... 15

    B.    *Marshall* did not change the law regarding incentives ............. 16

    C.    However read, *Marshall* does not establish a limit on incentives
            for public officials and does not address private attorneys ................. 20

II. No Historical Tradition Prohibits Financial Incentives for Private Persons Pursuing Civil Actions on the Government's Behalf ....................... 21

  A. Due process in judicial proceedings is defined by settled historical usages ................................................................... 22

  B. There is a long historical pedigree of compensating parties who pursue actions on the government's behalf ............................................ 24

    1. Interested parties long conducted criminal prosecutions .......... 24

    2. Qui tam actions have rewarded private parties as well ............ 28

    3. Bounties and moieties provided public and private actors a share of forfeited goods ................................................ 32

III. No Other Principle Supports Imposing a Novel Disinterestedness Requirement on Private Attorneys Conducting Forfeitures ........................... 35

IV. This Case Should Have Been Dismissed as Moot ............................................ 40

  A. Sparger-Withers's claim became moot six days into this lawsuit ........ 40

  B. No exception to mootness applies in this case ...................................... 44

CONCLUSION ............................................................................................... 49

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Woods*,
  6 U.S. (2 Cranch) 336 (1805) ................................................................. 29

*Am. Bankers Mgmt. Co. v. Heryford*,
  885 F.3d 629 (9th Cir. 2018) ............................................. 19, 20, 31, 37

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) ................................................................. 45

*Banks v. NCAA*,
  977 F.2d 1081 (7th Cir. 1992) ............................................................... 48

*Berger v. United States*,
  295 U.S. 78 (1935) ................................................................................. 15

*Brucker v. City of Doraville*,
  38 F.4th 876 (11th Cir. 2022) ............................................................... 21

*Burnham v. Super. Ct.*,
  495 U.S. 604 (1990) ............................................................................... 22

*C.R.M. v. State*,
  799 N.E.2d 555 (Ind. Ct. App. 2003) ...................................................... 4

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*,
  970 F.3d 835 (7th Cir. 2020) ................................................................. 29

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................... 41, 43

*Cnty. of Riverside v. McLaughlin*,
  500 U.S. 44 (1991) ........................................................................... 45, 48

*Cruz v. Farquharson*,
  252 F.3d 530 (1st Cir. 2001) ................................................................. 49

*Culley v. Marshall*,
  601 U.S. 377 (2024) ............................................................................... 22

*State ex rel. Discover Fin. Servs., Inc. v. Nibert*,
  744 S.E.2d 625 (W. Va. 2013) .......................................................... 19, 20

## CASES [CONT'D]

*Dobbs v. Jackson Women's Health Org.*,
　597 U.S. 215 (2022) ........................................................ 23

*Dowling v. United States*,
　493 U.S. 342 (1990) ........................................................ 23

*Dusenbery v. United States*,
　534 U.S. 161 (2002) ........................................................ 23

*Espenscheid v. DirectSat USA, LLC*,
　688 F.3d 872 (7th Cir. 2012) ........................................ 49

*United States ex rel. Fallon v. Accudyne Corp.*,
　921 F. Supp. 611 (W.D. Wis. 1995) .............................. 30

*FBI v. Fikre*,
　601 U.S. 234 (2024) .................................................. 41, 43

*Friedman v. Rite Aid Corp.*,
　152 F. Supp. 2d 766 (E.D. Pa. 2001) ............................ 30

*Genesis HealthCare Corp. v. Symczyk*,
　569 U.S. 66 (2013) ........................................ 44, 45, 47, 48

*Gerstein v. Pugh*,
　420 U.S. 103 (1975) .................................................. 45, 47

*Gideon v. Wainwright*,
　372 U.S. 335 (1963) ........................................................ 16

*Gonzalez v. State*,
　74 N.E.3d 1228 (Ind. Ct. App. 2017) ............................ 43

*Harjo v. City of Albuquerque*,
　326 F. Supp. 3d 1145 (D.N.M. 2018) ............................ 21

*Hero v. Lake Cnty. Election Bd.*,
　42 F.4th 768 (7th Cir. 2022) ........................................ 13

*Hughley v. State*,
　15 N.E.3d 1000 (Ind. 2014) ...................................... 4, 16

*Katner v. State*,
　655 N.E.2d 345 (Ind. 1995) .................................. 3, 4, 16

CASES [CONT'D]

*United States ex rel. Kelly v. Boeing Co.,*
    9 F.3d 743 (9th Cir. 1993) ..................................................................*passim*

*Larry v. Lawler,*
    605 F.2d 954 (7th Cir. 1978) ...................................................... 23

*Lewis v. Cont'l Bank Corp.,*
    494 U.S. 472 (1990) ...................................................... 40, 46

*Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't,*
    924 F.3d 375 (7th Cir. 2019) .......................................... 41, 43

*Mallory v. Norfolk S. Ry. Co.,*
    600 U.S. 122 (2023) ...................................................... 18, 22

*Marshall v. Jerrico, Inc.,*
    446 U.S. 238 (1980) ...............................................................*passim*

*Marvin v. Trout,*
    199 U.S. 212 (1905) .............................................................. 29

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................... 22, 23

*In re McKinney,*
    948 N.E.2d 1154 (Ind. 2011) .......................................... 38

*Medina v. California,*
    505 U.S. 437 (1992) .................................... 11, 22, 24, 28

*Montana v. Egelhoff,*
    518 U.S. 37 (1996) ...................................................... 22, 35

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) .............................................................. 28

*Olson v. Brown,*
    594 F.3d 577 (7th Cir. 2010) ...................................... 47, 48

*Patterson v. New York,*
    432 U.S. 197 (1977) ...................................................... 14, 35

*United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.,*
    123 F. Supp. 2d 990 (W.D.N.C. 2000) .............................. 30

CASES [CONT'D]

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
    599 U.S. 419 (2023) ........................................................................ 30

*Primax Recoveries, Inc. v. Sevilla,*
    324 F.3d 544 (7th Cir. 2003) ...................................................... 48, 49

*Schepers v. Comm'r,*
    691 F.3d 909 (7th Cir. 2012) ....................................................... 23

*Shalala v. Ill. Council on Long Term Care, Inc.,*
    529 U.S. 1 (2000) ......................................................................... 18

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ....................................................... 42

*State v. Actavis Pharma, Inc.,*
    167 A.3d 1277 (N.H. 2017) .......................................................... 19

*State v. Clem,*
    No. 27C01-1903-MI-19 (Grant Cnty. Cir. Ct. filed Mar. 1, 2019)...................... 46

*State v. Ellis,*
    No. 27C01-1904-MI-39 (Grant Cnty. Cir. Ct. filed Apr. 1, 2019) ...................... 46

*State v. Henning,*
    33 Ind. 189 (1870)........................................................................ 26

*State v. Lawrence,*
    No. 21D01-2003-MI-141 (Fayette Cnty. Super. Ct. filed Mar. 12,
    2020)........................................................................................ 46

*State v. Nichols,*
    481 S.E.2d 118 (S.C. 1997)............................................................ 26

*State v. Oldham,*
    No. 29D01-2301-MI-614 (Hamilton Cnty. Super. Ct. filed Jan. 20,
    2023)........................................................................................ 46

*State v. Parker,*
    No. 30C01-2404-MI-730 (Hancock Cnty. Cir. Ct. filed Apr. 9, 2024) .................. 46

*State v. Rose,*
    No. 73D01-1810-PL-43 (Shelby Cnty. Super. Ct. filed Oct. 25, 2018).................. 46

## CASES [CONT'D]

*State v. Starr*,
No. 29D01-1910-MI-9370 (Hamilton Cnty. Super. Ct. filed Oct. 8, 2019)...................................................................................... 46

*State v. Wilkerson*,
No. 29D01-2403-PL-2668 (Hamilton Cnty. Super. Ct. filed Mar. 12, 2024)...................................................................................... 46

*Susman v. Lincoln Am. Corp.*,
587 F.2d 866 (7th Cir. 1978) ................................................. 47

*Tobin for Governor v. Ill. State Bd. of Elections*,
268 F.3d 517 (7th Cir. 2001) ................................................. 41

*Trotter v. Klincar*,
748 F.2d 1177 (7th Cir. 1984) .......................................*passim*

*Tumey v. Ohio*,
273 U.S. 510 (1927) .......................................................*passim*

*U.S. Parole Comm'n v. Geraghty*,
445 U.S. 388 (1980) ............................................................. 45

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ................................................................. 39

*United States v. Murphy*,
41 U.S. (16 Pet.) 203 (1842) ................................................. 16

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ....................................................... 30, 31

*Ward v. Village of Monroeville*,
409 U.S. 57 (1972) ............................................................... 15

*Wiesmueller v. Kosobucki*,
513 F.3d 784 (7th Cir. 2008) ................................................. 44

*Windy City Meat Co. v. USDA*,
926 F.2d 672 (7th Cir. 1991) ................................................. 23

*Wrightsell v. Cook Cnty.*,
599 F.3d 781 (7th Cir. 2010) ................................................. 49

CASES [CONT'D]

*Young v. United States ex. rel. Vuitton et Fils S.A.,*
481 U.S. 787 (1987) ................................................................. 24, 25, 31

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ...................................................... 14

STATUTES

Act of July 31, 1789, §§ 22, 38, 1 Stat. 29, 42, 48 ...................... 32

Act of Apr. 30, 1790, ch. 9, § 16, 1 Stat. 112, 116 ..................... 27

Act of Mar. 3, 1863, § 11, 12 Stat. 737, 741 .............................. 32

Act of Mar. 2, 1867, § 1, 14 Stat. 546, 546–47 ........................... 32

28 U.S.C. § 1291 ......................................................................... 3

28 U.S.C. § 1331 ......................................................................... 3

31 U.S.C. § 3730(a)–(c)(3) ........................................................ 30

42 U.S.C. § 1983 ...................................................................... 2, 3

Act of 1641, in *The Colonial Laws of Massachusetts, Reprinted from the Edition of 1660, with the Supplements to 1672* (1889).......................... 21

Act of Sept. 10, 1692, ch. 21, *in 1 The Colonial Laws of New York from the Year 1664 to the Revolution* (1894) .................................. 29

Act of May 19, 1715, ch. 290, *in 2 The Colonial Laws of New York from the Year 1664 to the Revolution* (1894) .................................. 29

Act of May 1782, ch. 54, *in 11 The Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature in the Year 1619* (1823) ............................................... 29

Act of Sept. 14, 1807, § 5, *in The Laws of Indiana Territory 1801–1809,* at 560, 561–62 (Francis S. Philbrick ed., 1930) .................... 27

Act of Dec. 17, 1810, § 1, *in The Laws of Indiana Territory 1809–1816,* at 164–65 (Louis B. Ewbank & Dorothy L. Riker eds., 1934) ............ 27

STATUTES [CONT'D]

Ind. Code § 34-24-1-1 ...................................................................................*passim*

Ind. Code § 34-24-1-1(d) ......................................................................... 43

Ind. Code § 34-24-1-2 ................................................................................ 5

Ind. Code § 34-24-1-2(b) ......................................................................... 39

Ind. Code § 34-24-1-2(d)–(i) ................................................................... 39

Ind. Code § 34-24-1-2(k) ........................................................................... 5

Ind. Code § 34-24-1-3 .......................................................................... 5, 39

Ind. Code § 34-24-1-3(a) ........................................................ 4, 42, 45, 46

