No. 24-1367

# In the United States Court of Appeals for the Seventh Circuit

AMYA SPARGER-WITHERS, on behalf of herself and all others similarly situated,
Plaintiff-Appellant,

*v.*

JOSHUA N. TAYLOR, et al., Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Indiana (Civ. No. 21-2824)
(Hon. James R. Sweeney II)

## REPLY BRIEF OF APPELLANT

Anthony B. Sanders
INSTITUTE FOR JUSTICE
12143 24th St N
Lake Elmo, MN 55042
Telephone: 651.278.0257
E-mail: asanders@ij.org

J. Lee McNeely
Cynthia A. Bedrick
Scott A. Milkey
MCNEELYLAW LLP
2177 Intelliplex Drive, Suite 251
Shelbyville, IN 46176
Telephone: 317.825.5110
E-mail:　LMcNeely@McNeelyLaw.com
　　　　CBedrick@McNeelyLaw.com
　　　　SMilkey@McNeelyLaw.com

Samuel B. Gedge
　　*Counsel of Record*
Michael N. Greenberg
Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321
E-mail:　sgedge@ij.org
　　　　mgreenberg@ij.org
　　　　rbelden@ij.org

## TABLE OF CONTENTS

**Page**

Introduction..........................................................................................................1

Argument.............................................................................................................1

I.     Defendants' system of contingency-fee forfeiture prosecutors violates the Due Process Clause .....................................................................................1

     A.     The Due Process Clause sets a limit on the degree to which a prosecutor may be financially self-interested in the cases he or she prosecutes.............2

          1.     The Supreme Court's decision in *Marshall* v. *Jerrico, Inc.* confirms the existence of a due-process standard constraining prosecutors' financial self-interest........................................2

          2.     Defendants' historical survey and analogy to the False Claims Act do not displace the Supreme Court's reasoning in *Marshall*.............8

               a.     Defendants' historical account .....................................8

               b.     The False Claims Act analogy...................................10

     B.     Defendants' system of contingency-fee forfeitures contravenes the Due Process Clause's limit on financially self-interested prosecutors ...............15

II.    The federal courts have the power to hear this case ...................................19

     A.     Joshua Taylor's act of voluntary cessation did not moot Sparger-Withers's individual claim .................................................. 19

     B.     Even had Sparger-Withers's individual claim been mooted, the case falls within two class-action-specific exceptions to the mootness doctrine .. 21

Conclusion......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**(s)

CASES

*Am. Bankers Mgmt. Co.* v. *Heryford,*
    885 F.3d 629 (9th Cir. 2018) ......................................................................... 13, 14

*Brucker* v. *City of Doraville,*
    38 F.4th 876 (11th Cir. 2022) ............................................................................. 5

*Caperton* v. *A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) ............................................................................................. 5

*City & Cnty. of San Francisco* v. *Philip Morris, Inc.,*
    957 F. Supp. 1130 (N.D. Cal. 1997) ................................................................ 19

*City of Los Angeles* v. *Lyons,*
    461 U.S. 95 (1983) ............................................................................................. 21

*Cnty. of Riverside* v. *McLaughlin,*
    500 U.S. 44 (1991) ....................................................................................... 21, 22

*Cochise Consultancy, Inc.* v. *United States ex rel. Hunt,*
    587 U.S. 262 (2019) ........................................................................................... 11

*Driftless Area Land Conservancy* v. *Rural Utils. Serv.,*
    74 F.4th 489 (7th Cir. 2023) ............................................................................. 20

*FBI* v. *Fikre,*
    601 U.S. 234 (2024) ..................................................................................... 19, 20

*Freeport-McMoRan Oil & Gas Co.* v. *FERC,*
    962 F.2d 45 (D.C. Cir. 1992) ............................................................................ 16

*Genesis Healthcare Corp.* v. *Symczyk,*
    569 U.S. 66 (2013) ............................................................................................. 22

*Georgia* v. *McCollum,*
    505 U.S. 42 (1992) ............................................................................................. 17

*Gonzalez* v. *State,*
    74 N.E.3d 1228 (Ind. Ct. App. 2017) .............................................................. 20

*Hughes Aircraft Co.* v. *United States ex rel. Schumer*,
520 U.S. 939 (1997)............................................................................ 11, 15

*Mallory* v. *Norfolk S. Ry. Co.*,
600 U.S. 122 (2023)..................................................................................... 15

*Marshall* v. *Jerrico, Inc.*,
446 U.S. 238 (1980).............................................................................. *passim*

*Nielsen* v. *Preap*,
586 U.S. 392 (2019)..................................................................................... 23

*Olson* v. *Brown*,
594 F.3d 577 (7th Cir. 2010) ................................................................. 22, 23

*Price* v. *Caperton*,
62 Ky. 207 (1864) ....................................................................................... 10

*Primax Recoveries, Inc.* v. *Sevilla*,
324 F.3d 544 (7th Cir. 2003) ...................................................................... 24

*Rehberg* v. *Paulk*,
566 U.S. 356 (2012)....................................................................................... 9

*Seminole Tribe of Fla.* v. *Florida*,
517 U.S. 44 (1996)......................................................................................... 4

*State* v. *Town of Dover*,
9 N.H. 468 (1838).......................................................................................... 9

*Tumey* v. *Ohio*,
273 U.S. 510 (1927)................................................................................. 5, 10

*United States ex rel. Kelly* v. *Boeing Co.*,
9 F.3d 743 (9th Cir. 1993)..............................................................11, 12, 13

*United States* v. *Armstrong*,
517 U.S. 456 (1996)....................................................................................... 7

*Vt. Agency of Nat. Res.* v. *United States ex rel. Stevens*,
529 U.S. 765 (2000).................................................................................... 12

*Wilson* v. *Gordon*,
822 F.3d 934 (6th Cir. 2016) ................................................................. 22, 23

*Wolkenstein* v. *Reville*,
694 F.2d 35 (2d Cir. 1982) ................................................................ 7

*Young* v. *United States ex rel. Vuitton et Fils S.A.*,
481 U.S. 787 (1987) ......................................................................... 6