Ind. Code § 34-24-1-3(a)(2) ..................................................................... 42

Ind. Code § 34-24-1-3(b) ........................................................................... 5

Ind. Code § 34-24-1-3(d) ...........................................................*passim*

Ind. Code § 34-24-1-3(e) ......................................................................... 45

Ind. Code § 34-24-1-4 .......................................................................... 5, 43

Ind. Code § 34-24-1-4(b) ......................................................................... 39

Ind. Code § 34-24-1-4(c) ......................................................................... 39

Ind. Code § 34-24-1-8 ............................................................................ 4, 5

Ind. Code § 34-24-1-8(a) ........................................................................... 4

Ind. Code § 34-24-1-8(b) ........................................................................... 4

Ind. Code § 34-24-1-8(c) ....................................................................... 4, 38

Ind. Code § 34-24-1-8(e) .................................................................... 5, 6, 9

Ind. Code § 34-24-2-2(a) ........................................................................... 4

Ind. Code § 34-24-2-2(c) ........................................................................... 4

Ind. Code § 34-24-2-4(b) ......................................................................... 39

STATUTES [CONT'D]

Ind. Code § 34-24-2-4(c) ............................................... 39

Ind. Code § 34-24-2-8(a) ................................................ 4

Ind. Code § 35-41-4-2(a)(2) ........................................ 42

Ind. Code § 35-48-4-10(a)(1) ........................................ 8

Ind. Code § 35-48-4-11(a)(1) ........................................ 8

OTHER AUTHORITIES

1 Joel Prentiss Bishop, *Commentaries on the Law of Criminal Procedure* (2d ed. 1872) ......................................... 26

William Blackstone, *Commentaries on the Laws of England* ..................................... 34

Cong. Globe, 39th Cong., 2d. Sess. 1820 (1867) ........................................... 32

2 Cong. Rec. (1874) .............................................. 33

Juan Cardenas, *The Crime Victim in the Prosecutorial Process*, 9 Harv. J.L. & Pub. Pol'y 357 (1986) ......................... 25

Edward Coke, *The Third Part of the Institutes of the Laws of England* (1797) ............................................. 26

David A. Dana, *Public Interest and Private Lawyers: Toward a Normative Evaluation of Parens Patriae Litigation by Contingency Fee*, 51 DePaul L. Rev. 315 (2001) ..................... 36

Charles Hughes, *Hughes' Criminal Law* (1901) ......................... 25, 28

Robert M. Ireland, *Privately Funded Prosecution of Crime in the Nineteenth-Century United States*, 39 Am. J. Legal Hist. 43 (1995) ............. 25, 26

Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275 (1989) ............................. 25, 29

John H. Langbein, *The Origins of Public Prosecution at Common Law*, 17 Am. J. Legal Hist. 313 (1973) ............................. 29

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940* (2013) ........................... 27, 28, 32

Lois G. Schwoerer, *The Declaration of Rights, 1689* (1981) ....................... 34

**OTHER AUTHORITIES [CONT'D]**

Claire M. Sylvia, *The False Claims Act: Fraud Against the Government*
(updated July 2024).................................................................................. 30

## INTRODUCTION

The Fifth and Fourteenth Amendments guarantee the basics of due process, but do not dictate every detail of procedure. One issue that the Constitution leaves to the political process is whether federal, state, and local governments should retain private counsel on a contingency-fee basis to pursue litigation.

Although Amya Sparger-Withers concedes that there are "forms of civil litigation in which governments may retain contingency-fee counsel," Br. 40, she argues that contingency fees for private counsel retained to pursue civil forfeitures violate due process. As the district court recognized, however, no precedent from the Supreme Court or this Court forbids contingency-fee arrangements. Due process requires that litigants be given the opportunity to plead their cases before a neutral magistrate. But the Constitution does not prescribe a particular compensation arrangement for advocates hired to press the government's position.

The case on which Sparger-Withers most heavily relies makes this very point. In *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), the Supreme Court observed that the Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Id.* at 242. But the "rigid" neutrality requirements "designed for officials performing judicial or quasi-judicial functions" are "not applicable to those acting in a prosecutorial or plaintiff-like capacity." *Id.* at 248. A "state legislature," the Supreme Court observed, "'may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people.'" *Id.* at 249.

That observation disposes of Sparger-Withers's argument here. If the States may offer incentives to those pursuing criminal prosecutions, they may offer incentives to those pursuing civil forfeitures. History, moreover, confirms there is no constitutional prohibition against rewarding private counsel. From the earliest days of the common law through the Nation's founding and past the Fourteenth Amendment's adoption, governments rewarded both public officials and private persons for successfully pursuing cases on the government's behalf. Although financial rewards might be less popular with policymakers today, no settled tradition condemns them. The district court was correct to reject Sparger-Withers's constitutional challenge.

Even so, the district court should not have reached the merits. Sparger-Withers's case became moot six days after she filed it. Her challenge should be dismissed.

## JURISDICTIONAL STATEMENT

Sparger-Withers's jurisdictional statement is not complete and correct. Sparger-Withers brought this suit against defendants Joshua N. Taylor, in his official and personal capacities, and the Blackford County Prosecutor, Dearborn and Ohio County Prosecutor, Decatur County Prosecutor, Fayette County Prosecutor, Fulton County Prosecutor, Grant County Prosecutor, Hancock County Prosecutor, Harrison County Prosecutor, Henry County Prosecutor, Marshall County Prosecutor, Miami County Prosecutor, Morgan County Prosecutor, Rush County Prosecutor, Shelby County Prosecutor, Starke County Prosecutor, and Wabash County Prosecutor, in their official capacities, alleging that Indiana's statute dictating the compensation of private attorneys bringing civil-forfeiture claims violated due process under 42 U.S.C.

§ 1983 and the U.S. Constitution. Dkt. 1. Sparger-Withers's due-process claim presents a federal question under 28 U.S.C. § 1331. For the reasons in this brief, the district court lacked jurisdiction over the lawsuit once Sparger-Withers's claim became moot. *See* pp. 40–49, *infra*.

On February 7, 2024, the district court issued an order granting summary judgment in favor of defendants, App. 19, and entered final judgment in favor of defendants, App. 23. On March 7, 2024, Sparger-Withers timely filed a notice of appeal. Dkt. 139. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether it violates the Fourteenth Amendment's Due Process Clause for a private attorney retained under a contingency-fee agreement to conduct a civil-forfeiture action on the government's behalf, even where the private attorney's actions are subject to review by an attorney employed by the government.

2.     Whether the dismissal of Sparger-Withers's forfeiture proceeding prior to class certification rendered moot her lawsuit for prospective relief.

## STATEMENT OF THE CASE

### I.     Civil-Asset Forfeiture in Indiana

#### A.     Indiana law governing civil-forfeiture actions

Indiana law provides for the seizure and civil forfeiture of property used in violation of certain state criminal statutes. Ind. Code §§ 34-24-1-1 *et seq*. Although "forfeiture actions have characteristics of both civil and criminal actions," they are "properly classified as civil in nature." *Katner v. State*, 655 N.E.2d 345, 347 (Ind.

1995); *see Hughley v. State*, 15 N.E.3d 1000, 1005 (Ind. 2014) ("forfeitures are civil actions"). In Indiana, any forfeiture action is brought separately from any criminal prosecution; it is an *in rem* action against the property itself. *C.R.M. v. State*, 799 N.E.2d 555, 558 (Ind. Ct. App. 2003). Civil forfeiture actions serve "diverse legislative interests," including "punishing and deterring those who have engaged in illegal" activity, "creat[ing] an economic disincentive to engage in future illegal acts," and "permitting law enforcement agencies, via the sale of property seized, to defray some of the expense incurred in the battle against [crime]." *Katner*, 655 N.E.2d at 347–48.

Under Indiana law, civil forfeiture actions may be brought by the "prosecuting attorney" in the county where law enforcement seized the property at issue. Ind. Code §§ 34-24-1-3(a), 34-24-2-2(a), (c). Alternatively, a prosecuting attorney "may retain an attorney to bring a[ civil forfeiture] action." §§ 34-24-1-8(a); 34-24-2-8(a). Indiana Code § 34-24-1-8 governs the retention of attorneys hired to conduct civil forfeitures outside the racketeering context. It bars "[t]he attorney retained" from "serv[ing] as a deputy prosecuting attorney in any county." § 34-24-1-8(c). The statute further provides that any "compensation agreement between a prosecuting attorney and an attorney retained to bring an action under this chapter must be: (1) in writing; and (2) approved by the attorney general for form and legality." § 34-24-1-8(b).

Under Indiana Code § 34-24-1-8, a compensation agreement "must be" structured as a contingency-fee agreement limited as follows:

> (1) The contingency fee may not exceed thirty-three and one-third percent (33 1/3 %) of the first ten thousand dollars ($10,000) of proceeds or money obtained under a settlement or judgment.

(2) The contingency fee may not exceed twenty percent (20%) of the part of the proceeds or money obtained under a settlement or judgment that is more than ten thousand dollars ($10,000) and less than one hundred thousand dollars ($100,000).

(3) The contingency fee may not exceed fifteen percent (15%) of the part of the proceeds or money obtained under a settlement or judgment that is one hundred thousand dollars or more.

(4) The contingency fee agreement may establish a minimum fee that does not exceed one hundred dollars ($100).

§ 34-24-1-8(e).

Regardless of who manages the day-to-day of a civil forfeiture action—the prosecuting attorney or a retained attorney—the same procedural requirements govern. The property owner and other interested parties receive notice and an opportunity for a hearing in court. Ind. Code §§ 34-24-1-2, 34-24-1-3, 34-24-1-4; 34-24-2-4. In civil-forfeiture actions, the prosecuting attorney must serve the forfeiture complaint on "each person whose right, title, or interest is of record" with the agency authorized to record ownership interests in the type of property seized. § 34-24-1-3(b). If the property seized is real property or a vehicle, the prosecuting attorney must also notify the owner of record of their right to petition for provisional release within seven days. § 34-24-1-2(k). Any interested party "may appear at the hearing on the action," § 34-24-1-3(d), where the prosecuting attorney must meet the burden of proof and the judge rules on whether forfeiture is proper, § 34-24-1-4.

## B. Multiple Indiana prosecutors contract with Joshua Taylor under Indiana Code § 34-24-1-8

The State Defendants—16 elected prosecuting attorneys serving 17 Indiana counties—each signed a contract with Defendant Joshua N. Taylor, an attorney in

private practice, to conduct civil-forfeiture actions on their behalf. Dkt. 127-1. As required by Indiana Code § 34-24-1-8(e), the contracts set Taylor's compensation at a percentage of proceeds forfeited. Dkt. 100 at 2. Under the contracts, the highest percentage Taylor can receive is 30% for forfeitures of property valued at or under $10,000, whether the disposition is a settlement or a judgment. Dkt. 127-1 at 4; Dkt. 127-2 at 7 (Taylor Dep. 18:23–19:2). For amounts between $10,000 and $100,000, he receives 20%, and for amounts above $100,000, he receives 15%. Dkt. 127-1 at 4.