**OTHER AUTHORITIES**

2 Cong. Rec. 4030 (1874) .................................................................10

13C Charles Alan Wright et al., *Federal Practice & Procedure* § 3533.7 (3d ed. 2008) .....21

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*,
102 Mich. L. Rev. 689 (2004) .........................................................11

Br. of Appellants, *Marshall* v. *Jerrico, Inc.*,
No. 79-253, 1980 WL 339540 (U.S. filed Jan. 1980) ...........................5

Br. of Garrison Law Firm L.L.C. Supp. Mot. Summ. J.,
*Economan* v. *Cockrell*, No. 20-cv-32 (N.D. Ind. Feb. 28, 2023) (Doc. 161) .............13, 17

Brian A. Grossman, *The Prosecutor: An inquiry into the exercise of discretion* (1969).....9

*Constitutionality of the Qui Tam Provisions of the False Claims Act*,
13 Op. O.L.C. 207, 1989 WL 595854 (1989) ........................................11

Def.'s Mot. to Stay Case Pending Resolution of Federal Class Action,
*State* v. *Sparger*, No. 30D01-2102-MI-000152 (Ind. Super. Ct. Nov. 15, 2021)...............23

Harold J. Krent, *Executive Control Over Criminal Law Enforcement: Some
Lessons from History*, 38 Am. U. L. Rev. 275 (1989)...........................9

Joan E. Jacoby, *The American Prosecutor: A Search for Identity* (1980) .........................9

Martin H. Redish, *Private Contingent Fee Lawyers and Public Power:
Constitutional and Political Implications*, 18 Sup. Ct. Econ. Rev. 77 (2010)..............18

Robert M. Ireland, *Privately Funded Prosecution of Crime in the
Nineteenth-Century United States*, 39 Am. J. Legal History 43 (1995) .........................9

Tr. of Oral Arg., *Marshall* v. *Jerrico, Inc.*, No. 79-253 (Mar. 19, 1980)
https://tinyurl.com/5yt7fxvm ......................................................6

## INTRODUCTION

Unlike in every other state in the nation, some (though far from all) prosecuting attorneys in Indiana outsource civil-forfeiture prosecutions to private lawyers on a contingency-fee basis. These arrangements violate due process, which—the Supreme Court has made clear—imposes "constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions." *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 251-52 (1980). Following the district court's lead, Defendants (sixteen county prosecutors and the attorney to whom they outsource civil forfeitures) put almost all their eggs in one basket: arguing that the Due Process Clause imposes no disinterestedness standard at all on prosecutors in any case—civil or criminal. Resp. Br. 2 ("If the States may offer incentives to those pursuing criminal prosecutions, they may offer incentives to those pursuing civil forfeitures."). That proposition breaks with precedent nationwide, and it conflicts directly with the Supreme Court's *Marshall* decision. Applying the standard from *Marshall*, the judgment below should be reversed; as the district court itself acknowledged, "[i]t is hard to imagine a financial interest more direct" than the sort presented here.

## ARGUMENT

**I.    Defendants' system of contingency-fee forfeiture prosecutors violates the Due Process Clause.**

The Due Process Clause imposes a disinterestedness standard on prosecutors and constrains them from having a personal financial stake in the cases they prosecute. Defendants' system of for-profit forfeiture prosecutions contravenes that standard.

**A.      The Due Process Clause sets a limit on the degree to which a prosecutor may be financially self-interested in the cases he or she prosecutes.**

Defendants devote most of their brief to the view that due process imposes no constraint on prosecutors' financial self-interest, whether in civil cases or criminal. That contention conflicts with Supreme Court precedent.

**1.      The Supreme Court's decision in Marshall *v.* Jerrico, Inc. *confirms the existence of a due-process standard constraining prosecutors' financial self-interest.***

a.      As detailed in our opening brief (at 11-17), the Due Process Clause constrains the extent to which prosecutors may be financially self-interested in the cases they prosecute. That proposition is articulated most clearly in *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238 (1980). The Supreme Court in *Marshall* accepted that the "requirements of neutrality" applicable to prosecutors are not "the same" as those applicable to judges. *Id.* at 250. Simultaneously, however, the Court rejected any suggestion "that the Due Process Clause imposes no limits on the partisanship of . . . prosecutors." *Id.* at 249. Prosecutors, naturally, may be "zealous in their enforcement of the law," the Court observed. *Id.* at 248. But that zeal must be in service of "the public interest." *See id.* at 249. Hence, "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249-50.

Having articulated those principles, the Court concluded that the enforcement regime before it (part of the Fair Labor Standards Act) did not in fact "violate the constitutional constraints" on prosecutorial self-interest. *Id.* at 243-44. Analyzing the issue across nearly three pages, the Court emphasized, foremost, that "[i]t is plain that no official's

salary is affected by the levels of the penalties." *Id.* at 245. At a personal level, no prosecu-

torial official "st[ood] to profit economically from vigorous enforcement." *Id.* at 250. Nor did

the prospect of "institutional" gain present a "realistic possibility" of distorting prosecuto-

rial judgment either. *Id.* Given that record, the Court concluded that the prospect of mon-

etary considerations' influencing prosecutorial judgment was "too remote to violate the con-

straints applicable to the financial or personal interest of officials charged with prosecuto-

rial or plaintiff-like functions." *Id.* at 251-52.

b.     Notwithstanding *Marshall*'s reasoning, Defendants maintain that the Su-

preme Court's opinion in fact articulated no due-process constraint on prosecutors' financial

self-interest. In the main, their arguments replicate the district court's errors.

i.     As their core theory, Defendants truncate the *Marshall* opinion a full two-

and-a-half pages before the end; conspicuously absent from their brief is any discussion of

Section II.B (the applying-law-to-facts part). Echoing the district court, Defendants main-

tain that the Supreme Court's "observation that prosecutors need not be neutral was the

'heart of the legal discussion' and was 'enough to resolve the case.'" Resp. Br. 18-19 (quoting

App. 6). But litigants and lower courts are bound by the decisions printed in the U.S. Re-

ports. And on the face of pages 250 through 252 (volume 446), the Supreme Court did far

more than "observ[e] that prosecutors need not be neutral" and call it a day. Resp. Br. 18-

19. The Court held that the due-process constraint on prosecutors is not "the same" as the

more "rigid" standard applicable to judges. 446 U.S. at 248, 250. Then (flipping to pages 250

through 252), it applied a standard to the regime before it. In doing so, it placed significant

weight on the fact that "[n]o governmental official stands to profit economically from

vigorous enforcement" of the law. *Id.* at 250; *see also id.* ("The salary of the assistant regional administrator is fixed by law."); *id.* at 251 ("[I]t is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties."). And based "on this record and as presently administered," the Court concluded that the challenged law did not "violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions." *Id.* at 251-52.