The contingency-fee contracts between the prosecutors and Taylor govern their working arrangement, including Taylor's rights and obligations. Dkt. 100 at 3. Although some prosecutors minimize their involvement in Taylor's actions to "maintain a clear division between criminal prosecutions and civil forfeiture actions," Dkt. 115 at 4; *see* Dkt. 127-3 at 7 (Eaton Dep. 20:4–10, 21:3–18), the contracts give the prosecutors full authority over Taylor's actions, Dkt. 127-1 at 2–5; *see* Dkt. 127-3 at 8 (Eaton Dep. 23:13–15). Under the contracts, the prosecutors are entitled to make the "final decision to proceed to have seized assets declared forfeit," Dkt. 127-1 at 3, and may "forgo referral of individual cases to [Taylor]," *id.* at 4, or "remove [Taylor] from a matter assigned under th[e] Contract for failure to diligently pursue the forfeiture or for any breach of the Indiana Rules of Professional Conduct," *id.* at 5. The prosecutors also have "full, immediate, and unrestricted access to the work product of [Taylor] during the term of th[e] Contract." *Id.* at 4.

In most instances, Taylor hears of a potential forfeiture case directly from the law enforcement agency that seizes the property (for example, the arresting officer or

6

that officer's supervisor), or in Harrison County, from a non-attorney investigator in the prosecutor's office. Dkt. 127-2 at 12 (Taylor Dep. 41:9–16); Dkt. 115 at 4. Taylor bases his decision to file a forfeiture complaint, and whether eventually to settle the case, on the "strengths and weaknesses" of the State's case against the defendant's property, as determined from "the original probable-cause affidavit," the "outcome of the criminal case," or the "discovery process." Dkt. 127-2 at 12–14 (Taylor Dep. 41:17–23, 45:13–46:2). Whether Taylor discusses with the prosecuting attorney the filing of a forfeiture action, his day-to-day strategy during its prosecution, or his decision to settle the case depends on the county. Dkt. 115 at 4–5; Dkt. 127-3 at 12 (Eaton Dep. 40:16–20, 40:24–41:8); Dkt. 127-2 at 12–14 (Taylor Dep. 41:24–42:13, 46:8–22). As required by statute and contract, Taylor inputs forfeiture reports into the Indiana Prosecutor Case Management System, where prosecuting attorneys can access them directly. Dkt. 127-2 at 17–18 (Taylor Dep. 61:12–62:4); Dkt. 127-1 at 2.

## II.     Procedural Background

This case arises out of a forfeiture action that Taylor filed against cash suspected to be used for drug dealing seized from Amya Sparger-Withers.

### A.     The State brings and later dismisses a civil-forfeiture action involving Sparger-Withers's property

In the early morning hours of January 29, 2021, an officer of the McCordsville Police Department arrested Sparger-Withers during a traffic stop in Hancock County, Indiana. Dkt. 46-1 at 2. The officer smelled a strong odor of burning marijuana and observed marijuana and drug paraphernalia in the car. *Id.* at 3. After a search of the car, the officer found a safe in the trunk containing more marijuana and over $6,000

in cash, which the officer had probable cause to believe was connected with drug dealing. *Id.* at 3–4; Dkt. 46-9 at 2. The arresting officer seized the marijuana and cash. Dkt. 46-1 at 4.

The day after Sparger-Withers was arrested, Taylor received an e-mail from the arresting officer, who had attached a probable-cause affidavit and a forfeiture form filled out with basic information about the seizure of the cash. Dkt. 127-2 at 11 (Taylor Dep. 36:20–25); Dkt. 127-4. After reviewing the documents, Taylor, who was under contract with the Hancock County Prosecutor, filed a civil-forfeiture action against the seized cash on February 1, 2021. Dkt. 1 at 11; Dkt. 127-2 at 13 (Taylor Dep. 43:19–24). Taylor did not communicate with the Hancock County Prosecutor's Office before filing. Dkt. 127-2 at 12 (Taylor Dep. 40:14–17); Dkt. 127-3 at 12 (Eaton Dep. 40:2–10). Taylor testified that he did not treat Sparger-Withers's case any differently from other forfeiture actions. Dkt. 127-2 at 12 (Taylor Dep. 40:18–22).

On February 2, 2021, the day after Taylor filed the forfeiture action, the Hancock County Prosecutor charged Sparger-Withers with possession of marijuana, in violation of Indiana Code § 35-48-4-11(a)(1), and dealing in marijuana, in violation of Indiana Code § 35-48-4-10(a)(1). Dkt. 46-3 at 2; Dkt. 127-4 at 11. The case proceeded to trial. On November 5, 2021, after a bench trial, Sparger-Withers was convicted of the possession charge but acquitted of the dealing charge. Dkt. 46-5 at 7. Less than two weeks later, on November 16, 2021, Taylor voluntarily dismissed the forfeiture case. Dkt. 46-6. The Hancock County Prosecutor's Office and the McCordsville Police

Department then returned the money seized from Sparger-Withers. Dkt. 46-9 at 2–3.

**B.**    **Sparger-Withers challenges Indiana's contingency-fee statute**

Meanwhile, on November 10, 2021—five days after the trial court issued its findings in the criminal case and six days before Taylor dismissed the forfeiture case—Sparger-Withers filed a putative class action against the State Defendants and Taylor, Dkt. 1, and moved for class certification, Dkt. 6. She alleged that Indiana's statute authorizing prosecutors to retain private attorneys on a contingency-fee basis, Ind. Code § 34-24-1-8(e), violates the Due Process Clause of the Fourteenth Amendment, Dkt. 1 at 17–19, and she sought declaratory and injunctive relief preventing Taylor from accepting any compensation under his contracts with Indiana prosecutors that is contingent on the outcome of the civil-forfeiture actions he pursues, *id.* at 19–21.

Defendants moved to dismiss on the ground that Sparger-Withers could not maintain the suit under Article III's case-or-controversy requirement, as she had suffered no redressable injury and had not alleged any imminent future injury. Dkt. 46; Dkt. 47. On September 14, 2022, the district court denied the motion to dismiss. App. 35–40. In the same order, the district court also granted Sparger-Withers's motion to certify a class. *Id.* at 40–48. The court defined the class to include "[a]ll persons who are or will be named as defendants in civil-forfeiture actions (a) brought under Title 34, Article 24 of the Indiana Code and (b) in which Joshua N. Taylor represents the State of Indiana or any other government plaintiff." *Id.* at 48.

9

The parties then filed cross-motions for summary judgment, Dkt. 120; Dkt. 126, and the district court granted summary judgment to defendants, App. 19. Although the Supreme Court has required "perfect financial disinterestedness from judges," the district court explained, advocates are not subject to that same requirement. App. 4. In *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), the Supreme Court held that "prosecutors need not be entirely neutral and detached because, in an adversary system, they are necessarily permitted to be zealous in their enforcement of the law." App. 4 (cleaned up).

Although *Marshall* "cautioned there were still some limits on acceptable prosecutorial behavior," it did not say what those limits were or articulate a "new" due-process principle. App. 4–5, 8. The district court rejected the argument that *Marshall* had "overturn[ed] *sub silentio*" the Supreme Court's earlier decision in *Tumey v. Ohio*, 273 U.S. 510 (1927), which observed that States may "'stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." App. 4, 6. In fact, *Marshall* "cited with apparent approval . . . precedent wholeheartedly endorsing private prosecution on contingency." App. 4.

The district court also concluded that it would reject Sparger-Withers's challenge even if it assumed that *Marshall* "does establish an unspecified 'financial disinterestedness' requirement for prosecutors." App. 10. To decide what process is due, the district court looked to historical practice. *Id.* at 11. It observed that hiring private attorneys to conduct civil forfeitures on a contingency-fee basis is "in line with early

American practice." *Id.* at 2. In former times, "[r]ewards were a common incentive for successful prosecutions," and there was "no belief" that someone prosecuting a criminal case "had any special duty to justice in the abstract, apart from his role as one side's advocate in an adversary system." *Id.* at 16. The district court also observed that the incentives offered to private attorneys to conduct civil forfeitures are "indistinguishable" from the incentives offered to relators in "*qui tam* action[s], which ha[ve] been held constitutional." *Id.* at 2; *see id.* at 16. Offering incentives to private attorneys to litigate actions does not "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 19 (quoting *Medina v. California*, 505 U.S. 437, 446 (1992)).

## SUMMARY OF THE ARGUMENT

I.     Due process does not forbid Indiana prosecutors from retaining a private attorney to conduct civil forfeitures on a contingency-fee basis. In *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court held that settled usages forbid judges from having a financial interest in a case's outcome. At the same time, the Supreme Court observed that States "may and often ought to stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards." *Id.* at 535. *A fortiori* States may reward those who initiate and carry on civil forfeitures.

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), does not suggest otherwise. In that case, the Supreme Court rejected a due-process challenge to a federal statute that gave a federal office charged with enforcing labor laws a share of penalties collected. Although *Marshall* suggested in dicta that due process might be violated if a

statute gave administrative prosecutors a financial incentive to target particular persons, *Marshall* did not lay down any new due process requirements for public officials, much less private persons litigating cases on the government's behalf. In fact, the Supreme Court reiterated that States may reward those who prosecute cases.

II.     History reinforces the conclusion that retaining private attorneys on a contingency-fee basis does not violate due process. In England and early America, it was common for advocates to have a direct financial interest in the outcome of cases. Interested parties could bring criminal prosecutions and receive rewards for a successful conviction. Sometimes governments paid public prosecutors a fee for every successful conviction; other times the reward took the form of a share of goods forfeited—which is the exact form of compensation that Sparger-Withers opposes. Not until decades after the Fourteenth Amendment's ratification did Congress decide for policy reasons to put federal prosecutors on a fixed salary. And qui tam statutes, which remain in use today, have long rewarded private parties who successfully pursued civil actions on the government's behalf with a share of the recovery. There is no tradition that forbids advocates from having an interest in cases' outcomes.

III.     Sparger-Withers identifies no principled basis for imposing a novel bar on contingency fees for private attorneys conducting civil forfeitures while allowing those fees in other contexts. Her arguments amount to mere policy disagreements with Indiana's decision to authorize contingency fees. Nor are her policy objections well grounded. The contingency-fee arrangements that she challenges align the interests of private attorneys with the State's and free up public prosecutors to focus

on busy criminal dockets while preserving accountability to public officials. Sparger-Withers cites no evidence that contingency fees have adversely impacted any case.

IV.    Although the district court's merits analysis was correct, this case should have been dismissed on jurisdictional grounds. Sparger-Withers's claim became moot six days into this lawsuit when Taylor dismissed the forfeiture case against her in response to a state court acquitting Sparger-Withers of the offense supporting the forfeiture action. That development deprived Sparger-Withers of a personal stake in a lawsuit seeking only prospective relief.

No exception to mootness applies here. Sparger-Withers is not reasonably likely to suffer future injury. Taylor cannot re-file the forfeiture action he dismissed, and Sparger-Withers does not claim to have committed any new crimes that would provide a basis for filing a new forfeiture action against different property. Nor does Taylor's filing of a forfeiture action inflict an injury so inherently transitory that no court could certify a class before it dissipated. Many forfeiture actions last months or years. There is also no evidence that defendants "picked off" a succession of plaintiffs.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *See Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 771 (7th Cir. 2022). Any genuinely disputed facts must be viewed in the light most favorable to the party opposing summary judgment, with all reasonable inferences drawn in that party's favor. *See id.*

## ARGUMENT

The Fourteenth Amendment's Due Process Clause provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. That general language guarantees procedures consistent with the "settled usages and modes of proceeding existing in the common and statute law of England." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). It, however, does not regulate every aspect of state procedure. As the Supreme Court has observed, "it is normally 'within the power of the State to regulate procedures under which its laws are carried out.'" *Patterson v. New York*, 432 U.S. 197, 201 (1977). The district court correctly concluded that Sparger-Withers's arguments against contingency-fee arrangements for private counsel sound in policy rather than constitutional law.