This is precedent, binding on this Court as much as on the district court. Despite studiously ignoring the dispositive part of *Marshall*, in fact, Defendants appear to concede the obvious: that the whole of Section II.B of the opinion embodied the Supreme Court's "explanation of why Section 16(e) [of the Fair Labor Standards Act] posed no due-process problem." Resp. Br. 18. Precisely. That "explanation" is Supreme Court precedent on what the due-process standard is in challenges to prosecutors' financial self-interest. And the fact that the Court ultimately "*rejected* [the plaintiff's] constitutional challenge" in *Marshall* (Resp. Br. 14-15) does not make its standard any less of a standard. "When an opinion issues for the Court," after all, "it is not only the result but also those portions of the opinion necessary to that result by which [future courts] are bound." *Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 67 (1996).

Like the district court, Defendants observe (at 23) that the Court in *Marshall* did not elaborate the due-process standard "with precision" en route to resolving the controversy before it. 446 U.S. at 250. But as noted in the opening brief (at 24-25), that does not make the Court's standard any less binding. Indeed, the Supreme Court has long characterized the due-process limit applicable to judges as similarly lacking in "precision."

*Caperton* v. *A.T. Massey Coal Co.*, 556 U.S. 868, 879 (2009) (citation omitted). At base, the Court's rationale in *Marshall* is plain. If less "rigid" than the standard applicable to judges, 446 U.S. at 248, due process places a constraint on prosecutors' financial stake in their cases. And the Court's application of law to facts in *Marshall* is the clearest data point on that standard's contours. Only by breaking with precedent nationwide could the court below hold otherwise—a point Defendants again do not dispute. *Compare, e.g., Brucker* v. *City of Doraville*, 38 F.4th 876, 886-87 (11th Cir. 2022), *with* App. 7 (parting ways with *Brucker*).

 ii. Defendants also assert that, far from confirming a due-process constraint on self-interested prosecutors, *Marshall* affirmatively disavowed any such constraint. Resp. Br. 1, 11, 15-16, 17, 18. That, too, is wrong. It is of course true—as Defendants several times point out—that the Court in *Marshall* observed that it had previously (in a case about the neutrality of judges) "noted that a state legislature 'may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people.'" *Marshall*, 446 U.S. at 249 (quoting *Tumey* v. *Ohio*, 273 U.S. 510, 535 (1927)). From that passage, Defendants infer that due process imposes no disinterestedness standard at all on prosecutors, civil or criminal. Resp. Br. 16. As our opening brief forecast, however (at 12-13, 23-24), the Court in *Marshall* explicitly rejected that view. Like Defendants here, the federal government in *Marshall* harnessed *Tumey*'s "stimulate" line (twice) to argue that due process imposes no financial disinterestedness standard on prosecutors. Br. of Appellants, No. 79-253, 1980 WL 339540, at *21-23 (U.S. filed Jan. 1980). Like Defendants here, the government argued that there would be no "due process problem" with a prosecutor's "depend[ing] entirely upon

the fines assessed against people he was able to get a court to convict." Tr. of Oral Arg. 7-8, *Marshall* v. *Jerrico, Inc.*, No. 79-253 (Mar. 19, 1980), https://tinyurl.com/5yt7fxvm. Like Defendants, the government quoted *Tumey*'s "stimulate" line—verbatim, at oral argument—and urged that "this proposition should govern the case here." *Id.* 11.

Yet the Supreme Court saw things differently. The Court cited *Tumey*, not for the view that due process imposes *no* disinterestedness standard on prosecutors, but for the view that due process does not impose "the same" standard as it does for judges. *Marshall*, 446 U.S. at 248-49, 250; *see also Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) ("The requirement of a disinterested prosecutor is consistent with our recognition that prosecutors may not necessarily be held to as stringent a standard of disinterest as judges."). The Court then applied the standard detailed above. As with other difficulties, Defendants address this one, too, by ignoring it.

iii.     Equally without merit are Defendants' remaining grounds for distancing themselves from *Marshall*'s logic. Defendants posit, for example, that *Marshall* should not be read to have "overturn[ed]" or "dramatically limit[ed]" *Tumey*, and that the Court's "explicit endorsement" of *Tumey*'s line about stimulating prosecutions "should end the matter." Resp. Br. 18 (citation omitted). Unmentioned by Defendants, however, is that there was nothing for the Court in *Marshall* to "overturn" or "limit." Any "endorsement of rewards in *Tumey*" (Resp. Br. 16) was dicta; the decision addressed the due-process constraints on judges, not prosecutors. And when the Court *did* address directly "the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions"—in *Marshall* (446 U.S. at 251-52)—the Court did not view

its line in *Tumey* as "end[ing] the matter." Resp. Br. 18. Rather (and to repeat), the Court held that due process does not impose "the same" standard on prosecutors that it does for judges. *Marshall*, 446 U.S. at 248-49, 250. It then applied what Judge Friendly would describe as the "more relaxed" due-process standard discussed above. *Wolkenstein* v. *Reville*, 694 F.2d 35, 41 (2d Cir. 1982).