## I.   Supreme Court Precedent Authorizes Incentives for Private Persons Pursuing Civil Actions on the Government's Behalf

Sparger-Withers argues that the Due Process Clause forbids governments from retaining an attorney to conduct civil forfeitures under a contingency-fee arrangement. Br. 9. No precedent from the Supreme Court or this Court forbids contingency-fee arrangements. In fact, in *Tumey v. Ohio*, 273 U.S. 510 (1927), the Supreme Court observed that giving a *prosecutor* a financial interest in the outcome of a *criminal* case does not violate due process. *A fortiori* governments may give private attorneys a financial incentive to pursue civil cases on their behalf.

Sparger-Withers contends that, in *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980), the Supreme Court imposed a new "disinterestedness standard on prosecutors." Br. 9. As the district court observed, however, *Marshall*—a case that *rejected* a

14

constitutional challenge to administrative processes under the Fair Labor Standards Act—was a "straightforward application of then-existing law to an easy set of facts." App. 6. It did not overrule earlier cases "wholeheartedly endorsing private prosecution on contingency." *Id.* The unremarkable dicta that Sparger-Withers invokes do not support imposing a novel due-process requirement.

### A.    The Supreme Court has limited financial incentives for judges, but approved of incentives for advocates

The Supreme Court's decisions on due process draw a sharp distinction between the conduct required of judges and of advocates. In *Tumey* and *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), the "Court demanded perfect financial disinterestedness from judges." App. 4. Surveying the "settled usages and modes of proceeding existing in the common and statute law of England," the Supreme Court explained that there was a firm tradition against giving judicial officers even "the slightest pecuniary interest" in the outcome of a case. *Tumey*, 273 U.S. at 523–24. The requirement of judicial neutrality reflects that there is a "powerful" constitutional interest "in fair adjudicative procedure." *Marshall*, 446 U.S. at 243.

While imposing a neutrality requirement on judges in *Tumey*, however, the Supreme Court recognized that advocates are not bound by the same constraints. A prosecutor "may prosecute with earnestness and vigor—indeed, he should do so." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see Marshall*, 446 U.S. at 248. Likewise, "the Legislature of a state may and often ought to stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." *Tumey*, 273 U.S. at 535; *see, e.g.,*

15

*United States v. Murphy*, 41 U.S. (16 Pet.) 203, 211 (1842) (explaining a witness may "receive a reward for or upon the conviction of the offender" because the "public has an interest in the suppression of crime and the conviction of guilty criminals"). Due process demands fair judges, not "blasé" advocates. App. 19.

Indiana's offer of contingency fees to private attorneys who pursue civil forfeitures thus raises no constitutional concerns. In the criminal context, the concern for due process is at its zenith. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). Yet *Tumey* approved of financial "rewards" for "those who shall initiate and carry on such prosecutions." 273 U.S. at 534–35. It therefore follows that offering rewards to those who initiate and carry on civil-forfeiture actions accords with due process. Although civil forfeitures have a mix of different characteristics, forfeiture actions are "properly classified as civil in nature." *Katner v. State*, 655 N.E.2d 345, 347 (Ind. 1995); *see Hughley v. State*, 15 N.E.3d 1000, 1005 (Ind. 2014). If governments can offer financial incentives to those pursuing criminal actions consistent with due process, they can offer incentives to those pursuing civil forfeitures as well.

## B.  *Marshall* did not change the law regarding incentives

Notwithstanding the Supreme Court's endorsement of rewards in *Tumey*, Sparger-Withers argues that *Marshall* requires "prosecutors" to be financially disinterested. Br. 12; *see id.* at 22–25. Sparger-Withers "exaggerate[s]" what *Marshall* held. *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993). Neither *Marshall* nor any other controlling precedent supports imposing a new, ill-defined disinterestedness requirement on private attorneys who handle civil actions for federal, state, and local governments.

16

In *Marshall*, the Supreme Court considered a due-process challenge to proceedings for child-labor violations brought under the Fair Labor Standards Act. 446 U.S. at 239. The company charged with violations argued that Section 16(e) of the Act violated due process because it provided for "sums collected as civil penalties for the unlawful employment of child labor" to be returned to the Employment Standards Administration, which was responsible for "determining violations and assessing penalties." *Id.* at 239–40. The Supreme Court, however, rejected the notion that "the strict requirements of neutrality" for judges apply to "administrative prosecutors," explaining that "[i]n an adversary system," prosecutors are "necessarily permitted to be zealous in their enforcement of the law." *Id.* at 248, 250. Indeed, the Supreme Court repeated its earlier observation that "a state legislature 'may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people.'" *Id.* at 249 (quoting *Tumey*, 273 U.S. at 535).

After making that observation, the Supreme Court disclaimed that the "Due Process Clause imposes no limits on the partisanship of administrative prosecutors." *Marshall*, 446 U.S. at 249. It explained that a "scheme injecting a personal interest, financial or otherwise, into the enforcement process *may* bring irrelevant or impermissible factors into the prosecutorial decision and *in some contexts* raise serious constitutional questions." *Id.* at 249–50 (emphasis added). "In particular," the Supreme Court reserved whether due process would be violated "if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general

zealousness in the enforcement process." *Id.* at 250 n.12. Ultimately, however, the Supreme Court declined to "say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function," because the risk of bias in the case before it was so "exceptionally remote." *Id.* at 250.

As is clear from the Supreme Court's opinion, *Marshall* did not establish a "new" rule of due process. App. 8. That decision represents a "straightforward application of then-existing law to an easy set of facts." App. 6. It makes no sense to read *Marshall* as forbidding incentives for advocates given earlier precedent endorsing those incentives. The Supreme Court "does not normally overturn" or "dramatically limit" "earlier authority *sub silentio.*" *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). And far from limiting earlier authority, *Marshall* reiterated that States "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards." 446 U.S. at 249 (quoting *Tumey*, 273 U.S. at 535). That explicit endorsement should end the matter for this Court. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("a lower court 'should follow the case which directly controls' . . . even if the lower court thinks the precedent is in tension with 'some other line of decisions'").

Sparger-Withers emphasizes *Marshall*'s explanation of why Section 16(e) posed no due-process problem. Br. 12–14, 22–24. As the district court perceived, however, App. 5–6, the Supreme Court's ultimate holding was that any prospect of gain was simply "too remote" to pose any due-process concerns. *Marshall*, 446 U.S. at 243–44; *see id.* at 250–51. The Supreme Court's observation that prosecutors need not be

neutral was the "heart of the legal discussion" and was "enough to resolve the case." App. 6. At most, the Supreme Court reserved whether due process would be violated "if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process." *Marshall*, 446 U.S. at 250 n.12. But Sparger-Withers did not litigate this case on the theory that contingency fees prompted Taylor to single her out for disfavored treatment. Her complaint is that contingency fees are "structure[d]" to reward success. Br. 41–42.

The district court's understanding of *Marshall* is hardly "unprecedented." Br. 22. Both the Ninth Circuit and state high courts have rejected arguments that *Marshall* forbids contingency-fee arrangements for private attorneys who litigate cases on the government's behalf. *See Am. Bankers Mgmt. Co. v. Heryford*, 885 F.3d 629, 633 n.3 (9th Cir. 2018) (collecting cases). As the Ninth Circuit explained in upholding a contingency-fee arrangement between a district attorney and a private firm, the Supreme Court "observed that prosecutors in an adversary system 'are necessarily permitted to be zealous in their enforcement of the law,'" and while it was not suggesting "'the Due Process Clause imposes no limits on the partisanship of' prosecutors," *Marshall* did not say what those limits were. *Id.* at 637. *Marshall* simply "'does not support a finding of a due process violation'" by "'financially interested prosecutors.'" *Id.* at 638; *accord State v. Actavis Pharma, Inc.*, 167 A.3d 1277, 1284 (N.H. 2017) (stating that *Marshall* is "not pertinent" to whether private counsel's contingency-fee agreement with the New Hampshire Attorney General created a due-process violation); *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625, 630

19

n.20 (W. Va. 2013) ("we" have not found "*any* case that supports a due process viola-

tion claim through the use of special assistant attorneys general in the prosecution of

civil cases" retained under a contingency-fee arrangement (emphasis in original)).

### C. However read, *Marshall* does not establish a limit on incentives for public officials and does not address private attorneys

Even under Sparger-Withers's reading of *Marshall*, the question remains

about how much of an incentive for private attorneys conducting forfeitures is too

much under the Due Process Clause. Sparger-Withers herself admits that *Marshall*

never articulated precisely "what limits there may" (or may not) "be on a financial or

personal interest of one who performs a prosecutorial function." *Marshall*, 446 U.S.

at 250; *see* Br. 13. And this case does not concern financial incentives for public pros-

ecutors. It concerns a contingency fee for a private attorney retained to handle civil

forfeitures under the ultimate supervision of public prosecutors. Thus, any comments

that *Marshall* made about limits on administrative prosecutors do not necessarily

apply to private attorneys retained by government attorneys.

The Ninth Circuit made that precise point in *American Bankers Management

Co., Inc. v. Heryford*, 885 F.3d 629 (9th Cir. 2018). In that case, a defendant chal-

lenged an arrangement under which a district attorney retained private law firms on

a contingency-fee basis to pursue injunctive relief, restitution, and civil penalties for

alleged violations of California's Unfair Competition Law. *Id.* at 632. The Ninth Cir-

cuit rejected the argument that the contingency-fee arrangement violated due process

by giving the firm "a financial incentive to seek as much in civil penalties as possible."

*Id.* at 635. *Marshall*, the court observed, did not "prohibit[] civil prosecutions by

financially interested prosecutors." *Id.* at 638 (quoting *Kelly*, 9 F.3d at 759). And private firms in civil cases are not necessarily subject to the same standards as public prosecutors since private firms "do not have 'the power to employ the full machinery of the state'" against potential targets. *Id.* at 635 (quoting *Kelly*, 9 F.3d at 760).

Sparger-Withers may dispute the Ninth Circuit's reasoning. But she cites no decision in which courts have read *Marshall* to prohibit governments from retaining *private* attorneys on a contingency-fee basis. Nor is Sparger-Withers correct that "[c]ourts at every level of the federal judiciary" have treated "contingency fees" for *public* attorneys "as the bellwether of unconstitutionality." Br. 17. In fact, the decisions she cites—*Brucker v. City of Doraville*, 38 F.4th 876 (11th Cir. 2022), and *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018)—rejected due-process challenges to the compensation structure for public attorneys. *See Brucker*, 38 F.4th at 886 (giving the city prosecutor "$500 per court session . . . d[id] not raise significant due process concerns"); *Harjo*, 326 F. Supp. 3d at 1205 (paying city officials' "salaries . . . from forfeiture revenues" did "not give rise to a due process violation"). Holding that due process forbids governments from retaining private attorneys on a contingency-fee basis would require straying well beyond existing precedent.