Also unsound is Defendants' final (and most intricate) reading of *Marshall*: that the opinion stands, at most, only for the proposition that "due process might be violated if a statute gave administrative prosecutors a financial incentive to target particular persons." Resp. Br. 11-12, 19. No court (except, maybe, the court below) has interpreted *Marshall* in this way. Read pages 250 through 252 of the Supreme Court's opinion. What you'll see is the analysis we describe above. The Court accepted that due process imposes "constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions." 446 U.S. at 251-52. And following a two-and-a-half-page analysis, the Court held that the law before it, "on this record and as presently administered," did not violate those constraints. *Id.* at 252. Nowhere did the Court "suggest[]" that its due-process standard would be violated only if prosecutors were to operate under a "financial incentive to target particular persons." Resp. Br. 11-12. Quite the opposite: In a footnote, the Court made clear what its opinion did "not" address—whether "different" considerations (likely, equal-protection-related) might arise "if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process." 446 U.S. at 250 n.12; *see also United States* v. *Armstrong*, 517 U.S. 456, 464-65 (1996) (equal protection). Contrary to Defendants' suggestion, that footnote did

not rewrite the Court's above-the-fold analysis. Nor have Defendants cited any precedent from anywhere—besides, with a squint, the decision below—that reads *Marshall* this way.

**2.    Defendants' historical survey and analogy to the False Claims Act do not displace the Supreme Court's reasoning in Marshall.**

Defendants separately advance theories about history and about qui tam litigation, both in service of the view that due process imposes no constraint on financially self-interested prosecutors. Neither supports (or permits) departing from *Marshall*'s standard.

*a.    Defendants' historical account*

Defendants nowhere defend the premise of the district court's reasoning: that historically, "there was no belief that the prosecutor . . . in a criminal case had any special duty to justice in the abstract, apart from his role as one side's advocate in an adversary system." App. 16. Defendants appear not to deny that "'the principle that prosecutors owe a "special duty to justice" is entrenched in the Anglo-American judicial system.'" Resp. Br. 26 (quoting Appellant's Br. 29-30). In their view, however, "longstanding historical tradition" shows that prosecutorial contingency fees—civil or criminal—do not conflict with that principle, such that due process imposes no constraint on prosecutors' having a personal financial stake in their cases. Resp. Br. 21.

We won't belabor the low-hanging point: that Defendants' view cannot be squared with the standard in *Marshall*. Even on its own terms, Defendants' capsule-summary of history doesn't move the needle, much less trump precedent. Defendants dwell, for example, on the view that "[u]nder the English common law," criminal prosecutions often were brought by crime victims. Resp. Br. 25. The justice system at English common law, however, differed markedly from what would develop in America. In England, "[c]rime was

viewed not as an attack upon the public, but essentially as an attack upon the individual victim." Harold J. Krent, *Executive Control Over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 290 (1989); *id.* at 291 ("Damages were considered part of the criminal case."). "The fundamental, differentiating factor in American criminal law," by contrast, "lies in our adoption of a system of public prosecution." Joan E. Jacoby, *The American Prosecutor: A Search for Identity* 7 (1980). Even by "the first years of the eighteenth century," in fact, "most of the American colonies were doing away with private prosecutions," Brian A. Grossman, *The Prosecutor: An inquiry into the exercise of discretion* 13 (1969), and the practice "elicited spirited opposition" in the early decades of nationhood, Robert M. Ireland, *Privately Funded Prosecution of Crime in the Nineteenth-Century United States*, 39 Am. J. Legal History 43, 47 (1995). (In one high-profile case, the prosecutors also felt compelled to vigorously deny that "their fees were contingent upon [the defendant's] hanging." *Id.* at 52.)

More important, Defendants nowhere deny a more basic point: that in the American justice system, public prosecutors—charged with enforcing public laws—have consistently been expected to operate with "no motive . . . other than to protect and promote the public interest." *State* v. *Town of Dover*, 9 N.H. 468, 472 (1838); Appellant's Br. 30 n.6. That, in large part, is why absolute immunity has been held to apply to public prosecutors even though, historically, it did not extend to private enforcers. *Rehberg* v. *Paulk*, 566 U.S. 356, 364-65 (2012). That is also why, in the immediate aftermath of the Fourteenth Amendment, lawmakers at the federal and state levels systematically began to abolish moieties and conviction fees: because under a criminal-justice system based on public prosecution, the

system's integrity "rel[ies] upon public officers for the proper performance of their duties without stimulating them by any contingent advantages." 2 Cong. Rec. 4030 (1874); *cf. Price* v. *Caperton*, 62 Ky. 207, 208 (1864) ("A contingent fee dependent on conviction ought never to be permitted to stimulate assistant counsel . . . ."); *see generally* Appellant's Br. 29-34 (discussing history in more detail).

As against all this, Defendants point out that conviction fees first had to be established in order to later be abolished. *E.g.*, Resp. Br. 27 ("[A]t least 22 different jurisdictions adopted them."). But the same could have been said of the judicial-fee system invalidated in *Tumey* v. *Ohio*, which flourished in at least a dozen states. 273 U.S. at 526-27. At base, the historical record confirms what *Marshall* makes clear: that prosecutors exercise enormous government power, that they "must serve the public interest," and that giving them a personal monetary stake in their cases has long and overwhelmingly been recognized as corrosive to the integrity of our justice system. *Marshall*, 446 U.S. at 249-50.

b.    *The False Claims Act analogy*

i.    Defendants' analogy to the False Claims Act and similar qui tam regimes suffers much the same flaws. Resp. Br. 28-31. The most obvious—again—is *Marshall*. *Marshall* recognized that due process imposes a constraint on prosecutorial self-interest. *Marshall* involved a civil-enforcement action. So *Marshall* controls the threshold question whether due process imposes a constraint on prosecutorial self-interest in civil-enforcement actions. Defendants cannot analogize themselves out of that precedent.