## II.    No Historical Tradition Prohibits Financial Incentives for Private Persons Pursuing Civil Actions on the Government's Behalf

In the absence of any precedent that forbids the contingency-fee arrangement challenged here, the district court appropriately considered whether any historical tradition bars the arrangement. App. 11–19. No tradition does. To the contrary, there is a longstanding historical tradition of rewarding private persons who assist the

government in pursuing both criminal and civil actions. That tradition runs from the early common law through the Founding and Civil War up to the present day, providing "weighty evidence that due process does not" forbid incentives for private persons who litigate civil-forfeiture actions. *Culley v. Marshall*, 601 U.S. 377, 392 (2024). As the Supreme Court has emphasized, a "'process of law . . . must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country.'" *Burnham v. Super. Ct.*, 495 U.S. 604, 619 (1990).

## A.    Due process in judicial proceedings is defined by settled historical usages

In a due-process challenge, the plaintiff must show that the challenged procedure violates a principle "'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Montana v. Egelhoff*, 518 U.S. 37, 47 (1996). The judiciary's "primary guide in determining whether the principle in question is fundamental is, of course, historical practice." *Id.* at 43 (citing *Medina v. California*, 505 U.S. 437, 446 (1992)). As Justices Gorsuch, Thomas, Sotomayor, and Jackson recently observed, "the meaning of the Due Process Clause is not measured by the latest popularity poll." *Mallory*, 600 U.S. at 140 n.7. That principle holds true in the context of civil forfeitures. Just this past Term, the Supreme Court gave great weight to "historical practice" in rejecting arguments that due process requires "preliminary hearings in civil forfeiture cases." *Culley*, 601 U.S. at 390–92.[1]

---

[1] In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court employed "interest balancing" in the context of a challenge to administrative proceedings for the termination of Social Security disability benefits. App. 11–13. It considered the interests affected by the official action and the relative value and burden associated with any

Sparger-Withers argues that the district court was wrong to consider history, arguing that "impartiality standards set by existing due-process precedent" should control instead. Br. 27. In determining the impartiality required of adjudicators, however, the Supreme Court itself has considered "settled usages and modes of proceeding existing in the common and statute law of England." *Tumey*, 273 U.S. at 523; *see id.* at 523–31 (surveying Anglo-American history and precedents). Moreover, by Sparger-Withers's own admission, what precedent there is from the Supreme Court and this Circuit does "not mark out 'with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function.'" Br. 13 (quoting *Marshall*, 446 U.S. at 250). Courts therefore must look to something besides "existing precedent" to determine what limits the Due Process Clause imposes.

As the district court perceived, history supplies the missing information. Courts must employ "some principle of decision" if they are to respect their "limited constitutional role." App. 13. The judiciary "may not impose its 'personal and private notions' on the people of Indiana." *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352–53 (1990)); *see Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 (2022) ("[W]e must guard against the natural human tendency to confuse what that

---

"additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 332–35. But the Supreme Court has "never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 167–68 (2002). Rather, the classic judicial application of *Mathews* concerns the process due in "novel administrative processes." App. 13; *see, e.g., Schepers v. Comm'r*, 691 F.3d 909, 915 (7th Cir. 2012); *Windy City Meat Co. v. USDA*, 926 F.2d 672, 679–80 (7th Cir. 1991); *Larry v. Lawler*, 605 F.2d 954, 959–63 (7th Cir. 1978). And while Sparger-Withers cites *Mathews*, Br. 28, she does not advocate its application here.

Amendment protects with our own ardent views about the liberty that Americans should enjoy."). And outside the administrative context, "[h]istorical practice," "our common-law heritage," and "settled tradition" remain the judiciary's "primary guide" to determining what is "fundamental" to due process. *Medina*, 505 U.S. at 446.

Indeed, Sparger-Withers's resistance to history is ironic. She concedes that tradition should inform analysis of "criminal-procedure rules," Br. 27, and (incorrectly) urges that civil-forfeiture actions are "'functionally analogous to criminal proceedings,'" *id.* at 38; *see id.* at 39. Yet citing a case that employed a different framework than Sparger-Withers herself, Sparger-Withers argues that history should be ignored when it comes to examining the constitutionality of contingency-fee arrangements for private attorneys conducting civil forfeitures. *See id.* at 38. Especially given the Supreme Court's use of history in its most recent decision on civil forfeitures, there is no principled basis for casting history aside.

### B. There is a long historical pedigree of compensating parties who pursue actions on the government's behalf

As the district court observed, there is no settled tradition forbidding governments from retaining private counsel under contingency-fee arrangements to conduct civil forfeitures. App. 19. In fact, from the earliest days of the common law, Anglo-American governments have provided advocates with incentives for successfully pursuing civil and criminal cases.

### 1. Interested parties long conducted criminal prosecutions

"At the time of the Constitution, there existed in England a longstanding custom of private prosecution." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481

U.S. 787, 816 n.2 (1987) (Scalia, J., concurring). Under the English common law, criminal prosecutions "generally were initiated and prosecuted by the individuals who were victims of crime." Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 290 (1989). "In some contexts a successful prosecutor could recover the costs of the suit, in others, a victim could obtain restitution, and in still others, the victim could gain double damages from the defendant." *Id.* at 291; *see* Juan Cardenas, *The Crime Victim in the Prosecutorial Process*, 9 Harv. J.L. & Pub. Pol'y 357, 360 (1986).

These usages carried over into America. As in Britain, early colonial law provided for private participation in criminal prosecutions and rewarded informers with portions of fines and fees collected under civil or regulatory provisions. Charles Hughes, *Hughes' Criminal Law* § 2773 (1901). "If the crime victim's prosecutorial efforts were successful, he reaped certain benefits that could be quite lucrative," including restitution and punitive damages. Cardenas, *supra*, at 367. Private individuals could be authorized to assist with criminal prosecutions by courts (*i.e.*, appointment of a special prosecutor) or by statute. *See* 1 Joel Prentiss Bishop, *Commentaries on the Law of Criminal Procedure* 168–69 (2d ed. 1872).

This tradition of private prosecution continued past the Founding era. Throughout the nineteenth and twentieth centuries, courts regularly permitted prosecution by private attorneys paid by interested parties. Robert M. Ireland, *Privately Funded Prosecution of Crime in the Nineteenth-Century United States*, 39 Am. J. Legal Hist. 43, 46–50, 56–57 (1995). "By the end of the nineteenth century, the high

tribunals of Alabama, Florida, Iowa, Kansas, Kentucky, Maine, Minnesota, Missis-
sippi, Nebraska, New Jersey, North Dakota, Texas, Utah, Vermont, and Virginia had
upheld the legality of privately funded prosecutors." *Id.* at 49; *see id.* at 56–57 & n.24
(collecting cases from Nebraska, Missouri, Georgia, New York, Kentucky, and Ten-
nessee). And private involvement in state prosecutions has continued since. *See, e.g.*,
*State v. Nichols*, 481 S.E.2d 118, 122–23 (S.C. 1997).

Sparger-Withers does not dispute that, if financially interested parties may
conduct criminal prosecutions, they may pursue civil forfeitures as well. Instead, she
argues that it violates due process for interested parties to conduct criminal proceed-
ings because "the principle that prosecutors owe a 'special duty to justice' is en-
trenched in the Anglo-American judicial system." Br. 29–30. But none of the sources
that Sparger-Withers cites for that general proposition—Coke, Bishop, and *State v.
Henning*, 33 Ind. 189, 191 (1870)—says that this principle precludes financial incen-
tives. Coke addressed the need for witnesses in criminal proceedings, Edward Coke,
*The Third Part of the Institutes of the Laws of England* 78–79 (1797); Bishop warned
against "obtain[ing] a conviction by any trick or artifice," 1 Bishop, *supra*, § 293, at
173; and *Henning* addressed whether a bribery statute applied to a prosecutor, 33
Ind. at 190–91. And the fact remains that historical sources saw no conflict between
the idea that prosecutors should pursue justice and criminal prosecutions by inter-
ested parties.

Historical discussions of conviction fees for American prosecutors bear this out.
As early as 1748, New Jersey adopted a system under which prosecutors earned a fee

for the successful conviction of criminal defendants. *See* Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940*, at 263 (2013). Conviction fees were prevalent in colonies, territories, and States throughout the nineteenth century; at least 22 different jurisdictions adopted them. *See id.* at 263–69. Indiana, for example, adopted conviction fees "during the territorial period in 1807, keeping them long past statehood." *Id.* at 263 (footnote omitted); *see* Act of Sept. 14, 1807, § 5, *in The Laws of Indiana Territory 1801–1809*, at 560, 561–62 (Francis S. Philbrick ed., 1930); Act of Dec. 17, 1810, § 1, *in The Laws of Indiana Territory 1809–1816*, at 164–65 (Louis B. Ewbank & Dorothy L. Riker eds., 1934).

The federal government adopted a system of incentive payments too. For theft on the high seas, the First Congress authorized a whipping and a fine not to exceed fourfold the value of the goods stolen, directing "one moiety to be paid to the owner of the goods . . . and the other moiety to the informer and prosecutor." Act of Apr. 30, 1790, ch. 9, § 16, 1 Stat. 112, 116. In 1853, Congress provided for all federal prosecutors to receive conviction fees, and the government continued paying those fees until 1896—almost three decades after the Fourteenth Amendment's ratification. Parrillo, *supra*, at 268, 276. Legal observers thought payments for successful convictions (as opposed to the initiation of cases) would inspire prosecutors to "avoid initiating prosecutions likely to end in acquittal" and so protect the innocent. *Id.* at 265.

Sparger-Withers cites late nineteenth-century efforts to eliminate conviction fees for federal prosecutors as evidence of their unconstitutionality. Br. 33–34. But criticisms from the late nineteenth century do not show that due process was

27

understood at the Constitution's or Fourteenth Amendment's ratification to forbid prosecutors from having any interest in the outcome of cases—much less show that rule applied to private persons. *Cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 66 (2022) ("late-19th-century evidence cannot provide much insight . . . when it contradicts earlier evidence" due to its "temporal distance from the founding").

Moreover, as Sparger-Withers's own source explains, Congress's decision to replace conviction fees with a salary system reflected a "legislative desire" to "establish[] prosecutorial discretion as a softener of modern positivist legislation." *Parrillo, supra*, at 272, 277. Congress sought to give prosecutors the "financial independence" necessary to pursue more complicated cases under new federal statutes that prosecutors would be less likely to win. *Id.* at 288–89. Put another way, Congress simply chose to pursue a different public policy.

As the district court observed, however, the Constitution does not enshrine Sparger-Withers's view of what constitutes the best public policy for criminal or quasi-criminal prosecutions. App. 16–18. It forbids only practices that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 19 (quoting *Medina*, 505 U.S. at 446).

### 2.    Qui tam actions have rewarded private parties as well

Just as the American colonies, federal government, and States offered incentives in the criminal context, so they offered incentives in the civil context. Private persons had a substantial role in enforcing a wide variety of regulations through qui tam actions. Hughes, *supra*, § 2565. Qui tam actions have an "ancient pedigree."

*United States ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020); *see* Krent, *supra*, at 291. In England, any person "aware of criminal activity" could pursue a private prosecution against a wrongdoer; if successful, the qui tam relator could "split a statutory fine or forfeiture with the government." Krent, *supra*, at 291; *see* 3 William Blackstone, *Commentaries on the Laws of England* *160. That practice continued in America. Krent*, supra*, at 291, 296–303. Qui tam actions have existed "in this country ever since the foundation of our government," *Marvin v. Trout*, 199 U.S. 212, 225 (1905), and were in "widespread use at the time of the Founding," *UCB*, 970 F.3d at 847. "'[A]lmost every' penal statute could be enforced by them." *Id.* at 839 (quoting *Adams v. Woods*, 6 U.S. (2 Cranch) 336, 341 (1805)).