Even were the slate a blank one, moreover, Defendants acknowledge (with some understatement) that "qui tam actions are not a perfect analogy for the arrangement

challenged here." Resp. Br. 31. In truth, the differences are dispositive. "As a class of plaintiffs," the Supreme Court has cautioned, "*qui tam* relators are different in kind than the Government." *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U.S. 939, 949 (1997). For "[t]hey are motivated primarily by prospects of monetary reward rather than the public good." *Id.* Nor does the False Claims Act "make the relator anything other than a private person." *Cochise Consultancy, Inc.* v. *United States ex rel. Hunt*, 587 U.S. 262, 272 (2019). In fact, it is precisely *because* of their monetary stake that "a relator's interests and the Government's do not necessarily coincide." *Hughes Aircraft Co.*, 520 U.S. at 949 n.5. In these ways, they differ fundamentally from prosecutors enforcing public laws: "public officials" who "must serve the public interest." *Marshall*, 446 U.S. at 249.[*]

One of Defendants' most-cited authorities illustrates the point: the Ninth Circuit's *Kelly* decision, which declined to apply *Marshall*'s due-process standard to the False Claims Act's qui tam regime. *United States ex rel. Kelly* v. *Boeing Co.*, 9 F.3d 743 (1993). Every consideration the Ninth Circuit cited points in the opposite direction here. The court emphasized that "[q]ui tam relators pursue their claims essentially as private plaintiffs."

---

[*] Defendants' excursus on the "ancient pedigree" of qui tam laws (Resp. Br. 28 (citation omitted)) also overlooks that the laws were controversial even in Tudor England and had largely petered out in America by the mid-nineteenth century. *E.g.*, Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 727 (2004) ("In fact, the qui tam statutes adopted by the First Congress gave rise to little actual litigation, and subsequent Congresses rarely used the device." (footnotes omitted)); *id.* at 730 (" . . . Sir Edward Coke noted that some informers were 'viperous vermin' who had used qui tam statutes 'to vex and depauperize the subject . . . for malice or private ends, and never for love of justice.'"). Apart from a burst of popularity during World War II, moreover, the False Claims Act's qui tam provision "fell into relative desuetude" after the Civil War and remained "an anachronism" until the mid-1980s. *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209, 1989 WL 595854 (1989).

*Id.* at 760. The court concluded that relators do not "wield governmental powers." *Id.* In turn, the court reasoned, relators do not "owe the same type of duty to serve the public interest as government prosecutors." *Id.* Nor, the court added, does the relator's personal financial stake present the "type of conflict of interest" that would be present for a prosecutor whose responsibility is "solely to pursue the public interest." *Id.* (citation omitted). In the Ninth Circuit's view, the government's interest in a relator's False Claims Act suit was akin to that of a private tort plaintiff: in being made whole financially. *Id.* (characterizing the government's interest as "remedying harm to the federal treasury"). On that premise, the court thus held that the government's uniquely financial interest was "congruent" and "intertwined" with the financial interest of the relator. *Id.*

Every one of the Ninth Circuit's considerations cashes out differently here, *see* Appellant's Br. 37-39, and Defendants' arguments to the contrary lack merit. Defendants point out (at 30-31), for instance, that modern False Claims Act awards have punitive aspects as well as compensatory ones. *But cf. Vt. Agency of Nat. Res.* v. *United States ex rel. Stevens*, 529 U.S. 765, 785 (2000) (noting that, as late as the 1970s, the Court "suggested that damages under an earlier version of the FCA were remedial rather than punitive"). Yet the relator's authority to bring the action is exclusively as the "partial assignee" of "the Government's damages claim," not as steward of the government's sovereign interests. *Id.* at 773 & n.4 (emphasis omitted); Appellant's Br. 37 n.7. In this way, relators are qualitatively different than prosecutors like Joshua Taylor, who undisputedly "wield governmental powers" and are thus "bound to fulfill the same type of public duty as government prosecutors" more generally. *Kelly*, 9 F.3d at 760.

Defendants nonetheless posit that there is no meaningful difference between Taylor and a False Claims Act relator because, "like qui tam relators," Taylor "'do[es] not have the "power to employ the full machinery of the state in scrutinizing any given individual."'" Resp. Br. 31 (quoting *Kelly*, 9 F.3d at 760). Yet Defendants nowhere deny that Taylor has precisely the same machinery at his disposal as any full-time prosecutor charged with enforcing Indiana's forfeiture statutes. Appellant's Br. 38-39 (detailing the machinery). When sued for damages, in fact, he (or, more precisely, his former firm) invokes prosecutorial immunity "as an advocate for the State." Br. of Garrison Law Firm L.L.C. Supp. Mot. Summ. J. at 20, *Economan* v. *Cockrell*, No. 20-cv-32 (N.D. Ind. Feb. 28, 2023) (Doc. 161). At base, he—like any forfeiture prosecutor—exercises the state's power to prosecute a set of public laws that the state alone has the authority to enforce. That *some* aspects of state power may be unavailable in forfeiture actions (e.g., lethal force) does not exempt forfeiture prosecutors from "the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions." *Marshall*, 446 U.S. at 251-52.

ii.    A word on a more recent Ninth Circuit decision, flagged in our opening brief (at 39) and discussed in Defendants' (at 20-21, 31). In 2018, the Ninth Circuit extended the logic of its *Kelly* opinion beyond the False Claims Act to an action to enforce a California unfair-competition law. *American Bankers Management Co.* v. *Heryford* involved a due-process challenge to a district attorney's hiring contingency-fee lawyers to pursue civil penalties in an unfair-competition action against credit-card companies. 885 F.3d 629, 632 (9th Cir. 2018). The Ninth Circuit panel noted that "we are the first circuit to consider whether government officials may, without violating federal due process, retain private counsel on a

contingency-fee basis to litigate an action for civil penalties." *Id.* at 633 & n.3 (noting that "a handful" of state courts have "touched on" the issue). Even so, the court concluded that its decision in *Kelly* "controls this case." *Id.* at 635. In the panel's view, there was no "meaningful[] differen[ce]" between its civil-penalty action and a False Claims Act qui tam suit. *Id.* at 637. Because "*Kelly* held that the qui tam provisions of the False Claims Act do not offend due process," the panel thus "h[e]ld that the contingency-fee arrangement at issue here does not offend due process either." *Id.*

The Ninth Circuit's conclusion that California's Unfair Competition Law was "not meaningfully different from qui tam litigation" is open to question. *Id.* Also questionable is its implication that *Marshall*'s reasoning may not apply to civil-enforcement actions at all. *See id.* at 638. After all, *Marshall* itself involved a civil-enforcement action. 446 U.S. at 239, 248-49. Whatever the state of play in the Ninth Circuit, for this Court the choice between the Ninth Circuit's precedent and the Supreme Court's has only one right answer.