Qui tam actions arose from the need to recruit those who could provide "public opinion and local knowledge" to assist with the government's pursuit of a claim while avoiding "the creation of an expensive, centrally-directed professional prosecutorial corps." John H. Langbein, *The Origins of Public Prosecution at Common Law*, 17 Am. J. Legal Hist. 313, 335 (1973). Colonial statutes designated portions of fines to informers who reported fraudulent business practices, peddling without a license, improper catching of fish or packaging of meat, or the illegal possession of British goods. *See* Act of 1641, *in The Colonial Laws of Massachusetts, Reprinted from the Edition of 1660, with the Supplements to 1672*, at 129–30 (1889); Act of Sept. 10, 1692, ch. 21, *in* 1 *The Colonial Laws of New York from the Year 1664 to the Revolution*, at 279–81 (1894); Act of May 19, 1715, ch. 290, *in* 2 *The Colonial Laws of New York from the Year 1664 to the Revolution*, at 845–46 (1894); Act of May 1782, ch. 54, *in* 11 *The*

*Statutes at Large; Being a Collection of all the Laws of Virginia from the First Session of the Legislature in the Year 1619*, at 101–02 (1823).

One of the most used qui tam statutes, the federal False Claims Act, was enacted during the Civil War, just a few years before the Fourteenth Amendment's adoption, and remains in use today. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023). Under the False Claims Act, interested persons can initiate suits as qui tam relators and, "[i]f the Government elects not to proceed with the action, . . . conduct the action." 31 U.S.C. § 3730(a)–(c)(3). "If the action leads to a recovery, the relator may receive up to 30% of the total." *Polansky*, 599 U.S. at 425. Many states have similar qui tam statutes. *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 12:1 (updated July 2024). And courts regularly reject arguments it violates due process for governments to promise "a reward to relators for [a] successful prosecution." *Kelly*, 9 F.3d at 759–60; *see, e.g.*, *Friedman v. Rite Aid Corp.*, 152 F. Supp. 2d 766, 771 (E.D. Pa. 2001); *United States ex rel. Phillips v. Pediatric Servs. of Am., Inc.*, 123 F. Supp. 2d 990, 994–95 (W.D.N.C. 2000); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 623–24 (W.D. Wis. 1995).

Sparger-Withers argues that qui tam actions are different from forfeitures because qui tam actions implicate a "proprietary" government interest whereas forfeitures implicate a "sovereign" interest. Br. 37–38. But qui tam actions implicate "both" an "injury to [the government's] sovereignty arising from the violation of its laws" and a "proprietary injury resulting from the alleged fraud." *Vt. Agency of Nat. Res. v.*

30

*United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). As the Supreme Court has explained, the treble-damages regime created by the federal False Claims Act is "essentially punitive in nature." *Id.* at 784–85. "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Id.* at 786. So there is "nothing" that "meaningfully distinguishes" a private party's pursuit of a reward under a qui tam statute from that pursuit under a forfeiture statute. *Am. Bankers*, 885 F.3d at 363.

Nor does it matter that a private attorney working under Indiana's statute might be considered a state actor for some purposes. *Contra* Br. 38. Significantly, private attorneys, like qui tam relators, "do not have the 'power to employ the full machinery of the state in scrutinizing any given individual.'" *Kelly*, 9 F.3d at 760 (quoting *Young*, 481 U.S. at 814); *see Am. Bankers*, 885 F.3d at 634–35. And contrary to Sparger-Withers's suggestion, Br. 39, contingency-fee arrangements for forfeitures do not pit private and public interests against each other any more than do the rewards offered under qui tam statutes. The public has an interest in vigorous enforcement of civil-forfeiture laws and "thus the public's interest in successfully enforcing [them] and the [attorney's] private interest are intertwined rather than conflicting." *Kelly*, 9 F.3d at 760. And even if qui tam actions are not a perfect analogy for the arrangement challenged here, the actions' existence undermines Sparger-Withers's insistence that those championing the government's interests cannot have any financial incentives.

### 3. Bounties and moieties provided public and private actors a share of forfeited goods

Nor do qui tam actions stand alone. During "much of the colonial period," colonial laws authorized the forfeiture of goods for customs violations and provided for customs officers and informers to receive a portion of the goods seized. Parrillo, *supra*, at 222, 231, 235–236 (2013). In 1789, the First Congress adopted the practice too. Congress authorized the forfeiture of imported goods not properly invoiced "with design to defraud the revenue," and directed a moiety of "penalties, fines and forfeitures" to be divided between the customs officers responsible for the jurisdiction and any private informers. Act of July 31, 1789, §§ 22, 38, 1 Stat. 29, 42, 48. As the U.S. attorney for New York City later observed, there were "very few complaints" about the early moiety system. Parrillo, *supra*, at 240 (quoting Hearings (1874), 58–59).

At the same time that the Reconstruction Amendments were up for ratification, Congress "confirmed its faith in bounty-seeking," "reaffirm[ing] and expand[ing] the moiety rewards" through new legislation. Parrillo, *supra*, at 223, 239. In 1863, Congress began offering bounties to U.S. attorneys as well as customs officers, *see* Act of Mar. 3, 1863, § 11, 12 Stat. 737, 741, and further expanded the availability of bounties to lower-ranking customs officers in 1867, *see* Act of Mar. 2, 1867, § 1, 14 Stat. 546, 546–47, to "reward the zeal and fidelity of the seizing officer" and "greatly improve the public service," Cong. Globe, 39th Cong., 2d. Sess. 1820 (1867) (Sen. Edmunds). That history confirms that, even in the forfeiture context, offering financial incentives for success does not violate due process.

Although Sparger-Withers seeks to portray Congress's decision to abolish moieties for federal customs officers in the mid-1870s as evidence that early Americans believed incentives for prosecution to violate the Fifth Amendment, Br. 31–34, the opposite was true. As Ellis Roberts—the floor sponsor of the 1874 customs reform bill Sparger-Withers discusses—observed, customs bounties were not of recent vintage, but rather had been authorized by statute "since the earliest days of the Republic." 2 Cong. Rec. 4,030 (1874). As Sparger-Withers's own source recounts, "Congress's ultimate purpose" in enacting the reforms was to "win legitimacy for the ambitious revenue system it had constructed over the preceding years" and to create "a culture of voluntary compliance among the merchants." Parrillo, *supra*, at 247.

There is no suggestion that Congress saw moieties as unconstitutional. During debate on the 1874 bill abolishing bounties for federal customs officers, the only constitutional discussion concerned an unrelated statutory provision that permitted customs officers to seize the books and papers of merchants to investigate wrongdoing. 2 Cong. Rec. 4,029, 4,035–36 (1874). One opponent argued that the provision violated the principle that no one should be compelled to furnish evidence against himself. *Id.* at 4,035. By contrast, no member of Congress raised constitutional objections to bounties. Congress took it as given that bounties for customs officers were constitutionally permissible even if they no longer accorded with its preferred public policy.

Sparger-Withers seeks to portray Congress's abolition of moieties as building on English objections raised two hundred years earlier to practices by the English Crown (an example that she did not cite to the district court). Br. 30–31. But the

English Declaration of Rights did not condemn all incentives. What it prohibited was "grants and promises of fines and forfeitures *of particular persons* before conviction." Lois G. Schwoerer, *The Declaration of Rights, 1689*, at 96 (1981) (emphasis added) (citing Article 12 of the 1689 Declaration of Rights). That prohibition arose out of a "practice that had grown up around the law of treason," specifically that "courtiers and others" would solicit the forfeiture of the lands and goods of someone accused of treason "even before a judgment was rendered." *Id.* This incentivized courtiers who "stood to benefit from a conviction" to "interfere in the proceedings of the court to encourage conviction" and to "pressure . . . the bench to set the fine at a large figure." *Id.* But the English did not understand the Declaration of Rights to prohibit generally applicable laws providing incentives. English laws allowing for criminal prosecution by information often divided the forfeited property to provide a moiety to the informer. 4 Blackstone, *Commentaries* *303–04; *see id.* at *99 (1695 prohibition on exchanging counterfeit currency); *id.* at *172 (1664 prohibition on wagering sums over 100£); *id.* at *59–60 (1606 prohibition on profaning the Lord's name during a play).

Similarly, as is evident from widespread use of incentives in early America, the generations that ratified the Fifth and Fourteenth Amendments did not see the English tradition as prohibiting the enactment of generally applicable statutes that promised informers, private persons, and even prosecutors a fixed share or set payment. Besides, even if one or two pieces of history can be read differently, the Due Process Clause requires Sparger-Withers to do more than show that some policymakers thought rewards for assisting the government were dubious. The Fourteenth

Amendment requires her to demonstrate that "*settled* usages and modes of proceeding" forbid contingency-fee arrangements for private attorneys handling civil forfeitures. *Tumey*, 273 U.S. at 523 (emphasis added). Whatever else, the isolated examples she plucks from history do not represent a settled tradition.

## III.    No Other Principle Supports Imposing a Novel Disinterestedness Requirement on Private Attorneys Conducting Forfeitures

The Supreme Court's and history's approval of incentives demonstrate that Indiana may provide private attorneys an incentive for winning forfeiture cases before a neutral and detached magistrate. Sparger-Withers may believe that contingency fees create moral hazards or are abuse prone. *See* Br. 18–21, 41–43. But those are policy arguments for the Indiana legislature to weigh and resolve, as Congress has done over the years in enacting, repealing, and maintaining various statutory schemes offering incentives. The Constitution does not mandate her preferred policies but protects only principles "'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Egelhoff*, 518 U.S. at 47 (quoting *Patterson* 432 U.S. at 202). Sparger-Withers identifies no principle besides her own sense of justice that would allow this Court to decide some incentives are permissible and others are not.

Sparger-Withers's brief illustrates the difficulty. By Sparger-Withers's logic, no government—local, state, or federal—should be able to hire outside counsel on contingency to conduct civil litigation because that gives attorneys a "direct financial stake in winning." Br. 18; *see id.* at 3 ("direct financial self-interest"). But States regularly enter contingency-fee contracts with private attorneys to conduct civil

litigation, often in complex, time-intensive lawsuits, such as tobacco litigation. *See* David A. Dana, *Public Interest and Private Lawyers: Toward a Normative Evaluation of Parens Patriae Litigation by Contingency Fee*, 51 DePaul L. Rev. 315, 315 (2001). Faced with that reality, Sparger-Withers admits that there are "forms of civil litigation in which governments may retain contingency-fee counsel," such as where there is a "'proprietary interest.'" Br. 40. But why that line makes sense is elusive. In her view, the constitutional problem is the attorney's "direct financial stake." Br. 18.

Similar questions surround other types of fee arrangements. Even a lodestar fee gives private attorneys some financial incentive in how cases are litigated. Work more, earn more. Win more cases, be hired for more cases. Complete disinterestedness is an impossibility. This reality illustrates why it is perilous to attempt to decree judicially the "correct level of motivation" for private attorneys hired by the government. App. 19. The premise of the adversary system is that "each side will put its best foot forward and the neutral tribunal will find the truth." *Id.* Embracing Sparger-Withers's amorphous view of due process would invite individual members of the judiciary to impose their own views about what policy is best.