Of course, all this distracts from a more obvious point: Whatever the merits of the Ninth Circuit's reasoning, its bottom line is not implicated here. At base, the Ninth Circuit's rule of decision was this: If a civil-enforcement scheme is indistinguishable from a False Claims Act qui tam action, then circuit precedent compels the conclusion that the enforcer can have a financial stake in the case without violating due process. Right or wrong, that rule of decision does not apply here. As discussed, Indiana's civil-forfeiture system differs in fundamental ways from the False Claims Act's qui tam regime. It is linked closely with the state's criminal laws. Appellant's Br. 38-39. Defendants nowhere argue otherwise. The state's interest is purely sovereign, not proprietary. Appellant's Br. 38, 41. Defendants

nowhere argue otherwise. And the State of Indiana's obligation in prosecuting civil-forfeiture cases is not in maximizing monetary awards but in doing justice—a point Taylor conceded below. Doc. 120-4, at 74-75. Whatever might be said of qui tam suits, the tail doesn't wag the dog. "*[Q]ui tam* relators are different in kind than the Government," in that "[t]hey are motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft Co.*, 520 U.S. at 949. And all signs point one way here: Taylor is a state actor enforcing a public law on the government's behalf. *Marshall* applies.

*    *    *

For all their differences, the parties share common ground on one significant point: "'[A] lower court "should follow the case which directly controls" . . . even if the lower court thinks the precedent is in tension with "some other line of decisions."'" Resp. Br. 18 (quoting *Mallory* v. *Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)). That rule disposes of the parties' main ground of disagreement: whether due process imposes any constraint on prosecutors' having financial interests in the cases they prosecute. On that question, *Marshall* controls. Directly. Circuit courts read *Marshall* to confirm such a due-process standard. So do district courts. So does the Department of Justice. Contrary to Defendants' suggestion, that standard is not a "policy" choice reserved to legislatures. Resp. Br. 12. Nor does it call for "casting history aside." Resp. Br. 24. Simply, it is a standard articulated by the Supreme Court, and it is binding on this Court and the district court alike.

**B.   Defendants' system of contingency-fee forfeitures contravenes the Due Process Clause's limit on financially self-interested prosecutors.**

1.    Defendants devote almost none of their brief to defending their contingency-fee arrangements as against the standard applied in *Marshall*. They nowhere deny that

Taylor personally "stands to profit economically from vigorous enforcement" of Indiana's forfeiture laws. *Marshall*, 446 U.S. at 250. Or that his "salary is affected by the levels of the penalties." *Id.* at 245. Or that he is "financially dependent on the maintenance of a high level of penalties." *Id.* at 251. Nor do they deny that such a compensation structure presents a "realistic possibility" of "distort[ing]" prosecutorial judgment away from stewarding the public trust and towards personal gain. *Id.* at 250. As Defendants admit, "compensation depends on results." Resp. Br. 38. Under *Marshall*'s standard, though, the core problem is that the "results" dictating Taylor's compensation (winning and maximizing forfeitures) are in direct conflict with the state's obligation in enforcing its public laws: not to "win a case," but to see "that justice shall be done." *Freeport-McMoRan Oil & Gas Co.* v. *FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992) (citation omitted); *Marshall*, 446 U.S. at 249. The risk of distorted prosecutorial judgment is so obvious that the Treasury Department and the National District Attorneys Association vehemently warn against these arrangements. Appellant's Br. 20. On this front, even prosecutors and defense lawyers share common cause. *Compare* Br. of *Amicus Curiae* Nat'l Ass'n of Criminal Defense Lawyers 10-13, *with* Br. of *Amici Curiae* 55 Current and Former Elected Prosecutors and Law Enforcement Leaders, and Former Attorneys General, U.S. Attorneys, and U.S. Dep't of Justice Officials 7-8. As the district court itself acknowledged, "[i]t is hard to imagine a financial interest more direct" than the sort presented here. App. 10.

      2.     What arguments Defendants offer do not change the analysis.

      a.     Defendants contend that "private firms in civil cases are not necessarily subject to the same standards as public prosecutors." Resp. Br. 21. But the principle that "[t]he

State cannot avoid its constitutional responsibilities by delegating a public function to private parties" applies with equal force to prosecutors. *Georgia* v. *McCollum*, 505 U.S. 42, 53 (1992). Taylor admits that he is a "state actor[] and acting under color of state law." Doc. 94, at 11. He wields the same powers as public-sector prosecutors who bring forfeiture actions elsewhere. When sued for damages, his firms demand "the same immunity" as elected prosecutors. Br. of Garrison Law Firm L.L.C. Supp. Mot. Summ. J. at 19, *Economan* v. *Cockrell*, No. 20-cv-32 (N.D. Ind. Feb. 28, 2023) (Doc. 161). At bottom, he exercises the state's prosecutorial power, and with that power comes constitutional constraints, including *Marshall*'s.

      b.      Similarly without merit is Defendants' argument that other statutory procedures assuage any concern that Taylor's judgment could be distorted. Resp. Br. 38-39. The fact that Indiana's civil-forfeiture regime provides for timelines and burdens of proof does not exempt prosecutors from *Marshall*'s disinterestedness standard. Nor does the fact that judges preside over forfeiture cases alter the analysis. Resp. Br. 39. Those features were no less present in *Marshall* (and exist in most enforcement actions). 446 U.S. at 247-48. Yet *Marshall* nowhere suggested that they could cure a financial interest that posed a realistic possibility of distorting the prosecutor's judgment. Quite the opposite: The Court highlighted that the prosecutor's "decision to enforce . . . may itself result in significant burdens on a defendant . . . even if he is ultimately vindicated in an adjudication." *Id.* at 249.