Nor are Sparger-Withers's policy criticisms well founded. Sparger-Withers cites policies from the federal government and associations of government attorneys against making their compensation depend on outcomes. Br. 20. But those policies represent just that—policies. Even Sparger-Withers's own cited authorities do not require public attorneys' compensation to be completely severed from their activities. *See* pp. 16–21, 26–28, 33–35, *supra*. Nor are private attorneys situated the same as

public prosecutors tasked with pursuing criminal cases. As mentioned above, private attorneys pursuing civil cases "do not have the 'power to employ the full machinery of the state in scrutinizing any given individual.'" *Kelly*, 9 F.3d at 760. Private attorneys lack the power to employ "police investigation and interrogation, warrants, immunized informers and agents, authorized wiretapping, civil investigatory demands, [or] enhanced subpoena power."[2] *Am. Bankers*, 885 F.3d at 635. The limited role of a private attorney pursuing civil actions entails that they do not have "the same type of duty to serve the public interest as government prosecutors." *Id.* at 634.

This does not mean that private attorneys pursue their own interests instead. *Contra* Br. 19–20. The public has an interest in the vigorous enforcement of civil-forfeiture laws and "thus the public's interest in successfully enforcing [those laws] and the [attorney's] private interest are intertwined rather than conflicting." *Kelly*, 9 F.3d at 760. Giving prosecutors the flexibility to retain private attorneys to conduct civil forfeitures can benefit their pursuit of justice as well by allowing prosecutors to "maintain a clear division between criminal prosecutions and Forfeiture Actions." Dkt. 115 at 4; *see* Dkt. 127-3 at 7 (Eaton Dep. 20:4–10, 21:3–18). That separation can reduce any appearance that civil forfeitures can influence criminal cases while freeing prosecutors to pursue criminal cases of utmost importance to the public.

---

[2] Sparger-Withers cites an instance of Taylor "receiving a defendant's text messages via a detective." Br. 38–39 (citing Dkt. 132-2). But the cited email exchange does not indicate that Taylor directed the investigation, only that he reviewed information the police had obtained.

Sparger-Withers cites a "scandal" involving forfeitures. Br. 18. But she omits critical context. In the case cited, the problem was that a prosecutor had contracted with a deputy prosecutor within the same office to pursue civil forfeitures. *In re McKinney*, 948 N.E.2d 1154, 1156 (Ind. 2011). That risked a situation in which the power over "criminal case[s] w[ould be] held by one who stood to reap personal financial gain if the defendant agreed to the forfeiture of his or her assets." *Id.* at 1161. Contracting with a private attorney does not create the same risk precisely because the private attorney is not prosecuting criminal cases. *See* Ind. Code § 34-24-1-8(c) (barring the "[t]he attorney retained" to conduct civil forfeitures from "serv[ing] as a deputy prosecuting attorney in any county"); Dkt. 127-3 at 7 (Eaton Dep. 18:2–21:6).

Sparger-Withers also cites a handful of instances in which Taylor allegedly failed to return property in a timely manner or allegedly made errors. Br. 42–43. But there is no evidence Taylor's compensation played any role. As Sparger-Withers conceded below, "all" of Taylor's conduct may "be explained either as good-faith errors or as exercises of disinterested professional judgment." Dkt. 121 at 34. Similarly, the quotes that Sparger-Withers lists from Greg Garrison, Br. 19–20, do not suggest that contingency-fee arrangements create problems. The quotes add up to one thing: compensation depends on results. But that is not in dispute. What is missing is any evidence that offering contingency fees to lawyers who must then litigate forfeiture cases in front of neutral judges in fact "subverts" justice. Br. 41.

Moreover, there are multiple checks on private attorneys pursuing civil forfeitures. One constraint is state forfeiture statutes, which reflect legislative concerns for

due process. Those statutes detail procedures that police must follow when seizing property and that prosecutors or private counsel must follow when pursuing civil forfeiture of property. Ind. Code § 34-24-1-1 *et seq.* For example, they require a prompt showing of probable cause for a seizure and require a forfeiture complaint to be filed within 90 days of the seizure or 21 days of the owner's demand for return. §§ 34-24-1-2(b), 34-24-1-3. Another check is state courts. Under Indiana law, any party with an interest in seized property may request a hearing at which to contest a forfeiture. § 34-24-1-3(d). And "[i]f the prosecuting attorney fails to meet the burden of proof, the court shall order the property released to the owner, unless the owner's possession of the property is illegal." § 34-24-1-4(b). Taylor can never get paid unless a court first "enters judgment" and "order[s] distribution of the property." § 34-24-1-4(c).

A final backstop is public prosecutors themselves. Under Taylor's contracts with prosecutors, prosecutors are entitled to make the "final decision" about whether "to have seized assets declared forfeit." Dkt. 120-3 at 3. Prosecutors are also entitled to "full, immediate, and unrestricted access to [Taylor's] work product," to "progress reports . . . upon request," and to take over the case in certain circumstances. *Id.* at 4–5. Any person who feels that they are being treated unfairly can complain to a public official without a financial interest in the forfeiture action and with full authority to order the forfeiture action dismissed. *See* § 34-24-1-3(d). Whether or not prosecutors frequently need to intervene (they don't, *see* Dkt. 115 ¶ 6), review authority need not be exercised to be meaningful: "What matters is that [prosecutors] have the discretion to review." *United States v. Arthrex, Inc.*, 594 U.S. 1, 27 (2021).

Ultimately, Sparger-Withers tries to downplay everything but compensation structure, saying that this was the Supreme Court's focus in *Marshall*. Br. 43. But Sparger-Withers herself admits that *Marshall* did not articulate the Due Process Clause's precise contours, Br. 13—in truth, it did not touch contingency fees at all. And if the due-process analysis is to be a free-ranging debate that includes consideration of what positions various groups have taken and what missteps individuals may or may not have made (whether those are attributable to compensation or not), it is hard to see why nothing but Taylor's compensation arrangement matters. *Marshall* had no occasion to address what considerations might matter for private attorneys retained by public officials. The Court should reject Sparger-Withers's constitutional challenge.

## IV.  This Case Should Have Been Dismissed as Moot

Although the district court correctly held that States have the flexibility to retain private attorneys to conduct civil forfeitures under contingency-fee arrangements, it should never have reached the merits. This case became moot six days after it was filed when Taylor dismissed the forfeiture case involving Sparger-Withers's property. None of the exceptions that Sparger-Withers invokes applies.

### A.  Sparger-Withers's claim became moot six days into this lawsuit

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). To invoke a federal court's jurisdiction, a "litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* Under Article III, moreover, the litigant

invoking federal jurisdiction "must continue to have a 'personal stake in the outcome' of the lawsuit," *id.*, "at every stage of the trial and appellate proceedings," *Trotter v. Klincar*, 748 F.2d 1177, 1183 (7th Cir. 1984). A case is moot where the relief requested would have "no impact on the parties to the suit." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001). When "a complaining party manages to secure outside of litigation all the relief he might have won in it," the court "must dismiss the case as moot." *FBI v. Fikre*, 601 U.S. 234, 240 (2024).

Sparger-Withers no longer has the requisite personal stake in this case. Sparger-Withers's alleged injury arises from the civil-forfeiture action brought against her property by Taylor. Dkt. 1 at 11 (Compl. ¶ 48). Six days after Sparger-Withers filed this case, however, Taylor dismissed the civil-forfeiture action involving her property in response to the dismissal of the criminal charge supporting the forfeiture action. Dkt. 46-6; Dkt. 46-7. That dismissal rendered this case moot. In her complaint, Sparger-Withers sought only prospective relief. Dkt. 1 at 19–21. But "past wrongs" cannot support a request for prospective relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). A litigant must demonstrate that she is "likely to suffer future injury." *Id.* at 105; *see Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). Sparger-Withers, however, provides no evidence that she is likely to engage in criminal conduct that would lead to Taylor's filing another forfeiture action against her property.

The voluntary-cessation doctrine does not rescue Sparger-Withers's suit. *Contra* Br. 45–46. Under that doctrine, a defendant's "'voluntary cessation of challenged

conduct'" will moot a case if the defendant can show that the "'allegedly wrongful behavior could not reasonably be expected to recur.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020). Where the defendants are "public officials," the court "place[s] greater stock in their acts of self-correction, so long as they appear genuine," because to conclude otherwise would establish a presumption of official "bad faith" or "hidden motives"—"something [courts] ordinarily do not presume." *Id.* Here, Sparger-Withers has no reasonable expectation that her property will be subject to a civil forfeiture proceeding bought by Taylor while working under a contingency-fee arrangement. That is true for several reasons.

First, the only civil-forfeiture action that Taylor brought involving property seized from Sparger-Withers was dismissed in November 2021 after a court acquitted her of dealing marijuana. Dkt. 46-7. Sparger-Withers suggests a forfeiture action could be "re-file[d]." Br. 45. But the 90-day window for filing a forfeiture action after a seizure occurs has already passed. *See* Ind. Code § 34-24-1-3(a) (requiring forfeitures to be filed within 90 days of seizure). And the two-year window for filing a forfeiture based on either of the drug charges brought against Sparger-Withers, which were both misdemeanors, Dkt. 46-3 at 2, has elapsed as well. *See* Ind. Code § 34-24-1-3(a)(2) (requiring forfeitures to be filed within the limitations period set forth in Indiana Code § 35-41-4-2(a)(2)). Any re-filed forfeiture action would be time-barred.

Relatedly, on the facts here, Indiana Court of Appeals precedent would preclude re-filing based on the conviction for simple marijuana possession. To bring a forfeiture action, the State must establish that the property at issue constitutes the

proceeds or instrumentalities of a crime. Ind. Code § 34-24-1-1(d). As the Indiana Court of Appeals held, however, simple possession of marijuana does not support the forfeiture of cash because the cash is not an instrumentality or proceed of possession. *See Gonzalez v. State*, 74 N.E.3d 1228, 1231–32 (Ind. Ct. App. 2017).[3]

Third, there is no evidence to support Sparger-Withers's speculation that Taylor might bring another forfeiture action based on some yet-to-be-committed crime in one of the 17 counties in which Taylor conducts forfeitures. The mere existence of Taylor's contract provides no basis for concluding there is a reasonable likelihood that Sparger-Withers herself will be subject to the challenged conduct again. *See Lyons*, 461 U.S. at 106–08; *Lopez-Aguilar*, 924 F.3d at 396. A forfeiture would be brought only if Sparger-Withers engages in criminal conduct capable of supporting a forfeiture in one of those 17 counties, *see* Ind. Code § 34-24-1-1, if property is seized in connection with the crime or determined to be subject to forfeiture by a court, *see* § 34-24-1-4, and if Taylor determines that the property constitutes the proceeds or instrumentality of the offense, *see* Ind. Code § 34-24-1-1. It is hardly likely that one—much less all—of those conditions will occur.

Sparger-Withers's reliance on *FBI v. Fikre*, 601 U.S. 234 (2024), is thus misplaced. In *Fikre*, the plaintiff alleged that the government placed him on the No Fly

---

[3] Plaintiff argues that Taylor previously "sought forfeiture against defendants who faced charges of misdemeanor marijuana possession alone." Br. 46 n.13 (citing Dkt. 71 at 7–9). But each of those involved "facts and circumstances separate from misdemeanor possession of marijuana warranting the prosecution of the forfeiture claim." Dkt. 73 at 4; *see id*. at 4–9. Taylor routinely dismisses forfeiture actions when possession is the only basis for conviction. *See* Dkt. 72-1 (Singh Decl.); Dkt. 73 at 2–4.