      c.      Defendants attempt to minimize Taylor's prosecutorial power by citing his clients' "review authority" over him. Resp. Br. 39. As discussed in the opening brief, however (and ignored in Defendants'), Taylor in fact has full authority over key features of his

cases: He has the power to make "[d]ecisions to enter into a settlement agreement" and "decisions to proceed to trial" and to do so "without consulting the Prosecuting Attorney." Appellant's Br. 42. More fundamentally, the fact that a prosecutor is subordinate to *someone* does not eliminate the "realistic possibility" that his or her judgment will be distorted by "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process." *Marshall*, 446 U.S. at 249, 250. The record here illustrates the point: That Taylor could systematically violate a statutory notice requirement *for a half decade* spotlights that Defendants' (at best, notional) oversight does not eliminate the "realistic possibility" that his personal financial interests will distort the discharge of his prosecutorial obligations. *Id.* at 250; Appellant's Br. 42-43 (detailing the record). Nor is it clear "how a reviewing court could assure itself, in the individual case, that [governmental] control is in fact being exercised" in the first place. Martin H. Redish, *Private Contingent Fee Lawyers and Public Power: Constitutional and Political Implications*, 18 Sup. Ct. Econ. Rev. 77, 106 (2010). Even in the case against Sparger-Withers, Taylor initially tried to obscure the elected prosecutor's total lack of involvement. Appellant's Br. 46 & n.14.

d.     Lastly, Defendants portray Sparger-Withers's position as "novel," "amorphous," and guided by "no principle besides her own sense of justice." Resp. Br. 35, 36. But the principle follows directly from *Marshall*. Contrary to Defendants' view, moreover, taking *Marshall* at its word does not necessarily call into question all hourly compensation models (which, unlike Taylor's arrangement, would not as obviously "depend[] on results"). Resp. Br. 36, 38. Nor does it imperil all contingency-fee arrangements between governments and outside counsel. For example, much civil litigation involves governments'

vindicating their proprietary interests, not their uniquely sovereign ones. Appellant's Br. 40-41. As originally designed, in fact, the "tobacco litigation" presented as Defendants' one-band parade of horribles (Resp. Br. 35-36) would appear to fall on the proprietary end of the spectrum. *See, e.g., City & Cnty. of San Francisco* v. *Philip Morris, Inc.*, 957 F. Supp. 1130, 1135 (N.D. Cal. 1997). As for Indiana's civil-forfeiture actions, they fall on the sovereign, criminal-justice end. And as the decision below acknowledged, "[i]t is hard to imagine a financial interest more direct" than one like Taylor's. App. 10. If any financial interest violates *Marshall*'s standard, it's this one.

## II.   The federal courts have the power to hear this case.

Defendants renew their suggestion that this case was mooted when Joshua Taylor returned Amya Sparger-Withers her money. That is wrong.

### A.   Joshua Taylor's act of voluntary cessation did not moot Sparger-Withers's individual claim.

Taylor's choice to dismiss the forfeiture action against Sparger-Withers did not moot her individual claim for prospective relief. Defendants had the "formidable burden" of showing that Taylor could not revert to his allegedly unconstitutional conduct. *FBI* v. *Fikre*, 601 U.S. 234, 241 (2024) (citation omitted). And because Defendants' contingency-fee regime remains in place—unaltered—nothing prevents him from violating Sparger-Withers's due-process rights again. That should be the end of the matter; her claim is not moot.

Taylor and his co-defendants suggest that because they are "public officials," their "acts of self-correction" enjoy "greater stock" than those of ordinary litigants. Resp. Br. 42 (citation omitted). (What a difference a few pages makes. Resp. Br. 21 ("[P]rivate firms in civil cases are not necessarily subject to the same standards as public prosecutors . . . .").)

Yet the "formidable" voluntary-cessation burden "holds for governmental defendants no less than for private ones." *Fikre*, 601 U.S. at 241. This Court, too, has remarked that no amount of "good faith" can "moot a lawsuit when the change is 'not implemented by statute or regulation and could be changed again.'" *Driftless Area Land Conservancy* v. *Rural Utils. Serv.*, 74 F.4th 489, 493 (7th Cir. 2023). That principle controls here: The challenged statute and contingency-fee arrangements remain unchanged, and Taylor's for-profit forfeitures continue unchecked.

Also unfounded is Defendants' contention that they would be unlikely to reinstitute a forfeiture action to confiscate the precise currency that gave rise to this suit. Resp. Br. 42-43. On this front, several of their assertions are non-starters; the Indiana courts have not, for example, held that "simple possession of marijuana does not support the forfeiture of cash." Resp. Br. 43; *Gonzalez* v. *State*, 74 N.E.3d 1228, 1232 (Ind. Ct. App. 2017) (denying forfeiture because "the State did not produce any evidence that the cash found in [the defendant's] pants pocket was in any way connected to his commission of that crime"). More to the point, the voluntary-cessation question is not whether Taylor might pursue the *same currency* again. It's whether anything prevents him from repeating the *due-process violation* against Sparger-Withers again. And nothing does.

In this way, the situation is no different from Yonas Fikre's. Defendants' one ground for distinguishing *Fikre* drives home the point. Defendants point out that Fikre's suit remained live because the government "did not rule out placing [him] on a No Fly List again." Resp. Br. 44. Yet the same is true here: Like the government in *Fikre*, Defendants have not ruled out subjecting Sparger-Withers to contingency-fee forfeiture prosecutions again.

Resp. Br. 44 (saying that Defendants won't bring such an action against her "as long as she follows the law"). With the challenged law and contracts still in place, her claim remains live. 13C Charles Alan Wright et al., *Federal Practice & Procedure* § 3533.7, at 345-48 (3d ed. 2008) ("Change only for the plaintiff . . . does not moot the claim, at least if there is a prospect that the plaintiff may again encounter the generally unchanged practice").

Defendants are also wrong to say (at 41, 43) that Sparger-Withers now "must demonstrate that she is 'likely to suffer future injury'" under *City of Los Angeles* v. *Lyons*, 461 U.S. 95 (1983). *Lyons* (like this Court's *Lopez-Aguilar* decision) is about standing, not mootness. And here, there is no dispute that Sparger-Withers had standing on the date that matters—the day this suit was filed. Appellant's Br. 44. This case thus "is easily distinguished from *Lyons*." *Cnty. of Riverside* v. *McLaughlin*, 500 U.S. 44, 51 (1991). There, the "constitutionally objectionable practice [had] ceased altogether before the plaintiff filed his complaint." *Id.* Here, Sparger-Withers was "suffering a direct and current injury" on the date this case began. *Id.* It "was at that moment capable of being redressed." *Id.* So the question is not whether she has standing under *Lyons*, but whether Defendants have carried their burden of showing that their post-complaint maneuvers mooted her claim under *Fikre*.