List based on non-public criteria in an attempt to compel him to work as an informant against members of his mosque. *Id.* at 237–38. Although the government removed Fikre from the No Fly List after he filed suit and stated that he "w[ould] not be placed on the No Fly List in the future based on currently available information," the government did not rule out placing Fikre on a No Fly List again. *Id.* at 241. It, for example, did not forswear placing him on a list if he "attend[ed] a particular mosque or refuse[d] renewed overtures to serve as an informant." *Id.*

By contrast, Taylor did not dismiss the forfeiture case out of forbearance but in response to a court judgment acquitting Sparger-Withers of marijuana dealing. Dkt. 127-2 at 13 (Taylor Dep. 45:1–3). The dismissed action is now time-barred under controlling state law. And the prospect that Sparger-Withers will ever engage in conduct that provides the predicate for a new forfeiture action by Taylor is exceedingly remote. Indeed, as long as she follows the law, there is no risk that another forfeiture action will ever be brought against her. Sparger-Withers's claim became moot when Taylor dismissed the forfeiture case against her property.

## B.    No exception to mootness applies in this case

That this case was filed as a putative class action does not help Sparger-Withers either. Ordinarily, if "the named plaintiff's claim becomes moot before the class is certified, the suit must be dismissed because no one besides the plaintiff has a legally protected interest in the litigation." *Wiesmueller v. Kosobucki*, 513 F.3d 784, 786 (7th Cir. 2008); *see Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 73 (2013); *Trotter v. Klincar*, 748 F.2d 1177, 1185 n.10 (7th Cir. 1984). Although courts have recognized

narrow exceptions to this general rule, *see U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399, 404 n.11 (1980), none applies here.

First, the alleged injury here is not so "intrinsically fleeting" that the later-certified class action survives the demise of Sparger-Withers's personal interest in the action's outcome. *Trotter*, 748 F.2d at 1184; *contra* Br. 47. Where "no plaintiff possesse[s] a personal stake in a suit long enough for litigation to run its course," class certification can "'relate back' to the filing of the complaint." *Genesis HealthCare*, 569 U.S. at 76. But this "inherently transitory" exception encompasses only a "narrow class of cases" where the challenged conduct is "by nature temporary," *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)—so much so that the "challenged conduct" would otherwise be "effectively unreviewable," *Genesis HealthCare*, 569 U.S. at 76; *see Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). If it is "[]possible for a more suitable representative . . . to emerge," the inherently-transitory exception does not apply. *Arreola v. Godinez*, 546 F.3d 788, 799 (7th Cir. 2008).

The challenged conduct here—Taylor's pursuit of a forfeiture action under a contingency fee arrangement—is not "by nature temporary" so as to qualify for the exception. Indiana's civil-forfeiture statute sets out a basic timeline for forfeiture proceedings. *See* Ind. Code § 34-24-1-1, *et seq*. Once the owner's property is seized, the prosecuting attorney has 90 days to bring a forfeiture action. *See* § 34-24-1-3(a). Then, if the property owner does absolutely nothing to contest the forfeiture action, the earliest the action can end is in another 20 days. *See* § 34-24-1-3(d), (e). If the owner chooses to contest the seizure—as many do—the action will take even longer. The

owner may petition for provisional release of the seized property after the probable cause determination, which entitles the owner to briefing and a hearing. *See* § 34-24-1-2(d)–(i). And the owner may of course contest the forfeiture complaint, which entails a hearing too. *See* § 34-24-1-3(d). Add to this that many forfeiture actions do not resolve until the underlying criminal case reaches resolution—sometimes on the plaintiff's own motion to stay the proceedings pending disposition of the charges.[4]

The upshot is that forfeiture actions are not so "inherently transitory" as to prevent a court from addressing a motion for class certification or litigating an entire case to conclusion. Indeed, many forfeiture actions last for years.[5] As the Supreme Court has emphasized, Article III's case-or-controversy requirement "subsists through all stages of federal judicial proceedings, trial and appellate," and a plaintiff "must continue to have a personal stake in the outcome of the lawsuit." *Lewis*, 494 U.S. at 477–78 (cleaned up). Given that it is Sparger-Withers's burden to demonstrate jurisdiction, this case should not be permitted to proceed under the exception.

In holding otherwise, App. 37–40, the district court made three errors. First, the district court focused on the particulars of Sparger-Withers's case rather than the

---

[4] *See, e.g.*, *State v. Parker*, No. 30C01-2404-MI-730 (Hancock Cnty. Cir. Ct. filed Apr. 9, 2024); *State v. Oldham*, No. 29D01-2301-MI-614 (Hamilton Cnty. Super. Ct. filed Jan. 20, 2023); *State v. Wilkerson*, No. 29D01-2403-PL-2668 (Hamilton Cnty. Super. Ct. filed Mar. 12, 2024).

[5] *See, e.g.*, *State v. Clem*, No. 27C01-1903-MI-19 (Grant Cnty. Cir. Ct. filed Mar. 1, 2019) (1,407 days or 3.85 years); *State v. Ellis*, No. 27C01-1904-MI-39 (Grant Cnty. Cir. Ct. filed Apr. 1, 2019) (1,389 days or 3.8 years); *State v. Starr*, No. 29D01-1910-MI-9370 (Hamilton Cnty. Super. Ct. filed Oct. 8, 2019) (1,281 days or 3.5 years); *State v. Rose*, No. 73D01-1810-PL-43 (Shelby Cnty. Super. Ct. filed Oct. 25, 2018) (1,237 days or 3.38 years); *State v. Lawrence*, No. 21D01-2003-MI-141 (Fayette Cnty. Super. Ct. filed Mar. 12, 2020) (1,159 days or 3.17 years).

challenged conduct. *See* App. 39. The "inherently transitory" exception "focuses" on the "fleeting nature of the challenged conduct." *Genesis HealthCare*, 569 U.S. at 76. It asks whether "*any potential named plaintiff* . . . would have a live claim long enough for a district court to certify a class." *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010) (emphasis added); *see Gerstein*, 420 U.S. at 110 n.11 (exception applies where it is "most unlikely that *any given individual*" could reach resolution before challenged conduct ceases) (emphasis added)); *Trotter*, 748 F.2d at 1184 (similar). Clearly, there are potential plaintiffs whose claims would remain live long enough that they could file a complaint and seek class certification. Some forfeiture cases last for years. *See* pp. 46 & n.5, *supra*. Even Sparger-Withers's own forfeiture proceeding lasted nine months and fifteen days, App. 34—enough time to certify a class.

Second, the district court overlooked a key tenet of the inherently transitory exception: transitoriness. The district court cited *Olson* for the proposition that the "essence" of the exception is "uncertainty about whether a claim will remain alive for any given plaintiff long enough for a district court to certify the class." App. 38 (citing *Olson*, 594 F.3d at 583). Uncertainty is one relevant consideration. But *Olson* made clear that "the ultimate length" of the challenged conduct "affect[s] the applicability of the 'inherently transitory' exception." 594 F.3d at 582; *accord Susman v. Lincoln Am. Corp.*, 587 F.2d 866, 870 (7th Cir. 1978). And since *Olson*, the Supreme Court has stressed that the key is whether the claims raised are "'so inherently transitory that the trial court will not have even enough time to rule on a motion for class

certification.'" *Genesis Healthcare*, 569 U.S. at 76 (quoting *McLaughlin*, 500 U.S. at 52). Claims concerning Taylor's pursuit of forfeitures are not so inherently transitory.

Third, the district court overlooked the reason it did not have sufficient time to rule on Sparger-Withers's class-certification motion in this particular case—that Sparger-Withers delayed filing the case. Sparger-Withers could have brought this constitutional challenge any time after Taylor filed for forfeiture of her property on February 1, 2021. Instead, she waited nine months to bring this challenge, filing it a few days *after* her acquittal of the predicate crime for the forfeiture. That delay means that Sparger-Withers cannot invoke the exception for inherently transitory injuries. As this Court observed in *Olson*, where plaintiffs "chose to wait to file for class certification until the claim was nearly moot or already moot," the exception does not apply. 594 F.3d at 582; *see Trotter*, 748 F.2d at 1184–85 (declining to apply the exception where the plaintiff had 70 days to file a live claim but waited until after the 70 days had elapsed); *Banks v. NCAA*, 977 F.2d 1081, 1086 (7th Cir. 1992) (declining to apply the exception where the plaintiff waited 112 days to file his claim—a mere eight days before he knew it would become moot).

Nor does the "picking off" exception apply here. *Contra* Br. 48. The exception applies only in the rare situation in which the defendant orchestrates a scheme to "pick off," or moot, the individual claims of successive class representatives in order to "delay the [class] action indefinitely." *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 547 (7th Cir. 2003). For the "picking off" exception to apply, the defendant must "manufacture[] mootness in order to prevent a class action from going forward,"

*Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 874 (7th Cir. 2012), such as by "paying off each class representative in succession," *Primax*, 324 F.3d at 546; *see Wrightsell v. Cook Cnty.*, 599 F.3d 781, 782 (7th Cir. 2010).

The threshold for the picking-off exception is not met here. Sparger-Withers points only to the timing of dismissal and claims without argument that it "easily satisfies" the picking-off doctrine, Br. 48. But there is no evidence that Taylor "picked off" a succession of proposed class representatives. *Cf. Cruz v. Farquharson*, 252 F.3d 530, 535 (1st Cir. 2001) ("no acceptable basis to conclude" from "the plaintiffs' experience, in and of itself," that defendant "devised a scurrilous pattern and practice of thwarting judicial review"). Nor did Taylor treat Sparger-Withers's forfeiture action differently from any other case. Dkt. 127-2 at 12 (Taylor Dep. 40:18–22). Rather, he dismissed Sparger-Withers's forfeiture action in response to Sparger-Withers's acquittal on the dealing charge, the predicate crime for the forfeiture action. The reason why this case became moot is that Sparger-Withers waited to file this action until it was clear the underlying forfeiture action would be dismissed.

## CONCLUSION

The Court should affirm the district court's grant of summary judgment.

Respectfully submitted,

/s/ William N. Riley
WILLIAM N. RILEY
RUSSELL B. CATE
SUNDEEP SINGH

RILEYCATE, LLC
11 Municipal Drive, Suite 320
Fishers, IN 46038
Telephone: 317.588.2866
Facsimile: 317.458.1785
Email: wriley@rileycate.com

*Counsel for Defendant-Appellee
Joshua N. Taylor*

THEODORE E. ROKITA
Indiana Attorney General

By:   /s/ James A. Barta
JAMES A. BARTA
Solicitor General

KATELYN E. DOERING
Deputy Attorney General

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for State Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limitation of Circuit Rule 32(c) because this document contains 13,602 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.    This document complies with the typeface requirements of Circuit Rule 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 12-point font.

Dated: July 19, 2024                    /s/ James A. Barta
                                        JAMES A. BARTA
                                        Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ James A. Barta
JAMES A. BARTA
Solicitor General

Office of the Indiana Attorney General
Indiana Government Center South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Facsimile: (317) 232-7979
James.Barta@atg.in.gov