### B.    Even had Sparger-Withers's individual claim been mooted, the case falls within two class-action-specific exceptions to the mootness doctrine.

Even had Sparger-Withers's individual claim been mooted, Article III jurisdiction still would not have been extinguished for the class.

1.    The inherently-transitory doctrine secures the federal courts' jurisdiction over class actions even if "the class was not certified until after the named plaintiffs' claims

had become moot." *Id.* at 52. This Court has synthesized the doctrine's two elements: "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Olson* v. *Brown*, 594 F.3d 577, 582 (7th Cir. 2010). Defendants do not dispute that the second element is met; to this day, Taylor files new contingency-fee forfeitures with a will. And Defendants' arguments on the first element cannot be squared with precedent.

a.     Defendants insist that the inherently-transitory doctrine applies only if the claim is "intrinsically fleeting." Resp. Br. 45 (citation omitted). Because forfeiture actions can potentially last for years, Defendants urge that the doctrine cannot apply here. Resp. Br. 45-48. In this, however, Defendants are fighting a battle long since over. This Court has "specifically addressed" the issue and held that "the crux of the 'inherently transitory' exception is the uncertainty about the length of time a claim will remain alive." *Olson*, 594 F.3d at 582. If the claim's duration is "at the discretion" of the defendant, that "uncertainty is precisely what makes the 'inherently transitory' exception applicable." *Id.* at 583.

Defendants largely ignore *Olson*'s teaching, suggesting instead that the Supreme Court's decision in *Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66 (2013), ratified their competing view. Resp. Br. 45-48. Yet *Genesis Healthcare* didn't involve forward-looking relief (the focus of the inherently-transitory doctrine) or class actions. Nor did it involve "the distinction between claims of inherently uncertain duration and claims of inherently limited duration." *Wilson* v. *Gordon*, 822 F.3d 934, 946 (6th Cir. 2016). For that reason, courts continue to apply *Olson* to rebuff the precise argument Defendants make here. *E.g.,*

*id.* at 946-47 (noting that "*Genesis Healthcare* does not control this case"). For its part, the Supreme Court appears to agree; in 2019, a plurality applied the inherently-transitory doctrine to claims that lasted "on average, for one year, and sometimes longer" but whose duration was at the government's discretion. *Nielsen* v. *Preap*, 586 U.S. 392, 426 (Thomas, J., concurring in part and concurring in the judgment) (discussing plurality opinion).

b.    Defendants also suggest that the inherently-transitory doctrine does not apply because Sparger-Withers "chose to wait to file for class certification until the claim was nearly moot." Resp. Br. 48 (quoting *Olson*, 594 F.3d at 582). That, too, is incorrect, as the omitted half of Defendants' quoted sentence makes clear: This Court has held that the doctrine is not available when "*the named plaintiffs knew, from the outset, exactly how long their claims would remain alive* but chose to wait to file for class certification until the claim was nearly moot or already moot." *Olson*, 594 F.3d at 582-83 (emphasis added). This case bears no similarity to that. Amya Sparger-Withers did not know on filing day when Joshua Taylor would voluntarily dismiss the forfeiture action against her—or even *if* he would. Elsewhere, in fact, Taylor has argued full-throatedly that the state "is not constrained by [a] Defendant's conviction for possession of marijuana in proving its forfeiture case." Doc. 67-15, at 10. Indeed, one day before Taylor jettisoned her state-court forfeiture case, Sparger-Withers advised the state court of this then-putative class action and invited it "to stay th[e] forfeiture action pending resolution of the federal case." Def.'s Mot. to Stay Case Pending Resolution of Federal Class Action at 2, *State* v. *Sparger*, No. 30D01-2102-MI-000152 (Ind. Super. Ct. Nov. 15, 2021). Any suggestion that she "waited to file this action

until it was clear the underlying forfeiture action would be dismissed" finds no support in the record. Resp. Br. 49.

      2.     Separately, the "picking-off" doctrine keeps this case alive also. Defendants suggest that the doctrine applies only where a defendant picks off "a succession of proposed class representatives." Resp. Br. 49. But that conflates the doctrine's main purpose (preventing defendants from "delay[ing] the action indefinitely by paying off each class representative in succession") with its main requirements (that a motion for class certification has been diligently made but not decided when the defendant tries to moot the plaintiff's claim). *Primax Recoveries, Inc.* v. *Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003). As for those requirements, they are readily satisfied here. The district court had the power to resolve this case, and this Court has the power to correct that court's errors.

## CONCLUSION

The judgment of the district court should be reversed.

Dated: August 30, 2024.

Respectfully submitted,

/s/ Samuel B. Gedge

Samuel B. Gedge
   *Counsel of Record*
Michael N. Greenberg
Robert M. Belden
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Telephone: 703.682.9320
Facsimile: 703.682.9321
E-mail:  sgedge@ij.org
         mgreenberg@ij.org
         rbelden@ij.org

Anthony B. Sanders
INSTITUTE FOR JUSTICE
12143 24th St N
Lake Elmo, MN 55042
Telephone: 651.278.0257
E-mail: asanders@ij.org

J. Lee McNeely
Cynthia A. Bedrick
Scott A. Milkey
MCNEELYLAW LLP
2177 Intelliplex Drive, Suite 251
Shelbyville, IN 46176
Telephone: 317.825.5110
E-mail:  LMcNeely@McNeelyLaw.com
        CBedrick@McNeelyLaw.com
        SMilkey@McNeelyLaw.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Cir. R. 32(c) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 6,998 words.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Expanded font.

Dated: August 30, 2024.                          /s/ Samuel B. Gedge
                                                 Samuel B. Gedge

                                                 *Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Samuel B. Gedge
Samuel B. Gedge

*Counsel for Appellant*